

**Hayes Law Offices, PLLC**

Appellate Law —————————————————————

732 Ninth St., #571
Durham, N.C. 27705

12 November 2024

Honorable Nwamaka Anowi
Clerk, Fourth Circuit Court of Appeals
1100 East Main Street, Suite 501
Richmond, VA 23219

**Re:  *Clarence Delano Belton, Jr. v. Heather Loveridge* [No. 23-2046]
Plaintiff's Response to Defendant's Supplemental Authority**

Dear Clerk Anowi:

Pursuant to FRAP 28(j), Plaintiff-Appellee Belton submits as additional authority the cases cited in this letter, on issues raised at oral argument.

This Court asked whether a shooting is a Constitutional seizure.  It is.  *Torres v. Madrid*, 592 U.S. 306, 317 (2021) ("[T]he officers' shooting applied physical force to her body that manifested an intent to restrain").

This Court questioned whether Plaintiff's identity as an officer changed the "clearly established right" analysis. It does not.  The U.S. Supreme Court has held that "policemen. . . .are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).

Being "a police officer does not alter a Fourth Amendment analysis." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001).  It is "obvious from common sense" that officers have "the right to be free from an unreasonable seizure even from a fellow officer in the course of police work." *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003).

Mistaken identity does not change this conclusion.  "[A] fourth amendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of the specific act of physical restraint." *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991) (distinguishing a misidentified victim from the victim of an errant bullet).

Also, an "honest mistake" of identity does not excuse unreasonable behavior. Conduct is assessed by its objective reasonableness.  Regardless of an officer's "evil intentions" or

"good intentions," the Fourth Amendment violation turns on whether the shooting was "an objectively unreasonable use of force." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Finally, even presuming an honest and reasonable mistake of identity, an "immediate threat" must be perceived from the presumed suspect. *Aleman v. City of Charlotte*, 80 F.4th 264 (4th Cir. 2023). Defendant perceived no immediate threat, gave no warning and could have further retreated. "An officer acts unconstitutionally when he relies on lethal force as a first resort." *Lewis v. City of Edmond*, 48 F.4th 1193, 1201 (10th Cir. 2022).

Sincerely,

/s/ Mark L. Hayes

Mark L. Hayes
Attorney for Plaintiff-Appellant Clarence Belton

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*Torres v. Madrid*,
　　592 U.S. 306 (2021)...…………………………………………….....1

*Garrity v. State of N.J.*,
　　385 U.S. 493 (1967)……………………………………………..24

*Cerrone v. Brown*,
　　246 F.3d 194 (2001)...……………………………………...……..33

*Wilkins v. City of Oakland*,
　　350 F.3d 949 (2003)...……………………………………………42

*Rucker v. Harford County, Md.*,
　　946 F.2d 278 (1991)...……………………………………………48

*Graham v. Connor*,
　　490 U.S. 386 (1989)...……………………………………………54

*Aleman v. City of Charlotte*,
　　80 F.4th 264 (2023)…………………………………………… 63

*Lewis v. City of Edmond*,
　　48 F.4th 1193 (2022)…………………………………………….94

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

⚑ KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Asinor v. District of Columbia,   D.C.Cir.,   August 9, 2024

141 S.Ct. 989
Supreme Court of the United States.

Roxanne TORRES, Petitioner

v.

Janice MADRID, et al.

No. 19-292
|
Argued October 14, 2020
|
Decided March 25, 2021

**Synopsis**

**Background:** Suspect brought § 1983 action against state police officers, alleging they used excessive force when, while attempting to execute arrest warrant, they fired their weapons into her vehicle as she drove off, striking her. The United States District Court for the District of New Mexico, Laura Fashing, United States Magistrate Judge, ⚑ 2018 WL 4148405, granted summary judgment to the officers on the ground they had qualified immunity. Suspect appealed. The United States Court of Appeals for the Tenth Circuit, McKay, Senior Circuit Judge, ⚑ 769 Fed.Appx. 654, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Chief Justice Roberts, held that:

officers seized suspect for the instant that the bullets struck her, despite fact she temporarily eluded capture, and

application of physical force to the body of a person with intent to restrain is Fourth Amendment seizure even if the person does not submit and is not subdued, abrogating ⚑ Brooks v. Gaenzle, 614 F.3d 1213.

Vacated and remanded.

Justice Gorsuch filed a dissenting opinion, in which Justice Thomas and Justice Alito joined.

Justice Barrett took no part in the consideration or decision of the case.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Motion for Summary Judgment.

**\*\*991** *Syllabus* [*]

**\*306** Respondents Janice Madrid and Richard Williamson, officers with the New Mexico State Police, arrived at an Albuquerque apartment complex to execute an arrest warrant and approached petitioner Roxanne Torres, then standing near a Toyota FJ Cruiser. The officers attempted to speak with her as she got into the driver's seat. Believing the officers to be carjackers, Torres hit the gas to escape. The officers fired their service pistols 13 times to stop Torres, striking her twice. Torres

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

managed to escape and drove to a hospital 75 miles away, only to be airlifted back to a hospital in Albuquerque, where the police arrested her the next day. Torres later sought damages from the officers under 42 U.S.C. § 1983. She claimed that the officers used excessive force against her and that the shooting constituted an unreasonable seizure under the Fourth Amendment. Affirming the District Court's grant of summary judgment to the officers, the Tenth Circuit held that "a suspect's continued flight after being shot by police negates a Fourth Amendment excessive-force claim." 769 Fed.Appx. 654, 657.

*Held*: The application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued. Pp. 994 - 995.

(a) The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This Court's precedents have interpreted the term "seizure" by consulting the common law of arrest, the "quintessential" seizure of the person. *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639; *California v. Hodari D.*, 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690. In *Hodari D.*, this Court explained that the common law considered the application of physical force to the body of a person with the intent to restrain to be an arrest—not an attempted arrest—even if the person does not yield. *Id.*, at 624–625, 111 S.Ct. 1547. A review of the pertinent English and American decisions confirms that the slightest touching was a constructive detention that would complete the arrest. See, *e.g.*, *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928.

The analysis does not change because the officers used force from a distance to restrain Torres. The required "corporal seising or touching the defendant's body," 3 W. Blackstone, Commentaries on the Laws of **\*307** England 288 (1768), can be as readily accomplished by a bullet as by the end of a finger. The focus of the Fourth Amendment is "the privacy and security of individuals," not the particular form of governmental intrusion. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930.

The application of force, standing alone, does not satisfy the rule recognized in this decision. A seizure requires the use of force with intent to restrain, as opposed to force applied by accident or for some other purpose. *County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S.Ct. 1708, 140 L.Ed.2d 1043. The appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain. *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565. This test does not depend on either the subjective motivation of the officer or the subjective perception of the suspect. Finally, a seizure by force lasts only as long as the application of force unless the suspect submits. *Hodari D.*, 499 U.S., at 625, 111 S.Ct. 1547. Pp. 994 - 999.

(b) In place of the rule that the application of force completes an arrest, the officers would assess all seizures under one test: intentional acquisition of control. This alternative approach finds support in neither the history of the Fourth Amendment nor this Court's precedents. Pp. 999 - 1002.

(1) The officers attempt to recast the common law doctrine recognized in *Hodari D.* as a rule applicable only to civil arrests. But the common law did not define the arrest of a debtor any differently from the arrest of a felon. Treatises and courts discussing criminal arrests articulated a rule indistinguishable from the one applied to civil arrests at common law. Pp. 999 - 1001.

(2) The officers' contrary test would limit seizures of a person to "an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628. While that test properly describes seizures by control, seizures by force enjoy a separate common law pedigree that gives rise to a separate rule. A seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement. But as common law courts recognized, any such requirement of control would be difficult to apply to seizures by force. The officers' test will often

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

yield uncertainty about whether an officer succeeded in gaining control over a suspect. For centuries, the rule recognized in this opinion has avoided such line-drawing problems. Pp. 1001 - 1002.

(c) The officers seized Torres by shooting her with the intent to restrain her movement. This Court does not address the reasonableness of the seizure, the damages caused by the seizure, or the officers' entitlement to qualified immunity. Pp. 1002 - 1003.

**\*308** 🚩 769 Fed.Appx. 654, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which BREYER, SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined. BARRETT, J., took no part in the consideration or decision of the case.

### Attorneys and Law Firms

Kelsi B. Corkran, Washington, DC, for the petitioner.

Rebecca Taibleson for the United States as amicus curiae, by special leave of the Court, supporting vacatur and remand.

Mark D. Standridge, Las Cruces, NM, for the respondents.

Kelsi Brown Corkran, Counsel of Record, Thomas M. Bondy, Ethan P. Fallon, Sheila Baynes, Orrick, Herrington & Sutcliffe LLP, Washington, DC, E. Joshua Rosenkranz, Easha Anand, Rachel G. Shalev, Abigail Colella, Orrick, Herrington & Sutcliffe LLP, New York, NY, for petitioner.

Mark D. Standridge, Counsel of Record, Jarmie & Rogers, P.C., Cruces, NM, Mark D. Jarmie, Jarmie & Rogers, P.C., Albuquerque, NM, Christina L. G. Brennan, James P. Sullivan, Brennan & Sullivan, P.A., Santa Fe, NM, Elizabeth Anne Trickey, New Mexico Dept. of Public Safety, Santa Fe, NM, for respondents.

### Opinion

Chief Justice ROBERTS delivered the opinion of the Court.

**\*309  \*\*993** The Fourth Amendment prohibits unreasonable "seizures" to safeguard "[t]he right of the people to be secure in their persons." Under our cases, an officer seizes a person when he uses force to apprehend her. The question in this case is whether a seizure occurs when an officer shoots someone who temporarily eludes **\*\*994** capture after the shooting. The answer is yes: The application of physical force to the body of a person with intent to restrain is a seizure, even if the force does not succeed in subduing the person.

I

At dawn on July 15, 2014, four New Mexico State Police officers arrived at an apartment complex in Albuquerque to execute an arrest warrant for a woman accused of white collar crimes, but also "suspected of having been involved in drug trafficking, murder, and other violent crimes." App. to Pet. for Cert. 11a. What happened next is hotly contested. We recount the facts in the light most favorable to petitioner Roxanne Torres because the court below granted summary judgment to Officers Janice Madrid and Richard Williamson, the two respondents here. 🚩 *Tolan v. Cotton*, 572 U.S. 650, 655–656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (*per curiam*).

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

The officers observed Torres standing with another person near a Toyota FJ Cruiser in the parking lot of the complex. Officer Williamson concluded that neither Torres nor her companion was the target of the warrant. As the officers approached the vehicle, the companion departed, and Torres—at the time experiencing methamphetamine withdrawal—got into the driver's seat. The officers attempted to speak with her, but she did not notice their presence until one of them tried to open the door of her car.

Although the officers wore tactical vests marked with police identification, Torres saw only that they had guns. She **\*310** thought the officers were carjackers trying to steal her car, and she hit the gas to escape them. Neither Officer Madrid nor Officer Williamson, according to Torres, stood in the path of the vehicle, but both fired their service pistols to stop her. All told, the two officers fired 13 shots at Torres, striking her twice in the back and temporarily paralyzing her left arm.

Steering with her right arm, Torres accelerated through the fusillade of bullets, exited the apartment complex, drove a short distance, and stopped in a parking lot. After asking a bystander to report an attempted carjacking, Torres stole a Kia Soul that happened to be idling nearby and drove 75 miles to Grants, New Mexico. The good news for Torres was that the hospital in Grants was able to airlift her to another hospital where she could receive appropriate care. The bad news was that the hospital was back in Albuquerque, where the police arrested her the next day. She pleaded no contest to aggravated fleeing from a law enforcement officer, assault on a peace officer, and unlawfully taking a motor vehicle.

Torres later sought damages from Officers Madrid and Williamson under 42 U.S.C. § 1983, which provides a cause of action for the deprivation of constitutional rights by persons acting under color of state law. She claimed that the officers applied excessive force, making the shooting an unreasonable seizure under the Fourth Amendment. The District Court granted summary judgment to the officers, and the Court of Appeals for the Tenth Circuit affirmed on the ground that "a suspect's continued flight after being shot by police negates a Fourth Amendment excessive-force claim." 769 Fed.Appx. 654, 657 (2019). The court relied on Circuit precedent providing that "no seizure can occur unless there is physical touch or a show of authority," and that "such physical touch (or force) must terminate the suspect's movement" or otherwise give rise to physical control over the suspect. *Brooks v. Gaenzle*, 614 F.3d 1213, 1223 (10th Cir.2010).

**\*\*995** We granted certiorari. 589 U. S. ——, 140 S.Ct. 680, 205 L.Ed.2d 449 (2019).

**\*311** II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This case concerns the "seizure" of a "person," which can take the form of "physical force" or a "show of authority" that "in some way restrain[s] the liberty" of the person. *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The question before us is whether the application of physical force is a seizure if the force, despite hitting its target, fails to stop the person.

We largely covered this ground in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). There we interpreted the term "seizure" by consulting the common law of arrest, the "quintessential 'seizure of the person' under our Fourth Amendment jurisprudence." *Id.*, at 624, 111 S.Ct. 1547. As Justice Scalia explained for himself and six other Members of the Court, the common law treated "the mere grasping or application of physical force with lawful authority" as an arrest, "whether or not it succeeded in subduing the arrestee." *Ibid.*; see *id.*, at 625, 111 S.Ct. 1547 ("merely touching" sufficient to constitute an arrest). Put another way, an officer's application of physical force to the body of a person " 'for the purpose of arresting him' " was itself an arrest—not an *attempted* arrest—even if the person did not yield. *Id.*, at 624, 111 S.Ct. 1547 (quoting *Whitehead v. Keyes*, 85 Mass. 495, 501 (1862)).

USCA4 Appeal: 23-2046     Doc: 60     Filed: 11/12/2024     Pg: 8 of 104

Torres v. Madrid, 592 U.S. 306 (2021)

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

The common law distinguished the application of force from a show of authority, such as an order for a suspect to halt. The latter does not become an arrest unless and until the arrestee complies with the demand. As the Court explained in *Hodari D.*, "[a]n arrest requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority." 499 U.S., at 626, 111 S.Ct. 1547 (emphasis in original).

*Hodari D.* articulates two pertinent principles. First, common law arrests are Fourth Amendment seizures. And second, the common law considered the application of force to the body of a person with intent to restrain to be an arrest, **\*312** no matter whether the arrestee escaped. We need not decide whether *Hodari D.*, which principally concerned a show of authority, controls the outcome of this case as a matter of *stare decisis*, because we independently reach the same conclusions.

At the adoption of the Fourth Amendment, a "seizure" was the "act of taking by warrant" or "of laying hold on suddenly"—for example, when an "officer seizes a thief." 2 N. Webster, An American Dictionary of the English Language 67 (1828) (Webster) (emphasis deleted). A seizure did not necessarily result in actual control or detention. It is true that, when speaking of property, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.' " *Hodari D.*, 499 U.S., at 624, 111 S.Ct. 1547 (quoting 2 Webster 67). But the Framers selected a term—seizure—broad enough to apply to all the concerns of the Fourth Amendment: "persons," as well as "houses, papers, and effects." As applied to a person, "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." 499 U.S., at 626, 111 S.Ct. 1547. Then, as now, an ordinary user of the English language could remark: "She seized the purse-snatcher, but he broke out of her grasp." *Ibid.*

**\*\*996** The "seizure" of a "person" plainly refers to an arrest. That linkage existed at the founding. Samuel Johnson, for example, defined an "arrest" as "[a]ny ... seizure of the person." 1 A Dictionary of the English Language 108 (4th ed. 1773). And that linkage persists today. As we have repeatedly recognized, "the arrest of a person is quintessentially a seizure." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (internal quotation marks omitted); see *Hodari D.*, 499 U.S., at 624, 111 S.Ct. 1547.

Because arrests are seizures of a person, *Hodari D.* properly looked to the common law of arrest for "historical understandings **\*313** 'of what was deemed an unreasonable search and seizure when the Fourth Amendment was adopted.' " *Carpenter v. United States*, 585 U. S. ——, ——, 138 S.Ct. 2206, 2214, 201 L.Ed.2d 507 (2018) (quoting *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925); alteration omitted). Sometimes the historical record will not yield a well-settled legal rule. See, *e.g.*, *Atwater v. Lago Vista*, 532 U.S. 318, 327–328, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001); *Payton*, 445 U.S., at 593–596, 100 S.Ct. 1371. We do not face that problem here. The cases and commentary speak with virtual unanimity on the question before us today.

The common law rule identified in *Hodari D.*—that the application of force gives rise to an arrest, even if the officer does not secure control over the arrestee—achieved recognition to such an extent that English lawyers could confidently (and accurately) proclaim that "[a]ll the authorities, from the earliest time to the present, establish that a corporal touch is sufficient to constitute an arrest, even though the defendant do not submit." *Nicholl* v. *Darley*, 2 Y. & J. 399, 400, 148 Eng. Rep. 974 (Exch. 1828) (citing *Hodges* v. *Marks*, Cro. Jac. 485, 79 Eng. Rep. 414 (K. B. 1615)). The slightest application of force could satisfy this rule. In *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928 (Q. B. 1704), the defendant did not submit to the authority of an arrest warrant, but the court explained that the bailiff would have made an arrest if he "had but touched the defendant even with the end of his finger." *Ibid.*, 87 Eng. Rep., at 929. So too, if a "bailiff caught one by the hand (whom he had a warrant to arrest) as

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

he held it out of a window," that alone would accomplish an arrest. *Anonymous*, 1 Vent. 306, 86 Eng. Rep. 197 (K. B. 1677). The touching of the person—frequently called a laying of hands—was enough. See *Dunscomb* v. *Smith*, Cro. Car. 164, 79 Eng. Rep. 743 (K. B. 1629). Only later did English law grow to recognize arrest without touching through a submission to a show of authority. See *Horner* v. *Battyn*, Bull. N. P. 62 (K. B. 1738), reprinted in W. Loyd, Cases on Civil Procedure 798 (1916). Even so, the traditional rule **\*314** persisted that all an arrest required was "corporal seising or touching the defendant's body." 3 W. Blackstone, Commentaries on the Laws of England 288 (1768) (Blackstone).

Early American courts adopted this mere-touch rule from England, just as they embraced other common law principles of search and seizure. See 🔖 *Wilson v. Arkansas*, 514 U.S. 927, 933, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). Justice Baldwin, instructing a jury in his capacity as Circuit Justice, defined an arrest to include "touching or putting hands upon [the arrestee] in the execution of process." *United States v. Benner*, 24 F.Cas. 1084, 1086–1087 (No. 14,568) (CC ED Pa. 1830). State courts agreed that "any touching, however slight, is enough," *Butler v. Washburn*, 25 N.H. 251, 258 (1852), provided the officer made his intent to arrest clear, see *Jones v. Jones*, 35 N.C. 448, 448–449 (1852). Courts continued to hold that **\*\*997** an arrest required only the application of force—not control or custody—through the framing of the Fourteenth Amendment, which incorporated the protections of the Fourth Amendment against the States. See *Whitehead*, 85 Mass. at 501; *Searls v. Viets*, 2 Thomp.&C. 224, 226 (N. Y. Sup. Ct. 1873); *State v. Dennis*, 16 Del. 433, 436–437, 43 A. 261, 262 (1895); see also H. Voorhees, The Law of Arrest in Civil and Criminal Actions § 74, p. 44 (1904).

Stated simply, the cases "abundantly shew that the slightest touch [was] an arrest in point of law." *Nicholl*, 2 Y. & J., at 404, 148 Eng. Rep., at 976. Indeed, it was not even required that the officer have, at the time of such an arrest, "the power of keeping the party so arrested under restraint." *Sandon* v. *Jervis*, El. Bl. & El. 935, 940, 120 Eng. Rep. 758, 760 (Q. B. 1858). The consequences would be "pernicious," an English judge worried, if the question of control "were perpetually to be submitted to a jury." *Ibid.*; cf. 3 Blackstone 120 (describing how "[t]he least touching of another's person" could satisfy the common law definition of force to commit battery, "for the law cannot draw the line between different degrees of violence").

**\*315** This case, of course, does not involve "laying hands," *Sheriff* v. *Godfrey*, 7 Mod. 288, 289, 87 Eng. Rep. 1247 (K. B. 1739), but instead a shooting. Neither the parties nor the United States as *amicus curiae* suggests that the officers' use of bullets to restrain Torres alters the analysis in any way. And we are aware of no common law authority addressing an arrest under such circumstances, or indeed any case involving an application of force from a distance.

The closest decision seems to be *Countess of Rutland's Case*, 6 Co. Rep. 52b, 77 Eng. Rep. 332 (Star Chamber 1605). In that case, serjeants-at-mace tracked down Isabel Holcroft, Countess of Rutland, to execute a writ for a judgment of debt. They "shewed her their mace, and touching her body with it, said to her, we arrest you, madam." *Id.*, at 54a, 77 Eng. Rep., at 336. We think the case is best understood as an example of an arrest made by touching with an object, for the serjeants-at-mace announced the arrest at the time they touched the countess with the mace. See, *e.g.*, *Hodges*, Cro. Jac., at 485, 79 Eng. Rep., at 414 (similar announcement upon laying of hands). Maybe the arrest could be viewed as a submission to a show of authority, because a mace served not only as a weapon but also as an insignia of office. See Kelly, The Great Mace, and Other Corporation Insignia of the Borough of Leicester, 3 Transactions of the Royal Hist. Soc. 295, 296–301 (1874). But that view is difficult to reconcile with the fact that English courts did not recognize arrest by submission to a show of authority until the following century. See *supra*, at 996 - 997.[*]

**\*316** However one reads *Countess of Rutland*, we see no basis for drawing an artificial line between grasping with a hand and other means of applying physical force to effect an arrest. The dissent (though not the officers) argues that the common law limited arrests by force to the literal placement of hands on the suspect, because no court published an opinion discussing a suspect who continued to flee after being **\*\*998** hit with a bullet or some other weapon. See *post*, at 1012 - 1014 (opinion of GORSUCH, J.). This objection calls to mind the unavailing defense of the person who "persistently denied that he had laid hands upon a priest, for he had only cudgelled and kicked him." 2 S. Pufendorf, De Jure Naturae et Gentium 795 (C. Oldfather & W. Oldfather transl. 1934). The required "corporal seising or touching the defendant's body" can be as readily accomplished by a bullet as by the end of a finger. 3 Blackstone 288.

USCA4 Appeal: 23-2046    Doc: 60    Filed: 11/12/2024    Pg: 10 of 104

Torres v. Madrid, 592 U.S. 306 (2021)

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

We will not carve out this greater intrusion on personal security from the mere-touch rule just because founding-era courts did not confront apprehension by firearm. While firearms have existed for a millennium and were certainly familiar at the founding, we have observed that law enforcement did not carry handguns until the latter half of the 19th century, at which point "it bec[a]me possible to use deadly force from a distance as a means of apprehension." *Tennessee v. Garner*, 471 U.S. 1, 14–15, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). So it should come as no surprise that neither we nor the dissent has located a common law case in which an officer used a gun to apprehend a suspect. Cf. *post*, at 1013 - 1014 (discussing *Dickenson* v. *Watson*, Jones, T. 205, 84 Eng. Rep. 1218, 1218–1219 (K. B. 1682), in which a tax collector accidentally discharged hailshot into a passerby's eye). But the focus of the Fourth Amendment is "the privacy and security of individuals," not the particular manner of "arbitrary invasion[ ] by governmental officials." *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). As noted, our precedent protects "that degree of privacy against government **\*317** that existed when the Fourth Amendment was adopted," *Kyllo v. United States*, 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)— a protection that extends to "[s]ubtler and more far-reaching means of invading privacy" adopted only later, *Olmstead v. United States*, 277 U.S. 438, 473, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). There is nothing subtle about a bullet, but the Fourth Amendment preserves personal security with respect to methods of apprehension old and new.

We stress, however, that the application of the common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure. A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. See *County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Nor will force intentionally applied for some other purpose satisfy this rule. In this opinion, we consider only force used to apprehend. We do not accept the dissent's invitation to opine on matters not presented here—pepper spray, flash-bang grenades, lasers, and more. *Post*, at 1015 - 1016.

Moreover, the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context. See *Nieves v. Bartlett*, 587 U. S. ——, ——, 139 S.Ct. 1715, 1724-25, 204 L.Ed.2d 1 (2019). Only an objective test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain. A tap on the shoulder to get one's attention will rarely exhibit such an intent. See **\*\*999** *INS v. Delgado*, 466 U.S. 210, 220, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Jones*, 35 N.C., at 448–449.

Nor does the seizure depend on the subjective perceptions of the seized person. Here, for example, Torres claims to have perceived the officers' actions as an attempted carjacking. **\*318** But the conduct of the officers—ordering Torres to stop and then shooting to restrain her movement—satisfies the objective test for a seizure, regardless whether Torres comprehended the governmental character of their actions.

The rule we announce today is narrow. In addition to the requirement of intent to restrain, a seizure by force—absent submission —lasts only as long as the application of force. That is to say that the Fourth Amendment does not recognize any "*continuing* arrest during the period of fugitivity." *Hodari D.*, 499 U.S., at 625, 111 S.Ct. 1547. The fleeting nature of some seizures by force undoubtedly may inform what damages a civil plaintiff may recover, and what evidence a criminal defendant may exclude from trial. See, *e.g.*, *Utah v. Strieff*, 579 U. S. ——, ——, 136 S.Ct. 2056, 2060-61, 195 L.Ed.2d 400 (2016). But brief seizures are seizures all the same.

USCA4 Appeal: 23-2046    Doc: 60    Filed: 11/12/2024    Pg: 11 of 104

Torres v. Madrid, 592 U.S. 306 (2021)
141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

Applying these principles to the facts viewed in the light most favorable to Torres, the officers' shooting applied physical force to her body and objectively manifested an intent to restrain her from driving away. We therefore conclude that the officers seized Torres for the instant that the bullets struck her.

III

In place of the rule that the application of force completes an arrest even if the arrestee eludes custody, the officers would introduce a single test for all types of seizures: intentional acquisition of control. This alternative rule is inconsistent with the history of the Fourth Amendment and our cases.

A

The officers and their *amici* stress that common law rules are not automatically "elevated to constitutional proscriptions," *Hodari D.*, 499 U.S., at 626, n. 2, 111 S.Ct. 1547, especially if they are "distorted almost beyond recognition when literally applied," *Garner*, 471 U.S., at 15, 105 S.Ct. 1694. In their view, the common law doctrine recognized in *Hodari D.* is just "a narrow legal rule **\*319** intended to govern liability in civil cases involving debtors." Brief for National Association of Counties et al. as *Amici Curiae* 12. The dissent presses the same argument. See *post*, at 1010 - 1012.

But the common law did not define the arrest of a debtor any differently from the arrest of a felon. Whether the arrest was authorized by a criminal indictment or a civil writ, "there must be a corporal seizing, or touching the defendant's person; or, what is tantamount, a power of taking immediate possession of the body, and the party's submission thereto, and a declaration of the officer that he makes an arrest." 1 J. Backus, A Digest of Laws Relating to the Offices and Duties of Sheriff, Coroner and Constable 115–116 (1812). Treatises on the law governing criminal arrests cited *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928—the preeminent mere-touch case involving a debtor—for the proposition that, "[i]n making the arrest, the constable or party making it should actually seize or touch the offender's body, or otherwise restrain his liberty." 1 R. Burn, The Justice of the Peace 275 (28th ed. 1837). When English courts confronted arrests for criminal offenses, they too relied on precedents concerning arrests for civil offenses. See *Bridgett* v. *Coyney*, 1 Man. & Ryl. 1, 5–6 (K. B. 1827); **\*\*1000** *Arrowsmith* v. *Le Mesurier*, 2 Bos. & Pul. 211, 211–212, 127 Eng. Rep. 605, 606 (C. P. 1806). American courts likewise articulated a materially identical definition in criminal cases—that "[t]he arrest itself is the laying hands on the defendant," *State v. Townsend*, 5 Del. 487, 488 (Ct. Gen. Sess. 1854), or that an arrest is "the taking, seizing, or detaining of the person of another, either by touching him or putting hands on him," *McAdams v. State*, 30 Okla.Crim. 207, 210, 235 P. 241, 242 (1925).

This uniform definition also explains why an arrest by mere touch carried legal consequences in both the criminal and civil contexts. The point of an arrest was of course to take custody of a person to secure his appearance at a proceeding. **\*320** But some arrests did not culminate in actual control of the individual, let alone a trip to the gaol or computer. See *Nicholl*, 2 Y. & J., at 403–404, 148 Eng. Rep., at 975–976. When an officer let an arrestee get away, the officer risked becoming a defendant himself in an action for "escape." See Perkins, The Law of Arrest, 25 Iowa L. Rev. 201, 204 (1940). The laying of hands constituted a taking custody and would expose the officer to liability for the escape of felons and debtors alike. See 1 M. Hale, Pleas of the Crown 590–591, 597, 603 (1736); 2 *id.*, at 93 (no liability for escape "if the felon were not once in the hands of an officer"); see also Perkins, 25 Iowa L. Rev., at 206.

The tort of false imprisonment, which the dissent rightly acknowledges as the " 'closest analogy' to an arrest without probable cause," *post*, at 1009 (quoting *Wallace v. Kato*, 549 U.S. 384, 388–389, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007)), reinforces the conclusion that the common law considered touching to be a seizure. Stated generally, false imprisonment required "confinement," such as "taking a person into custody under an asserted legal authority." Restatement of Torts §§ 35, 41 (1934);

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

see 3 Blackstone 127. But that element of confinement demanded no more than that the defendant "had for one moment taken possession of the plaintiff 's person"—including, "for example, if he had tapped her on the shoulder, and said, 'You are my prisoner.' " *Simpson* v. *Hill*, 1 Esp. 431, 431–432, 170 Eng. Rep. 409 (N. P. 1795); see Restatement of Torts § 41, Comment *h* (noting that "the touching alone of the person against whom [legal authority] was asserted would be sufficient to constitute" confinement by arrest when the authority was valid). While the dissent emphasizes that "the court [in *Simpson*] proceeded to *reject* the plaintiff's claim for false imprisonment," *post*, at 1009, that was only because "the constable never touched the plaintiff, or took her into custody." 1 Esp., at 431, 170 Eng. Rep., at 409.

To be sure, the mere-touch rule was particularly well documented in cases involving the execution of civil process. An **\*321** officer pursuing a debtor could not forcibly enter the debtor's home unless the debtor had escaped arrest, such as by fleeing after being touched. See *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 196 (K. B. 1604); see also ⚑ *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Officers seeking to execute criminal process, on the other hand, possessed greater pre-arrest authority to enter a felon's home. See ⚑ *Payton*, 445 U.S., at 598, 100 S.Ct. 1371. But the fact that the common law rules of arrest generated more litigation in the civil context proves only that creditors had ready recourse to the courts to pursue escape actions for unsatisfactory arrests. There is no reason to suspect that English jurists silently adopted a special definition of arrest only for debt collection—indeed, they told us just the opposite. See *supra*, at 999 - 1000. Nothing specific to debt collection **\*\*1001** elevated escape from arrest into a justification for entry of the home. Whenever a person was "lawfully arrested for *any* Cause and afterwards escape[d], and shelter[ed] himself in a House," the officer could break open the doors of the house. 2 W. Hawkins, Pleas of the Crown 87 (1721) (emphasis added).

In any event, the officers and the dissent misapprehend the history of the Fourth Amendment by minimizing the role of practices in civil cases. "[A]rrests in civil suits were still common in America" at the founding. *Long v. Ansell*, 293 U.S. 76, 83, 55 S.Ct. 21, 79 L.Ed. 208 (1934). And questions regarding the legality of an arrest "typically arose in civil damages actions for trespass or false arrest." ⚑ *Payton*, 445 U.S., at 592, 100 S.Ct. 1371. Accordingly, this Court has not hesitated to rely on such decisions when interpreting the Fourth Amendment. See, *e.g.*, ⚑ *United States v. Jones*, 565 U.S. 400, 404–405, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012); 🚩 *Boyd v. United States*, 116 U.S. 616, 626, 6 S.Ct. 524, 29 L.Ed. 746 (1886). We see no reason to break with our settled approach in this case.

## B

The officers and the dissent derive from our cases a different touchstone for the seizure of a person: "an intentional **\*322** acquisition of physical control." ⚑ *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Under their alternative rule, the use of force becomes a seizure "only when there is a governmental termination of freedom of movement through means intentionally applied." ⚑ *Id.*, at 597, 109 S.Ct. 1378 (emphasis deleted); see Brief for Respondents 12–15; *post*, at 1006 - 1007.

This approach improperly erases the distinction between seizures by *control* and seizures by *force*. In all fairness, we too have not always been attentive to this distinction when a case did not implicate the issue. See, *e.g.*, ⚑ *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). But each type of seizure enjoys a separate common law pedigree that gives rise to a separate rule. See ⚑ *Hodari D.*, 499 U.S., at 624–625, 111 S.Ct. 1547; A. Cornelius, The Law of Search and Seizure § 47, pp. 163–164 (2d ed. 1930) (contrasting actual control with "constructive detention" by touching).

Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement. A prime example of the latter comes from ⚑ *Brower*, where the police seized a driver

USCA4 Appeal: 23-2046   Doc: 60   Filed: 11/12/2024   Pg: 13 of 104

Torres v. Madrid, 592 U.S. 306 (2021)

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

when he crashed into their roadblock. 489 U.S., at 598–599, 109 S.Ct. 1378; see also, *e.g.*, *Scott v. Harris*, 550 U.S. 372, 385, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (ramming car off road); *Williams* v. *Jones*, Cas. t. Hard. 299, 301, 95 Eng. Rep. 193, 194 (K. B. 1736) (locking person in room). Under the common law rules of arrest, actual control is a necessary element for this type of seizure. See Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 553 (1924). Such a seizure requires that "a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S., at 599, 109 S.Ct. 1378. But that requirement of control or submission never extended to seizures by force. See, *e.g.*, *Sandon*, El. Bl. & El., at 940–941, 120 Eng. Rep., at 760.

As common law courts recognized, any such requirement of control would be difficult to apply in cases involving the **\*323** application of force. See *supra*, at 997 - 998. At the most basic level, it will often be unclear when an officer succeeds in gaining control over a struggling suspect. Courts will puzzle over whether an officer **\*\*1002** exercises control when he grabs a suspect, when he tackles him, or only when he slaps on the cuffs. Neither the officers nor the dissent explains how long the control must be maintained—only for a moment, into the squad car, or all the way to the station house. To cite another example, counsel for the officers speculated that the shooting would have been a seizure if Torres stopped "maybe 50 feet" or "half a block" from the scene of the shooting to allow the officers to promptly acquire control. Tr. of Oral Arg. 45. None of this squares with our recognition that " '[a] seizure is a single act, and not a continuous fact.' " *Hodari D.*, 499 U.S., at 625, 111 S.Ct. 1547 (quoting *Thompson v. Whitman*, 18 Wall. 457, 471, 21 L.Ed. 897 (1874)). For centuries, the common law rule has avoided such line-drawing problems by clearly fixing the moment of the seizure.

### IV

The dissent sees things differently. It insists that the term "seizure" has always entailed a taking of possession, whether the officer is seizing a person, a ship, or a promissory note. See *post*, at 1006 - 1007. But the facts of the cases and the language of the opinions confirm that the concept of possession included the "constructive detention" of persons "never actually brought within the physical control of the party making an arrest." Wilgus, 22 Mich. L. Rev., at 556 (emphasis deleted); see, *e.g.*, *Nicholl*, 2 Y. & J., at 404, 148 Eng. Rep., at 976 (explaining that the "slightest touch" can constitute "custody"); *Anonymus*, 1 Vent., at 306, 86 Eng. Rep., at 197 (describing a touch as a "taking" of a person). Even the dissent acknowledges that a touch can establish a form of constructive possession. See *post*, at 1013 -1014.

The dissent says that "common law courts never contemplated" that the touching itself could effect a seizure. *Post,* at 1012 - 1013. But one need only look at the many decisions adopting **\*324** that definition of arrest. See *supra*, at 995 - 998, 999 - 1001. The dissent can offer no case expressing doubt about the rule that the touching constitutes an arrest, much less refusing to apply that rule in any context—felon or debtor. And we have, as noted, definitively stated that "the arrest of a person is quintessentially a seizure." *Payton*, 445 U.S., at 585, 100 S.Ct. 1371 (internal quotation marks omitted). The dissent's attempt to ignore arrests it appraises as "unfortunate" or "peculiar," *post*, at 1011, 1011 - 1012, pays insufficient regard to the complete history underlying the Fourth Amendment.

The dissent argues that we advance a "schizophrenic reading of the word 'seizure.' " *Post*, at 1006. But our cases demonstrate the unremarkable proposition that the nature of a seizure can depend on the nature of the object being seized. It is not surprising that the concept of constructive detention or the mere-touch rule developed in the context of seizures of a person—capable of fleeing and with an interest in doing so—rather than seizures of "houses, papers, and effects."

The dissent also criticizes us for "posit[ing] penumbras" of "privacy" and "personal security" in our analysis of the Fourth Amendment. *Post*, at 1016. But the *text* of the Fourth Amendment expressly guarantees the "right of the people to be *secure* in their *persons*," and our earliest precedents recognized privacy as the "essence" of the Amendment—not some penumbral

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

emanation. 🚩 *Boyd*, 116 U.S., at 630, 6 S.Ct. 524. We have relied on that understanding in construing the meaning of the Amendment. See, *e.g.*, 🟨 *Riley v. California*, 573 U.S. 373, 403, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).

The dissent speculates that the real reason for today's decision is an "impulse" to **1003 provide relief to Torres, *post*, at 1015 - 1016, or maybe a desire "to make life easier for ourselves," *post*, at 1015. It may even be, says the dissent, that the Court "at least hopes to be seen as trying" to achieve particular goals. *Post*, at 1016. There is no call for such surmise. At the end of the day we simply agree with the analysis of the common law of arrest and its relation to the Fourth Amendment set *325 forth thirty years ago by Justice Scalia, joined by six of his colleagues, rather than the competing view urged by the dissent today.

* * *

We hold that the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued. Of course, a seizure is just the first step in the analysis. The Fourth Amendment does not forbid all or even most seizures—only unreasonable ones. All we decide today is that the officers seized Torres by shooting her with intent to restrain her movement. We leave open on remand any questions regarding the reasonableness of the seizure, the damages caused by the seizure, and the officers' entitlement to qualified immunity.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice BARRETT took no part in the consideration or decision of this case.

Justice GORSUCH, with whom Justice THOMAS and Justice ALITO join, dissenting.

The majority holds that a criminal suspect can be simultaneously seized and roaming at large. On the majority's account, a Fourth Amendment "seizure" takes place whenever an officer "merely touches" a suspect. It's a seizure even if the suspect refuses to stop, evades capture, and rides off into the sunset never to be seen again. That view is as mistaken as it is novel.

Until today, a Fourth Amendment "seizure" has required taking possession of someone or something. To reach its contrary judgment, the majority must conflate a seizure with its attempt and confuse an arrest with a battery. In the *326 process, too, the majority must disregard the Constitution's original and ordinary meaning, dispense with our conventional interpretive rules, and bypass the main currents of the common law. Unable to rely on any of these traditional sources of authority, the majority is left to lean on (really, repurpose) an abusive and long-abandoned English debt-collection practice. But there is a reason why, in two centuries filled with litigation over the Fourth Amendment's meaning, this Court has never before adopted the majority's definition of a "seizure." Neither the Constitution nor common sense can sustain it.

I

A

This case began when two Albuquerque police officers approached Roxanne Torres on foot. The officers thought Ms. Torres was the subject of an arrest warrant and suspected of involvement in murder and drug trafficking. As it turned out, they had the wrong person; Ms. Torres was the subject of a *different* arrest warrant. As she saw the officers walk toward her, Ms. Torres responded by getting into her car and hitting the gas. At the time, Ms. Torres admits, she was "tripping out bad" on methamphetamine.

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

Fearing the oncoming car was about to hit them, the officers fired their duty weapons, and two bullets struck Ms. Torres while others hit her car.

 **\*\*1004** None of that stopped Ms. Torres. She continued driving—over a curb, across some landscaping, and into a street, eventually colliding with another vehicle. Abandoning her car, she promptly stole a different one parked nearby. Ms. Torres then drove over 75 miles to another city. When she eventually sought medical treatment, doctors decided she needed to be airlifted back to Albuquerque for more intensive care. Only at that point, a day after her encounter with the officers, was Ms. Torres finally identified and arrested. Ultimately, she pleaded no contest to assault on a **\*327** police officer, aggravated fleeing from an officer, and the unlawful taking of a motor vehicle.

More than two years later, Ms. Torres sued the officers for damages in federal court under 🚩 42 U.S.C. § 1983. She alleged that they had violated the Fourth Amendment by unreasonably "seizing" her. After discovery, the officers moved for summary judgment. The district court granted the motion, and the court of appeals affirmed. Individuals like Ms. Torres are free to sue officers under New Mexico state law for assault or battery. They may also sue officers under the Fourteenth Amendment for conduct that "shocks the conscience." But under longstanding circuit precedent, the courts explained, a Fourth Amendment "seizure" occurs only when the government obtains "physical control" over a person or object. Because Ms. Torres "managed to elude the police for at least a full day after being shot," the courts reasoned, the officers' bullets had not "seized" her; any seizure took place only when she was finally arrested back in Albuquerque the following day. 🚩 *Torres v. Madrid*, 769 Fed.Appx. 654, 657 (CA10 2019).

B

Now before us, Ms. Torres argues that this Court's decision in 🚩 *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), "compel[s] reversal." Brief for Petitioner 25. As she reads it, 🚩 *Hodari D.* held that a Fourth Amendment seizure takes place whenever an officer shoots or even "mere[ly] touch[es]" an individual with the intent to restrain. Brief for Petitioner 15.

Whatever one thinks of Ms. Torres's argument, one thing is certain: 🚩 *Hodari D.* has generated considerable confusion. There, officers chased a suspect on foot. 🚩 499 U.S., at 623, 111 S.Ct. 1547. Later, the suspect argued that he was "seized" for purposes of the Fourth Amendment the moment the chase began. See 🚩 *id.*, at 625, 111 S.Ct. 1547. Though *he* fled, the suspect argued, a "reasonable person" would not have felt at liberty given the officers' **\*328** "show of authority," so a Fourth Amendment seizure had occurred. 🚩 *Id.*, at 627–628, 111 S.Ct. 1547.

The Court rejected this argument. In doing so, it explained that, "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.' " 🚩 *Id.*, at 624, 111 S.Ct. 1547. Because the defendant did not submit to the officers' show of authority, the Court reasoned, the officers' conduct amounted at most to an attempted seizure. See 🚩 *id.*, at 626, and n. 2, 111 S.Ct. 1547. And "neither usage nor common-law tradition makes an *attempted* seizure a seizure." 🚩 *Ibid.*

At the same time, and as Ms. Torres emphasizes, the Court didn't end its discussion there. It proceeded to imagine a different and hypothetical case, one in which the officers not only chased the suspect but also "appl[ied] physical force" to him. In these circumstances, the Court suggested, "merely touching" a suspect, even when officers fail to gain possession, might qualify as a seizure. 🚩 *Id.*, at 624–625, 111 S.Ct. 1547.

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

**\*\*1005** Unsurprisingly, these dueling passages in 🚩*Hodari D.* led to a circuit split. For the first time, some lower courts began holding that a "mere touch" constitutes a Fourth Amendment "seizure." Others, however, continued to adhere to the view, taken "[f]rom the time of the founding to the present," that the word "seizure" means "taking possession." 🚩*Id., at 624, 111 S.Ct. 1547* (internal quotation marks omitted). We took this case to sort out the confusion.

## II

As an initial matter, Ms. Torres is mistaken that 🚩*Hodari D.*'s discussion of "mere touch" seizures compels a ruling in her favor. Under the doctrine of *stare decisis*, we normally afford prior holdings of this Court considerable respect. But, in the course of issuing their holdings, judges sometimes include a "witty opening paragraph, the background information on how the law developed," or "digressions speculating on how similar hypothetical cases might be resolved." B. Garner et al., The Law of Judicial Precedent 44 (2016). Such **\*329** asides are dicta. The label is hardly an epithet: "Dicta may afford litigants the benefit of a fuller understanding of the court's decisional path or related areas of concern." *Id.*, at 65. Dicta can also "be a source of advice to successors." *Ibid.* But whatever utility it may have, dicta cannot bind future courts.

This ancient rule serves important purposes. A passage unnecessary to the outcome may not be fully considered. Parties with little at stake in a hypothetical question may afford it little or no adversarial testing. And, of course, federal courts possess no authority to issue rulings beyond the cases and controversies before them. If the respect we afford past holdings under the doctrine of *stare decisis* may be justified in part as an act of judicial humility, respecting that doctrine's limits must be too. Fewer things could be less humble than insisting our every passing surmise constitutes a rule forever binding a Nation of over 300 million people. No judge can see around every corner, predict the future, or fairly resolve matters not at issue. See, *e.g.*, 🚩*Cohens v. Virginia*, 6 Wheat. 264, 399–400, 5 L.Ed. 257 (1821); 🚩*Central Va. Community College v. Katz*, 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006).

On any account, the passage in 🚩*Hodari D.* Ms. Torres seeks to invoke was dicta. The only question presented in that case was whether officers seize a defendant by a show of authority *without* touching him. The Court answered that question in the negative. The separate question whether a "mere touch" *also* qualifies as a seizure was not presented by facts of the case. No party briefed the issue. And the opinion offered the matter only shallow consideration, resting on just three sources: A state court opinion from the 1860s, a "comment" in the 1934 Restatement of Torts, and a 1930s legal treatise. See 🚩*499 U.S., at 624–625, 111 S.Ct. 1547*.

Already some lower courts, including those below, have recognized that 🚩*Hodari D.*'s aside does not constitute a binding holding. See 🚩 **\*330** *Brooks v. Gaenzle*, 614 F.3d 1213, 1220–1221 (CA10 2010); 🚩*Henson v. United States*, 55 A.3d 859, 864–865 (D. C. 2012). Today's majority seems to accept the point too. It acknowledges that 🚩*Hodari D.* "principally concerned a show of authority." *Ante*, at 995. And it says it intends to rule for Ms. Torres "independently" of 🚩*Hodari D. Ante*, at 995 - 996.

## III

Seeking to carry that burden, the majority picks up where 🚩*Hodari D.*'s dicta left off. It contends that an officer "seizes" a person by merely touching him with an "intent to restrain." *Ante*, at 998 - 999. We **\*\*1006** are told that a touch is a seizure even if the suspect never stops or slows down; it's a seizure even if he evades capture. In all the years before 🚩*Hodari D.*'s

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

dicta, this conclusion would have sounded more than a little improbable to most lawyers and judges—as it should still today. A mere touch may be a battery. It may even be part of an attempted seizure. But the Fourth Amendment's text, its history, and our precedent all confirm that "seizing" something doesn't mean touching it; it means taking possession.


A

Start with the text. The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." As at least part of *Hodari D.* recognized, "[f]rom the time of the founding to the present," the key term here—"seizure"—has always meant " 'taking possession.' " *499 U.S., at 624, 111 S.Ct. 1547*.

Countless contemporary dictionaries define a "seizure" or the act of "seizing" in terms of possession. [1] This Court's **\*331** early cases reflect the same understanding. Just sixteen years after the Fourth Amendment's adoption, Congress passed a statute regulating the "seizure" of ships. See *The Josefa Segunda*, 10 Wheat. 312, 322, 6 L.Ed. 320 (1825). This Court interpreted the term to require "an open, visible possession claimed," so that those previously possessing the ship "understand that they are dispossessed, and that they are no longer at liberty to exercise any dominion on board of the ship." *Id., at 325*. Nor did the Court's view change over time. In *Pelham v. Rose*, 9 Wall. 103, 106, 19 L.Ed. 602 (1870), the Court likewise explained that "[t]o effect [a] seizure" of something, one needed "to take" the thing "into his actual custody and control." *Id., at 107*.

Today's majority disputes none of this. It accepts that a seizure of the inanimate objects mentioned in the Fourth Amendment (houses, papers, and effects) requires possession. *Ante*, at 995 - 996. And when it comes to persons, the majority agrees (as *Hodari D.* held) that a seizure in response to a "show of authority" takes place if and when the suspect submits to an officer's possession. *Ante*, at 1001 - 1002. The majority insists that a different rule should apply *only* in cases where an officer "touches" the suspect. Here—and here alone—possession is not required. So, under the majority's logic, we are quite literally asked to believe the officers in this case "seized" Ms. Torres's person, but *not* her car, when they shot both and both continued speeding down the highway.

**\*332** The majority's need to resort to such a schizophrenic reading of the word "seizure" should be a signal that something **\*\*1007** has gone seriously wrong. The Fourth Amendment's Search and Seizure Clause uses the word "seizures" once in connection with four objects (persons, houses, papers, and effects). The text thus suggests parity, not disparity, in meaning. It is close to canon that when a provision uses the same word multiple times, courts must give it the same meaning each time. *Ratzlaf v. United States*, 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). And it *is* canonical that courts cannot give a single word different meanings depending on the happenstance of "which object it is modifying." *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 329, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) ("[W]e refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying"). To "[a]scrib[e] various meanings" to a single word, we have observed, is to "render meaning so malleable" that written laws risk "becom[ing] susceptible to individuated interpretation." *Ratzlaf*, 510 U.S., at 143, 114 S.Ct. 655 (internal quotation marks omitted). The majority's conclusion that a single use of the word "seizures" bears two different meanings at the same time—indeed, in this very case—is truly novel. And when it comes to construing the Constitution, that kind of innovation is no virtue.

If more textual evidence were needed, the Fourth Amendment's neighboring Warrant Clause would seem to provide it. That Clause states that warrants must describe "the persons or things to be seized." Once more, the Amendment uses the same verb —"seized"—for both persons and objects. Once more, it suggests parity, not some hidden divergence between people and their possessions. Nor does anyone dispute that a warrant for the "seizure" of a person means a warrant authorizing officers to take that person into their *possession*.

Against all these adverse textual clues, the majority offers little in reply. It *admits* that its interpretation defies this **\*333** Court's teachings in 🔖 *Ratzlaf* and 🔖 *Reno* by ascribing different meanings to the word "seizure" depending on "the object being seized." *Ante*, at 1002. It says only that we should overlook the problem because "our cases" in the Fourth Amendment context compel this remarkable construction. *Ibid.* But it is unclear what cases the majority might have in mind for it cites none.

Instead, the majority proceeds to reason that the word "seizure" *must* carry a different meaning for persons and objects because persons alone are "capable of fleeing" and have "an interest in doing so." *Ibid.* But that reasoning faces trouble even from 🔖 *Hodari D.*, which explained that "[a] ship still fleeing, even though under attack, would not be considered to have been seized as a war prize." 🔖 499 U.S., at 624, 111 S.Ct. 1547. Of course, as the majority observes, persons alone can possess "an interest" in fleeing. But, as 🔖 *Hodari D.*'s example shows, they can have as much (or more) interest in fleeing to prevent the seizure of their possessions as they do their persons. Even today, a suspect driving a car loaded with illegal drugs may be more interested in fleeing to avoid the loss of her valuable cargo than to prevent her own detention. Yet the majority offers no reasoned explanation why the meaning of the word "seizure" changes when officers hit the suspect and when they hit her drugs and car as all three speed away.

Unable to muster any precedent or sound reason for its reading, the majority finishes its textual analysis with a selective snippet from Webster's Dictionary and a hypothetical about a purse snatching. The majority notes that Webster equated a seizure with " 'the act of taking by warrant' " or " 'laying hold on suddenly.' " **\*\*1008** *Ante*, at 995 - 996. But Webster used the warrant definition to describe "the seizure of contraband goods"—a seizure the majority *agrees* requires possession. Meanwhile, the phrase "laying hold on" a person connotes physical possession, as a look at the dictionary's entire definition demonstrates. A "seizure," Webster continued, **\*334** is the "act of taking possession by force," the "act of taking by warrant," "possession," and "a catching." [2] Read in full, Webster thus lends no support to the majority's view.

The purse hypothetical, borrowed from 🔖 *Hodari D.*'s dicta, turns out to be even less illuminating. It supposes that "an ordinary user of the English language could remark: 'She seized the purse-snatcher, but he broke out of her grasp.' " *Ante*, at 995 (quoting 🔖 *Hodari D.*, 499 U.S., at 626, 111 S.Ct. 1547). But what does that prove? The hypothetical contemplates a woman who *takes possession* of the purse-snatcher, establishing a "grasp" for him to "break out of." One doesn't "break out of " a mere touch.

Really, the majority's answer to the Constitution's text is to ignore it. The majority stands mute before the consensus among founding-era dictionaries, this Court's early cases interpreting the word "seizure," and the Warrant Clause. It admits its interpretation spurns the canonical interpretive principle that a single word in a legal text does not change its meaning depending on what object it modifies. All we're offered is a curated snippet and an unhelpful hypothetical. Ultimately, it's hard not to wonder whether the majority says so little about the Constitution's terms because so little can be said that might support its ruling.

**\*335** B

Rather than focus on text, the majority turns quickly to history. At common law, it insists, a "linkage" existed between the "seizure" of a person and the concept of an "arrest." *Ante*, at 995 - 996. Thus, the majority contends, we must examine how the common law defined *that* term. But following the majority down this path only leads to another dead end. Unsurprisingly, an "arrest" at common law ordinarily required possession too.

1

USCA4 Appeal: 23-2046    Doc: 60    Filed: 11/12/2024    Pg: 19 of 104

Torres v. Madrid, 592 U.S. 306 (2021)

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

Consider what some of our usual common law guides say on the subject. Blackstone defined "an arrest" in the criminal context as "the apprehending or restraining of one's person, in order to be forthcoming to answer an alleged or suspected crime." 4 Commentaries on the Laws of England 286 (1769). Hale and Hawkins both equated an "arrest" with "apprehending," "taking," and "detain[ing]" a person. See 1 M. Hale, Pleas of the Crown 89, 93–94 (5th ed. 1716); 2 W. Hawkins, Pleas of the Crown 74–75, 77, 80–81, 86 (3d ed. 1739). And Hawkins stated that an arrest required the officer to "actually have" the suspect "in his Custody." *Id.*, at 129. Any number of historical dictionaries attest to a **1009** similar understanding—defining an "arrest" as a "stop," a "taking of a person," and the act "by which a man becomes a prisoner." [3]

**336** Common law causes of action point to the same common-sense conclusion. During the founding era, an individual who was unlawfully arrested could seek redress through the tort of false imprisonment. See 3 W. Blackstone, Commentaries on the Laws of England 127 (1768); see also 🔖 *Payton v. New York*, 445 U.S. 573, 592, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); 🔖 *Wallace v. Kato*, 549 U.S. 384, 388–389, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (describing "false arrest and false imprisonment" as the "closest analogy" to an arrest without probable cause). That cause of action aimed to remedy "the violation of the right of personal liberty," 3 Blackstone, *supra*, at 127, which was "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct," 1 W. Blackstone, Commentaries on the Laws of England 130 (1765). Thus, false imprisonment—the violation of the right to move where one desired—required proof of "[t]he detention of the person" and "[t]he unlawfulness of such detention." 3 Blackstone, *supra*, at 127. That detention could occur "in a gaol, house, stocks, or in the street," but it occurred only if a person was "*under the custody* of another." 1 E. East, Pleas of the Crown 428 (1806) (emphasis added).

Much the same held true in another related field. At common law, an officer could be held criminally liable for allowing an individual to escape after being arrested. And to prove the existence of an arrest in an "Indictment for an Escape," a prosecutor had to "expressly shew" that "the Party was actually in the *Defendant's Custody* for a Crime, Action, or Commitment for it." 2 Hawkins, *supra*, at 132 (emphasis added). In other words, to demonstrate an arrest, a prosecutor had to prove the suspect had been "a Prisoner *in [the officer's] Custody.*" 1 Hale, *supra*, at 112 (emphasis added). Here, too, an arrest required possession.

**337** Once more, the majority's primary answer to all this countervailing evidence is to ignore it. And once more, the majority's own sources do more to hurt than help its cause. Lifting a line from *Simpson v. Hill*, 1 Esp. 431, 170 Eng. Rep. 409 (N. P. 1795), the majority suggests that the tort of false imprisonment at common law required no more than a "tapping on the shoulder." *Ante*, at 1000 - 1001 (citing 1 Esp., at 431–432, 170 Eng. Rep., at 409). But *Simpson* could not have stated the possession requirement more plainly: "[W]ithout any *taking possession* of the person," there "is not, by law, a false imprisonment." *Id.*, at 432, 170 Eng. Rep., at 409 (emphasis added). And the court proceeded to *reject* the plaintiff 's claim for false imprisonment because the "constable did never take her *into custody*." *Ibid.* (emphasis added). The **1010** majority offers no case finding the elements of false imprisonment satisfied by the mere touch of a fleeing person.

What remains of the majority's response follows the same course. The majority asserts that claims for escape only required proof that the officer touched a suspect. *Ante*, at 999 - 1000. But to prove its point, the majority quotes a sentence from Hale stating that *no* liability for escape exists " 'if the felon were not once in the hands of an officer.' " *Ibid.* (quoting 2 Pleas of the Crown 93 (1736)). And as Hale proceeded to make plain, a felon "in the hands of an officer" was another way of saying the officer had "apprehended" or "taken" the felon into his "custody." See *id.*, at 89, 93–94 (5th ed. 1716).

Ultimately, the majority seeks to invoke Samuel Johnson's dictionary and 🔖 *Payton*, 445 U.S., at 585, 100 S.Ct. 1371, to confirm only the anodyne point that some sort of "linkage" existed at common law between the concepts of "arrests" and "seizures." *Ante*, at 995 - 996. Yet, even here it turns out there is more to the story. The majority neglects to mention that Johnson proceeded to define an "arrest" as a "caption" of the person, "a stop or stay," a "restraint of a man's person, depriving him of his own will," and "the beginning of imprisonment." 1 S. Johnson, **338** A Dictionary of the English Language (6th ed. 1785). "To arrest," Johnson said, was "[t]o seize," "to detain by power," "[t]o withhold; to hinder," and "[t]o stop motion."

USCA4 Appeal: 23-2046    Doc: 60    Filed: 11/12/2024    Pg: 20 of 104

**Torres v. Madrid, 592 U.S. 306 (2021)**

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

*Ibid.* Meanwhile, the sentence fragment the majority quotes from 🚩 *Payton* turns out to have originated in Justice Powell's concurrence in 🚩⚠️ *United States v. Watson*, 423 U.S. 411, 428, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). And looking to that sentence in full, it is plain Justice Powell, too, understood an arrest not as a touching, but as "the taking hold of one's person." *Ibid.* Thus, even the majority's best sources only wind up pointing us back to the traditional possession rule.

2

Unable to identify anything helpful in the main current of the common law, the majority is forced to retreat to an obscure eddy. Starting from 🚩 *Hodari D.*'s three references to "mere touch" arrests, the majority traces these authorities back to their English origins. The tale that unfolds is a curious one.

Before bankruptcy reforms in the 19th century, creditors seeking to induce repayment of their loans could employ bailiffs to civilly arrest delinquent debtors and haul them off to debtors prison. See Cohen, The History of Imprisonment for Debt and Its Relation to the Development of Discharge in Bankruptcy, 3 J. Legal Hist. 153, 154–155 (1982). But the common law also offered debtors some tools to avoid or delay that fate. Relevant here, the common law treated the home as a "castle of defence and asylum" so no bailiff could break into a debtor's home to effect a civil arrest. 3 Blackstone, *supra*, at 288; see also Treiman, Escaping the Creditor in the Middle Ages, 43 L. Q. Rev. 230, 233 (1927). Over time, the practice of "keeping house" became an increasingly popular way for debtors to evade the bailiff. *Id.*, at 234. Naturally, too, creditors railed against this "notorious" practice. See *ibid.* And eventually Parliament responded to their clamor. The English bankruptcy statutes of 1542 and 1570 imposed **\*339** serious penalties on debtors who "kept house" to avoid imprisonment. Cohen, *supra*, at 157.

It was seemingly against this backdrop that the strange cases 🚩 *Hodari D.*'s dicta briefly alluded to and the majority has now dug up began to appear. Under their terms, a bailiff who could manage to touch a person hiding in his home, often through an open window or door, was deemed to **\*\*1011** have effected a civil "arrest." See *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928 (K. B. 1704). And because this mere touch was deemed an "arrest," the bailiff was then permitted by law to proceed to "br[eak] the house ... to seize upon" the person and render him to prison. *Ibid.*, 87 Eng. Rep., at 929. Of course it was farcical to call a tap through an open window an "arrest." But it proved a useful farce, at least for creditors.

One of the majority's lead cases, *Sandon* v. *Jervis*, El. Bl. & El. 935, 120 Eng. Rep. 758 (K. B. 1858), illustrates the absurdity of it all. There, a bailiff tried and failed "on several occasions" to arrest a debtor. *Id.*, at 936, 120 Eng. Rep., at 758. Eventually, the bailiff spotted an open window on "an upper story," so he ordered an assistant to fetch a ladder. *Ibid.* But the debtor and his daughter noticed the ploy and "ran to the window," slamming it closed. *Ibid.* Unfortunately, in the excitement a window pane broke. Seeing the opportunity, the bailiff 's assistant, while perched atop the ladder, thrust his hand through the opening and managed to touch the debtor. *Id.*, at 936–937, 120 Eng. Rep., at 758. According to the court, this "arrest" was sufficient to justify the bailiff 's later forcible entry into the home. *Id.*, at 946–948, 120 Eng. Rep., at 762–763.

By everyone's account, however, the farce extended only so far. Yes, the mere-touch arrest was a feature of civil bankruptcy practice for an unfortunate period. But the majority has not identified a *single* founding-era case extending the mere-touch arrest rule to the criminal context. The majority points to two nineteenth-century treatises, but both **\*340** reference only a case about a debt-collection arrest. See *ante*, at 999 - 1000 (citing 1 J. Backus, A Digest of Laws Relating to the Offices and Duties of Sheriff, Coroner and Constable 115–116, n. (c) (1812) (citing *Genner* v. *Sparks*, 6 Mod. 173, 87 Eng. Rep. 928 (K. B. 1704)), and 1 R. Burn, The Justice of the Peace 275 (28th ed. 1837) (citing the same)). The majority nods to dicta from an 1854 Delaware state trial court, but that came long after the founding and the majority does not explain how it sheds light on the Fourth Amendment's original meaning. See *ante*, at 999 - 1000 (citing *State v. Townsend*, 5 Del. 487, 488)). And every remaining early American case the majority cites for its "mere touch" rule—from the founding through the Civil War—involved only civil debt-collection arrests. See *ante*, at 995 - 996 (citing *Whitehead v. Keyes*, 85 Mass. 495 (1862)); *ante*, at 996 - 997

USCA4 Appeal: 23-2046    Doc: 60    Filed: 11/12/2024    Pg: 21 of 104

Torres v. Madrid, 592 U.S. 306 (2021)

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

(citing *United States v. Benner*, 24 F.Cas. 1084 (No. 14568) (CC ED Pa. 1830)); *ante*, at 996 - 997 (citing *Butler v. Washburn*, 25 N.H. 251 (1852)* (tax collection)). The same goes for the majority's primary English authorities. See *ante*, at 997 - 998 (citing *Nicholl* v. *Darley*, 2 Y. & J. 399, 400, 148 Eng. Rep. 974 (Exch. 1828); *Sandon*, El. Bl. & El., at 940, 120 Eng. Rep., at 760)).

So what relevance do these obscure and long-abandoned civil debt-collection practices have for today's case concerning a criminal arrest and brought under the Fourth Amendment? The answer seems to be not much, for at least three reasons.

In the first place, the Amendment speaks of "seizures," not "arrests." To the extent the common law of arrests informs the Amendment's meaning, we have already seen that an arrest normally meant taking possession of an arrestee. Maybe in one peculiar area, and for less than admirable reasons, the common law deviated from this understanding. But this Court usually presumes that those who wrote the Constitution used words in their ordinary sense, not in some **\*341** idiosyncratic way. See 📑 *District of Columbia v. Heller*, 554 U.S. 570, 576, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). And today's majority supplies no **\*\*1012** evidence that anyone during the founding era understood the Fourth Amendment to adopt the specialized definition of "arrest" from civil debt-collection practice.

Second, even if we were to hypothesize that people *did* understand the Fourth Amendment to incorporate this quirky rule, what would that tell us? Here, the officers tried to arrest Ms. Torres in a parking lot on behalf of the State for serious crimes, not break into her home on behalf of the local credit union for missing a payment. So even if we were willing to suppose that the founding generation understood the Constitution to incorporate the majority's civil debt-collection arrest rule, nothing before us suggests they contemplated, let alone endorsed, injecting it into the criminal law and overriding settled doctrine equating arrests with possession.

Finally, even in the civil debt-collection context, the majority cannot point to even a single case suggesting that hitting a suspect with an object—an arrow, a bullet, a cudgel, *anything*—as she flees amounted to an arrest. Instead, the majority's cases hold only that the "laying of hands" on an arrestee constituted an arrest. *Ante*, at 997 - 998. Thus, even if the Fourth Amendment did transpose the "mere touch" rule from the context of civil arrests into the criminal arena, it *still* would not reach this case.

How does the majority respond? Again, it does little more than disregard the difficulties. The majority says there is "no reason to suspect" the common law defined criminal arrests of felons "any differently" than civil arrests of debtors. *Ante*, at 1000 - 1001, 999. But the majority skips over all the evidence canvassed above showing that a criminal arrest required possession, not a mere touch. See Part III–B–1, *supra*. It sails past its failure to identify *any* case holding that a mere touch qualified as a criminal arrest. It ignores **\*342** the fact Blackstone defined criminal and civil arrests differently. [4] And it claims to find support in Hawkins's statement that an officer could break into a house to capture an arrestee who escaped after being " 'lawfully arrested for *any* Cause.' " *Ante*, at 1001 (quoting 2 Pleas of the Crown 87 (1721)). Yet, the question before us isn't what an officer might do *after* making an arrest; it's what constitutes an arrest *in the first place*.

Rather than confront shortcomings like these, the majority asks us to glide past them. It suggests that importing the mere-touch rule into the criminal context is permissible because "no common law case" had occasion to reject that idea expressly. See *ante*, at 1002. But this gets things backwards. Today, for the first time, the majority seeks to equate seizures and criminal arrests with mere touches, attempted seizures, and batteries. It is for *the majority* to show the Fourth Amendment commands this result. No amount of rhetorical maneuvering can obscure how flat it has fallen: Even its own authorities do more to undermine than support its thesis. If common law courts never contemplated the majority's odd definition of a criminal arrest—and this Court didn't either for more than two centuries—that can only be further proof of its implausibility.

**\*\*1013** The majority asks us to glide past another problem too. It acknowledges that its debt-collection cases required a "laying on of hands" to complete an arrest. But it says we should overlook that rule as an accident of antiquity. "Touchings" by "firearm," we are told, were unknown to **\*343** "founding-era courts," and no "officer used a gun to apprehend a suspect" before 1850. *Ante*, at 998. Never mind the shot heard round the world in 1775 and the adoption of the Second Amendment. Never mind that as early as 1592, when a bailiff "feared resistance" and thus "brought with him" a gun "to arrest" someone, a

common law court deemed it lawful because "[t]he sheriff or any of his ministers may for the better execution of justice carry with them offensive or defensive weapons." *Seint John's Case*, 5 Co. Rep. 71b, 77 Eng. Rep. 162, 162–163 (K. B. 1592). Never mind that even tax collectors were carrying guns by the 1680s. *E.g.*, *Dickenson* v. *Watson*, Jones, T. 205, 205–206, 84 Eng. Rep. 1218, 1218–1219 (K. B. 1682). And never mind, too, that the majority's problem isn't limited to guns. It fails to cite any case in which a touching by *any* weapon was deemed sufficient to effect an arrest. Seemingly, the majority would have us believe that bailiffs wielding anything but their fists were beyond the framers' imagination.

Faced with all these problems, the majority tacks. It scrambles to locate a case—any case—suggesting that common law courts considered "touchings" by weapon enough to effect an arrest in the debt-collection context. Ultimately, the majority asks us to dwell at length on the Countess of Rutland's case. In at least that lone instance, the majority promises, we will find bailiffs who arrested a debtor by touching her with an object (a mace) rather than a laying on of hands. See *ante*, at 997 - 998 (citing *Countess of Rutland's Case*, 6 Co. Rep. 52b, 54a, 77 Eng. Rep. 332 (Star Chamber 1605)). But it turns out the dispute concerned whether a countess could be civilly arrested *at all*, not when or how the arrest was completed. The court had no reason to (and did not) decide whether the bailiffs accomplished their arrest when they "shewed her their mace," "touch[ed]" her with the mace, or "compelled the coachman to carry" her to jail. *Id.*, at 54a, 77 Eng. Rep., at 336. And no one questions that these things together—a show of authority followed by compelled **\*344** detention—have always been enough to complete an arrest. Not even minor royalty can rescue the majority.

So the majority tacks again. Now it asks us to dispense with the common law's "laying on of hands" requirement as an "artificial" rule. *Ante*, at 998. Distinguishing between "touchings" by hand and by weapon, it says, "calls to mind the unavailing defense of the person who 'persistently denied that he had laid hands upon a priest, for he had only cudgelled and kicked him.' " *Ibid.* But the quip exposes the majority's bind. To get where it wishes to go, the majority not only must rework the rules found in the cases on which it relies, it must also abandon their rationale. The debt-collection cases treated the "laying on of hands" as a sign of *possession*.[5] Maybe **\*\*1014** the possession was more "constructive" or even fictional than "actual." See *ante*, at 1002 - 1003. But the idea was that someone who stood next to a debtor and laid hands on him could theoretically exercise a degree of control over his person. Common law courts never said the same of bailiffs who fired arrows at debtors, shot them with firearms, or cudgeled them as they ran away. Such conduct might have amounted to a *battery*, but it was never deemed sufficient to constitute an *arrest*. Doubtless that's why when a tax collector shot a man in the eye with a (supposedly unavailable) firearm in 1682, the man sued the officer for "assault, battery, and wounding"—*not* false imprisonment. See *Dickenson*, Jones, T., at 205, 84 Eng. Rep., at 1218–1219.

**\*345** The majority implores us to study the common law history of arrests. But almost immediately, the majority realizes it cannot find what it seeks in the history of criminal arrests. So it is forced to disinter a long-abandoned mere-touch rule from civil bankruptcy practice. Then it must import that rule into the criminal law. And because even that isn't enough to do the work it wishes done, the majority must jettison both the laying on of hands requirement and the rationale that sustained it. All of which leaves us confusing seizures with their attempts and arrests with batteries.

The common law offers a vast legal library. Like any other, it must be used thoughtfully. We have no business wandering about and randomly grabbing volumes off the shelf, plucking out passages we like, scratching out bits we don't, all before pasting our own new pastiche into the U. S. Reports. That does not respect legal history; it rewrites it.

C

If text and history pose challenges for the majority, so do this Court's precedents. The majority admits (as it must) that the seizure of an object occurs only through taking possession. *Ante*, at 995 - 996. The majority also admits (as it must) that the seizure of a person through a "show of authority" occurs only if the suspect submits to an officer's possession. *Ante*, at 1001 - 1002. But the majority fails to acknowledge that this Court has *also* said the same principle governs the seizure of persons effected through the use of force.

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court explained that "*[o]nly* when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id., at* 19, n. 16, 88 S.Ct. 1868 (emphasis added). The restraint of liberty *Terry* referred to was "interference" with a person's "freedom of movement." *United States v. Jacobsen*, 466 U.S. 109, 113, n. 5, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). As the Court put it in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), a decision issued just **\*346** two years before *Hodari D.*: "It is clear, in other words, that a Fourth Amendment seizure" occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." 489 U.S., at 597, 109 S.Ct. 1378 (emphasis deleted).

Rather than follow these teachings, the majority disparages them. After highlighting (multiple times) that Justice Scalia authored *Hodari D.*'s dicta, the majority turns about and faults his opinion for the Court in *Brower* for "improperly eras[ing] the distinction between seizures by *control* and seizures by *force.*" *Ante*, at 1001. The majority continues on to blame other of our decisions, too, for "hav[ing] not always been attentive" to this supposedly fundamental distinction. *Ibid*. But this Court has **\*\*1015** not been "[in]attentive" to a fundamental Fourth Amendment distinction for over two centuries, let alone sought to "erase" it. In truth, the majority's "distinction" is a product of its own invention. This Court has always recognized that *how* seizures take place can differ. Some may take place after a show of authority, others by the application of force, still others after a polite request. But to *be* a "seizure," the same result has always been required: An officer must acquire possession.

IV

If text, history, and precedent cannot explain today's result, what can? The majority seems to offer a clue when it promises its new rule will help us "avoi[d] ... line-drawing problems." *Ante*, at 1002 (internal quotation marks omitted). Any different standard, the majority worries, would be "difficult to apply." *Ante*, at 1001 - 1002.

But if efficiency in judicial administration is the explanation, it is a troubling one. Surely our role as interpreters of the Constitution isn't to make life easier for ourselves. Cf. Calabresi & Lawson, The Rule of Law as a Law of Law, 90 Notre Dame L. Rev. 483, 488 (2014). Nor, for that matter, has the majority even tried to show that the traditional possession **\*347** rule—in use "[f]rom the time of the founding," *Hodari D.*, 499 U.S., at 624, 111 S.Ct. 1547—has proven unreasonably difficult to administer. Everyone agrees, too, that the possession rule will continue to govern when it comes to the seizures of objects and persons through a show of authority. So, rather than simplify things, the majority's new rule for "mere touch" seizures promises only to add another layer of complexity to the law.

Even within its field of operation, the majority's rule seems destined to underdeliver on its predicted efficiencies. The majority tells us that its new test requires an "objective intent to restrain." *Ante*, at 998. But what qualifies is far from clear. The majority assures us that a "tap on the shoulder to get one's attention will rarely exhibit such an intent." *Ibid*. Suppose, though, the circumstances "objectively" indicate that the tap was "intended" to secure a person's attention for a minute, a quarter hour, or longer. Would that be enough?

Then there's the question what kind of "touching" will suffice. Imagine that, with an objective intent to detain a suspect, officers deploy pepper spray that enters a suspect's lungs as he sprints away. Does the application of the pepper spray count? Suppose that, intending to capture a fleeing suspect, officers detonate flash-bang grenades that are so loud they damage the suspect's eardrum, even though he manages to run off. Or imagine an officer shines a laser into a suspect's eyes to get him to stop, but the suspect is able to drive away with now-damaged retinas. Are these "touchings"? What about an officer's bullet that shatters the driver's windshield, a piece of which cuts her as she speeds away? Maybe the officer didn't touch the suspect, but he set

USCA4 Appeal: 23-2046     Doc: 60     Filed: 11/12/2024     Pg: 24 of 104

Torres v. Madrid, 592 U.S. 306 (2021)
141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

in motion a series of events that yielded a touching. Does that count? While assuring us that its new rule will prove easy to administer, the majority refuses to confront its certain complications. Lower courts and law enforcement won't have that luxury.

**\*348**  If efficiency cannot explain today's decision, what's left? Maybe it is an impulse that individuals like Ms. Torres *should* be able to sue for damages. Sometimes police shootings are justified, but other times they cry out for a remedy. The majority seems to give voice to this sentiment when it disparages the traditional possession rule as "artificial" and promotes its alternative as more sensitive to "personal security"  **\*\*1016**  and "new" policing realities. *Ante*, at 997 - 998. It takes pains to explain, too, that its new rule will provide greater protection for personal "privacy" interests, which we're told make up the "essence" of the Fourth Amendment. *Ante*, at 1002 - 1003 (internal quotation marks omitted).

But tasked only with applying the Constitution's terms, we have no authority to posit penumbras of "privacy" and "personal security" and devise whatever rules we think might best serve the Amendment's "essence." The Fourth Amendment allows this Court to protect against specific governmental actions—unreasonable searches and seizures of persons, houses, papers, and effects—and that is the limit of our license. Besides, it's hard to see why we should stretch to invent a new remedy here. Ms. Torres had ready-made claims for assault and battery under New Mexico law to test the officers' actions. See N. M. Stat. Ann § 41–4–12 (2020). The only reason this case comes before us under 🚩 § 1983 and the Fourth Amendment rather than before a New Mexico court under state tort law seems to be that Ms. Torres (or her lawyers) missed the State's two-year statutory filing deadline. See Tr. of Oral Arg. 16–17; Brief for Respondents 20, n. 4. That may be a misfortune for her, but it is hardly a reason to upend a 230 year-old understanding of our Constitution.

Nor, if we are honest, does today's decision promise much help to anyone else. Like Ms. Torres, many seeking to sue officers will be able to bring state tort claims. Even for those whose only recourse is a federal lawsuit, the majority's new rule seems likely to accomplish little. This Court has  **\*349**  already said that a remedy lies under 🚩 § 1983 and the Fourteenth Amendment for police conduct that "shocks the conscience." 🚩 *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 845–847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). At the same time, qualified immunity poses a daunting hurdle for those seeking to recover for less egregious police behavior. In our own case, Ms. Torres has yet to clear that bar and still faces it on remand. So, at the end of it all, the majority's new rule will help only those who (1) lack a state-law remedy, (2) evade custody, (3) after some physical contact by the police, (4) where the contact was sufficient to show an objective intent to restrain, (5) and where the police acted "unreasonably" in light of clearly established law, (6) but the police conduct was *not* "conscience shocking." With qualification heaped on qualification, that can describe only a vanishingly small number of cases.

Even if its holding offers little practical assistance to anyone, perhaps the majority at least hopes to be seen as trying to vindicate "personal security" and the "essence" of "privacy" when it derides the traditional possession rule as "artificial." But an attractive narrative cannot obscure the hard truth. Not only does the majority's "mere touch" rule allow a new cause of action in exceedingly few cases (non-conscience-shocking-but-still-unreasonable batteries intended to result in possession that don't achieve it). It supplies no path to relief for otherwise identical near-misses (assaults). A fleeing suspect briefly touched by pursuing officers may have a claim. But a suspect who evades a hail of bullets unscathed, or one who endures a series of flash-bang grenades untouched, is out of luck. That distinction is no less "artificial" than the one the law has recognized for centuries. And the majority's new rule promises such scarce relief that it can hardly claim more sensitivity to "personal security" than the rule the Constitution has long enshrined.

In the face of these concerns, the majority replies by denying their relevance. It says there is "no call" to "surmise" that its  **\*\*1017**  decision rests on anything beyond an "analysis of  **\*350**  the common law of arrest." *Ante*, at 1003. But there is no surmise about it. The majority itself tells us that its decision is *also* justified by the need to "avoi[d] ... line-drawing problems," protect "personal security," and advance the "privacy" interests that form the "essence" of the Fourth Amendment. Having invoked these sundry considerations, it's hard to see how the majority might disown them.

\*

To rule as it does, the majority must endow the term "seizure" with two different meanings at the same time. It must disregard the dominant rule of the common law. It must disparage this Court's existing case law for erasing distinctions that never existed. It cannot even guarantee that its new rule will offer great efficiencies or meaningfully vindicate the penumbral promises it supposes. Instead, we are asked to skip from one snippet to another, finally landing on a long-abandoned debt-collection practice that must be reengineered to do the work the majority wishes done. Our final destination confuses a battery for a seizure and an attempted seizure with its completion. All this is miles from where the standard principles of interpretation lead and just as far from the Constitution's original meaning. And for what? A new rule that may seem tempting at first blush, but that offers those like Ms. Torres little more than false hope in the end.

Respectfully, I dissent.

**All Citations**

592 U.S. 306, 141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625, 2021 Daily Journal D.A.R. 2792, 28 Fla. L. Weekly Fed. S 693

---

## Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 🚩 *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*    The arrest was not Isabel's first brush with the law or money troubles. A decade earlier, Elizabeth Charlton sued to recover for the estate of her husband, the fourth Earl of Rutland, an assortment of jewels allegedly taken by Isabel, the widow of the third Earl of Rutland. Elizabeth bested Isabel in the clash of the countesses, and Isabel was found liable for 940 pounds, worth about $400,000 today. *Elizabeth Countess of Rutland* v. *Isabel Countess of Rutland*, Cro. Eliz. 377, 78 Eng. Rep. 624 (C. P. 1595).

1    N. Bailey, Universal Etymological English Dictionary (22 ed. 1770) (To seize is "to take into Custody or Possession by Force, or wrongfully; to distrain, to attack, to lay hold of, or catch"; a seizure is a "seizing, taking into Custody"); T. Dyche & W. Pardon, A New General English Dictionary (14th ed. 1771) (To seize is "to lay or take hold of violently or at unawares, wrongfully, or by force"; a seizing or seizure is "a taking possession of any thing by violent, force, &c"); 2 S. Johnson, A Dictionary of the English Language (6th ed. 1785) (To seize is "1. To take hold of; to gripe; to grasp." "2. To take possession of by force." "3. To take possession of; to lay hold on; to invade suddenly." "4. To take forcible possession of by law." "5. To make possessed; to put in possession of." A seizure is "1. The act of seizing." "2. The thing seized." "3. The act of taking forcible possession." "4. Gripe; possession." "5. Catch"); 2 J. Ash, The New and Complete Dictionary of the English Language (2d ed. 1795) (To seize is "[t]o grasp, to lay hold on, to fasten on, to take possession of, to take possession by law"; a seizure is "[t]he act of seizing, a gripe, a catch; the act of taking possession by force of law; the thing seized, the thing possessed").

2    2 N. Webster, An American Dictionary of the English Language 67 (1828) (To seize is "1. To fall or rush upon suddenly and lay hold on; or to gripe or grasp suddenly." "2. To take possession by force, with or without right." "3. To invade suddenly; to take hold of; to come upon suddenly; as, a fever *seizes* a patient." "4. To take possession by virtue of a warrant or legal authority." To be seized is to be "[s]uddenly caught or grasped; taken by force; invaded suddenly; taken possession of; fastened with a cord; having possession." A seizure is "1. The act of seizing; the act of laying hold on suddenly; as the *seizure* of a thief. 2. The act of taking possession by force; as the *seizure* of lands or goods; the *seizure*

141 S.Ct. 989, 209 L.Ed.2d 190, 21 Cal. Daily Op. Serv. 2625...

of a town by an enemy; the *seizure* of a throne by an usurper. 3. The act of taking by warrant; as the *seizure* of contraband goods. 4. The thing taken or seized." "5. Gripe; grasp; possession." "6. Catch; a catching").

3    See, *e.g.*, Bailey, Universal Etymological English Dictionary (To arrest is "to stop or stay"; an arrest (in the legal sense) is "a Legal taking of a Person, and restraining him from Liberty"); Dyche & Pardon, A New General English Dictionary (An arrest is "the stopping or detaining a person, by a legal process"); 1 Johnson, A Dictionary of the English Language ("1. In law. A stop or stay; as, a man apprehended for debt, is said to be arrested." "An arrest is a certain restraint of a man's person, depriving him of his own will, and binding it to become obedient to the will of the law, and may be called the beginning of imprisonment." "2. Any caption, seizure of the person." "3. A stop" (emphasis deleted)); 1 Ash, The New and Complete Dictionary of the English Language (To arrest is "[t]o seize a man for debt, to apprehend by virtue of a writ from any court of justice, to stop, to hinder"; an arrest is "[t]he act of seizing on a man's person for debt, the execution of a writ from any court of justice by which a man becomes a prisoner, a stop, a hindrance").

4    The majority cites only Blackstone's definition of a civil arrest, which required a "corporal seising or touching the defendant's body." *Ante*, at 996 (quoting 3 W. Blackstone, Commentaries on the Laws of England 288 (1768)). But flipping from Blackstone's third volume (discussing "private wrongs") to his fourth volume (discussing "public wrongs") reveals—as we have already seen but the majority fails to acknowledge—that Blackstone equated a criminal arrest with "apprehending or restraining ... one's person, in order to be forthcoming to answer an alleged or suspected crime." See *supra*, at 1008.

5    That is why the mere-touch cases often discussed the "corporal possession of the debtor." *E.g.*, *Sandon* v. *Jervis*, El. Bl. & El. 935, 941–942, 120 Eng. Rep. 758 (K. B. 1858) (Hill, J.). A "corporal" touch was a legal term of art and was frequently used in the context of determining the possession of goods. *E.g.*, *Jordan v. James*, 5 Ohio 88, 98 (1831) (stating that an owner "may deliver any chattel he sells, symbolically and constructively, as well as by corporal touch"); see also 2 W. Blackstone, Commentaries on the Laws 448–449, n. 16 (J. Chitty ed. 1826); Friedman, Formative Elements in the Law of Sales: The Eighteenth Century, 44 Minn. L. Rev. 411, 445 (1960).

---

**End of Document**      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by  Zeigler v. State,  Ga.App.,  June 21, 2019

87 S.Ct. 616
Supreme Court of the United States

Edward J. GARRITY et al., Appellants,

v.

STATE OF NEW JERSEY.

No. 13.
|
Argued Nov. 10, 1966.
|
Decided Jan. 16, 1967.

### Synopsis

Police officers were convicted in state court of conspiracy to obstruct justice. The New Jersey Supreme Court, 44 N.J. 209, 207 A.2d 689, affirmed the judgment. The United States Supreme Court treated the papers of the officers as a petition for certiorari. The Supreme Court, Mr. Justice Douglas, held that where police officers being investigated were given choice either to incriminate themselves or to forfeit their jobs under New Jersey statute dealing with forfeiture of office or employment tenure, and pension rights of persons refusing to testify on ground of self-incrimination, and officers chose to make confessions, confessions were not voluntary but were coerced, and Fourteenth Amendment prohibited their use in subsequent criminal prosecution in state court.

Judgment reversed.

Mr. Justice Harlan, Mr. Justice Clark, Mr. Justice Stewart, and Mr. Justice White, dissented.

For dissenting opinion of Mr. Justice White, see 87 S.Ct. 636.

### Attorneys and Law Firms

**\*\*617**  **\*494**  Daniel L. O'Connor, Washington, D.C., for appellants.

Alan B. Handler, Newark, N.J., for appellee.

### Opinion

Mr. Justice DOUGLAS delivered the opinion of the Court.

Appellants were police officers in certain New Jersey boroughs. The Supreme Court of New Jersey ordered that alleged irregularities in handling cases in the municipal courts of those boroughs be investigated by the Attorney General, invested him with broad powers of inquiry and investigation, and directed him to make a report to the court. The matters investigated concerned alleged fixing of traffic tickets.

Before being questioned, each appellant was warned (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office. [1]

 **\*495**  Appellants answered the questions. No immunity was granted, as there is no immunity statute applicable in these circumstances. Over their objections, some of the answers given were used in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. Appellants were convicted and their convictions were sustained over their protests that their statements were coerced, [2] by reason of the fact that, if  **\*\*618**  they refused to answer, they could lose their positions with the police department. See State v. Naglee, 44 N.J. 209, 207 A.2d 689; 44 N.J. 259, 208 A.2d 146.

We postponed the question of jurisdiction to a hearing on the merits. 383 U.S. 941, 86 S.Ct. 941, 16 L.Ed.2d 205. The statute whose validity was sought to be 'drawn in question,' 28 U.S.C. s 1257(2), was the forfeiture statute. [3] But the New  **\*496** Jersey Supreme Court refused to reach that question ( 44 N.J., at 223, 207 A.2d, at 697), deeming the voluntariness of the statements as the only issue presented. Id., at 220—222, 207 A.2d at 695—696. The statute is therefore too tangentially involved to satisfy 28 U.S.C. s 1257(2), for the only bearing it had was whether, valid or not, the fear of being discharged under it for refusal to answer on the one hand and the fear of self-incrimination on the other was "a choice between the rock and the whirlpool" [4] which made the statements products of coercion in violation of the Fourteenth Amendment. We therefore dismiss the appeal, treat the papers as a petition for certiorari ( 28 U.S.C. s 2103), grant the petition and proceed to the merits.


We agree with the New Jersey Supreme Court that the forfeiture-of-office statute is relevant here only for the bearing it has on the voluntary character of the statements used to convict petitioners in their criminal prosecutions.

The choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession under Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, and related cases can be 'mental as well as physical'; 'the blood of the accused is not the only hallmark of an unconstitutional inquisition.' Blackburn v. State of Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242. Subtle pressures ( Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948; Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513) may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.' Lisenba v. People of State of California, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166.


We adhere to Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, a civil forfeiture action against property. A statute offered  **\*497**  the owner an election between producing a document or forfeiture of the goods at issue in the proceeding. This was held to be a form of compulsion in violation of both the Fifth Amendment and the Fourth Amendment. Id., at 634— 635, 6 S.Ct. It is that principle that we adhere to and apply in Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574. The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in Miranda v. State of Arizona, 384 U.S. 436, 464—465, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, is 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' We think the statements were infected by  **\*\*619**  the coercion [5] inherent in this scheme of questioning  **\*498**  and cannot be sustained as voluntary under our prior decisions.

87 S.Ct. 616, 17 L.Ed.2d 562

It is said that there was a 'waiver.' That, however, is a federal question for us to decide. Union Pac. R.R. Co. v. Public Service Comm., 248 U.S. 67, 69—70, 39 S.Ct. 24, 25, 63 L.Ed. 131. Stevens v. Marks, supra, 383 U.S. 234, 243—244, 86 S.Ct. 788, 793. The Court in Union Pac. R.R. Co. v. Public Service Comm., supra, in speaking of a certificate exacted under protest and in violation of the Commerce Clause, said:

'Were it otherwise, as conduct under duress involves a choice, it always would be possible for a State to impose an unconstitutional burden by the threat of penalties worse than it in case of a failure to accept it, and then to declare the acceptance voluntary * * *.' Id., 248 U.S., at 70, 39 S.Ct. at 25.

Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other.

'It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.' Ibid.

**\*499**  In that case appellant paid under protest. In these cases also, though petitioners succumbed to compulsion, they preserved their objections, raising them at the earliest possible point. Cf. Abie State Bank v. Bryan, 282 U.S. 765, 776, 51 S.Ct. 252, 256, 75 L.Ed. 690. The cases are therefore quite different from the situation where one who is anxious to make a clean breast of the whole affair volunteers the information.

Mr. Justice Holmes in McAuliffe v. New Bedford, 155 Mass. 216, 29 N.E. 517, stated a dictum on which New Jersey heavily relies:

'The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. **\*\*620** There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech as well as of idleness by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him. On the same principle the city may impose any reasonable condition upon holding offices within its control.' Id., at 220, 29 N.E., at 517—518.

The question in this case, however, is not cognizable in those terms. Our question is whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee.

We held in Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, that a public school teacher could not be discharged merely because he had invoked the Fifth Amendment privilege against self-incrimination when questioned by a congressional committee:

'The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of **\*500**  guilt or a conclusive presumption of perjury. * * * The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.' Id., at 557—558, 76 S.Ct. at 641.

We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights. There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. Engaging in interstate commerce is one. Western Union Tel. Co. v. State of Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355. Resort to the federal courts in diversity of citizenship cases is another. Terral v. Burke Constr. Co., 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352. Assertion of a First Amendment right is still another. Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Murdock v. Com. of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292; Thomas v. Collins, 323 U.S.

87 S.Ct. 616, 17 L.Ed.2d 562

516, 65 S.Ct. 315, 89 L.Ed. 430; Lamont v. Postmaster General, 381 U.S. 301, 305—306, 85 S.Ct. 1493, 1495—1496, 14 L.Ed.2d 398. The imposition of a burden on the exercise of a Twenty-fourth Amendment right is also banned. Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50. We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.

Reversed.

Mr. Justice HARLAN, whom Mr. Justice CLARK and Mr. Justice STEWART join, dissenting.

The majority opinion here and the plurality opinion in Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574, stem from fundamental misconceptions about the logic and necessities of the **\*501** constitutional privilege against self-incrimination. I fear that these opinions will seriously and quite needlessly hinder the protection of other important public values. I must dissent here, as I do in Spevack.

The majority employs a curious mixture of doctrines to invalidate these convictions, and I confess to difficulty in perceiving the intended relationships among the various segments of its opinion. I gather that the majority believes that the possibility that these policemen might have been discharged had they refused to provide information pertinent to their public responsibilities is an impermissible 'condition' imposed by New Jersey upon petitioners' privilege against self-incrimination. From this premise the majority draws the conclusion that **\*\*621** the statements obtained from petitioners after a warning that discharge was possible were inadmissible. Evidently recognizing the weakness of its conclusion, the majority attempts to bring to its support illustrations from the lengthy series of cases in which this Court, in light of all the relevant circumstances, has adjudged the voluntariness in fact of statements obtained from accused persons.

The majority is apparently engaged in the delicate task of riding two unruly horses at once: it is presumably arguing simultaneously that the statements were involuntary as a matter of fact, in the same fashion that the statements in Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, and Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, were thought to be involuntary, and that the statements were inadmissible as a matter of law, on the premise that they were products of an impermissible condition imposed on the constitutional privilege. These are very different contentions and require separate replies, but in my opinion both contentions are plainly mistaken, for reasons that follow.

**\*502** I.

I turn first to the suggestion that these statements were involuntary in fact. An assessment of the voluntariness of the various statements in issue here requires a more comprehensive examination of the pertinent circumstances than the majority has undertaken.

The petitioners were at all material times policemen in the boroughs of Bellmawr and Barrington, New Jersey. Garrity was Bellmawr's chief of police and Virtue one of its police officers; Holroyd, Elwell, and Murray were police officers in Barrington. Another defendant below, Mrs. Naglee, the clerk of Bellmawr's municipal court, has since died. In June 1961 the New Jersey Supreme Court sua sponte directed the State's Attorney General to investigate reports of traffic ticket fixing in Bellmawr and Barrington. Subsequent investigations produced evidence that the petitioners, in separate conspiracies, had falsified municipal court records, altered traffic tickets, and diverted moneys produced from bail and fines to unauthorized purposes. In the course of these investigations the State obtained two sworn statements from each of the petitioners; portions of those statements were admitted at trial. The petitioners were convicted in two separate trials of conspiracy to obstruct the proper administration of the state motor traffic laws, the cases being now consolidated for purposes of our review. The Supreme Court of New Jersey affirmed all the convictions.

The first statements were taken from the petitioners by the State's Deputy Attorney General in August and November 1961. All of the usual indicia of duress are wholly absent. As the state court noted, there was 'no physical coercion, no overbearing tactics of psychological persuasion, no lengthy incommunicado detention, or efforts to humiliate or ridicule the defendants.' **\*503** 44 N.J. 209, 220, 207 A.2d 689, 695. The state court found no evidence that any of the petitioners were reluctant to offer statements, and concluded that the interrogations were conducted with a 'high degree of civility and restraint.' Ibid.

These conclusions are fully substantiated by the record. The statements of the Bellmawr petitioners were taken in a room in the local firehouse, for which Chief Garrity himself had made arrangements. None of the petitioners were in custody before or after the depositions were taken; each apparently continued to pursue his ordinary duties as a public official of the community. The statements were recorded by a court stenographer, who testified that he witnessed no indications of unwillingness or even significant hesitation on the part of any of the petitioners. The Bellmawr petitioners did not have counsel present, but the Deputy Attorney **\*\*622** General testified without contradiction that Garrity had informed him as they strolled between Garrity's office and the firehouse that he had arranged for counsel, but thought that none would be required at that stage. The interrogations were not excessively lengthy, and reasonable efforts were made to assure the physical comfort of the witnesses. Mrs. Naglee, the clerk of the Bellmawr municipal court, who was known to suffer from a heart ailment, was assured that questioning would cease if she felt any discomfort.

The circumstances in which the depositions of the Barrington petitioners were taken are less certain, for the New Jersey Supreme Court found that there was an informal agreement at the Barrington trial that the defendants would argue simply that the possibility of dismissal made the statements 'involuntary as a matter of law.' The defense did not contend that the statements were the result of physical or mental coercion, or that the wills of the Barrington petitioners were overborne. Accordingly, the State was never obliged to offer evidence **\*504** of the voluntariness in fact of the statements. We are, however, informed that the three Barrington petitioners had counsel present as their depositions were taken. Insofar as the majority suggests that the Barrington statements are involuntary in fact, in the fashion of Chambers or Haynes, it has introduced a factual contention never urged by the Barrington petitioners and never considered by the courts of New Jersey.

As interrogation commenced, each of the petitioners was sworn, carefully informed that he need not give any information, reminded that any information given might be used in a subsequent criminal prosecution, and warned that as a police officer he was subject to a proceeding to discharge him if he failed to provide information relevant to his public responsibilities. The cautionary statements varied slightly, but all, except that given to Mrs. Naglee, included each of the three warnings. [1] Mrs. Naglee was **\*505** not told that she could be removed from her position at the court if she failed to give information pertinent to the discharge of her duties. All of the petitioners consented to give statements, none displayed any significant hesitation, and none suggested that the decision to offer information was motivated by the possibility of discharge.

A second statement was obtained from each of the petitioners in September and December 1962. These statements were not materially different in content or circumstances from the first. The only significant distinction was that the interrogator did not advert even obliquely to any possibility of dismissal. All the petitioners were cautioned that they **\*\*623** were entitled to remain silent, and there was no evidence whatever of physical or mental coercion.

All of the petitioners testified at trial, and gave evidence essentially consistent with the statements taken from them. At a preliminary hearing conducted at the Bellmawr trial to determine the voluntariness of the statements, the Bellmawr petitioners offered no evidence beyond proof of the warning given them.

The standards employed by the Court to assess the voluntariness of an accused's statements have reflected a number of values, and thus have emphasized a variety of factual criteria. The criteria employed have included threats of imminet danger, Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975, physical deprivations, Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948, repeated or extended interrogation, Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 47i, 60 S.Ct. 47i, limits on access to counsel or friends, Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d

1448, length and illegality of detention under state law, Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, individual weakness or incapacity, Lynumn v. State of Illinois, 372 U.S. 528, and the adequacy of warnings of constitutional rights, Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895. Whatever the criteria employed, the duty of the Court has been 'to examine the entire **\*506** record,' and thereby to determine whether the accused's will 'was overborne by the sustained pressures upon him.' Davis v. State of North Carolina, 384 U.S. 737, 741, 739, 86 S.Ct. 1761, 1764, 1763.

It would be difficult to imagine interrogations to which these criteria of duress were more completely inapplicable, or in which the requirements which have subsequently been imposed by this Court on police questioning were more thoroughly satisfied. Each of the petitioners received a complete and explicit reminder of his constitutional privilege. Three of the petitioners had counsel present; at least a fourth had consulted counsel but freely determined that his presence was unnecessary. These petitioners were not in any fashion 'swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion * * *.' Miranda v. State of Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 1621. I think it manifest that, under the standards developed by this Court to assess voluntariness, there is no basis for saying that any of these statements were made involuntarily.

## II.

The issue remaining is whether the statements were inadmissible because they were 'involuntary as a matter of law,' in that they were given after a warning that New Jersey policemen may be discharged for failure to provide information pertinent to their public responsibilities. What is really involved on this score, however, is not in truth a question of 'voluntariness' at all, but rather whether the condition imposed by the State on the exercise of the privilege against self-incrimination, namely dismissal from office, in this instance serves in itself to render the statements inadmissible. Absent evidence of involuntariness in fact, the admissibility of these statements thus hinges on the validity of the consequence which the State acknowledged might have resulted if the statements had not been given. If the consequence is **\*507** constitutionally permissible, there can surely be no objection if the State cautions the witness that it may follow if he remains silent. If both the consequence and the warning are constitutionally permissible, a witness is obliged, in order to prevent the use of his statements against him in a criminal prosecution, to prove under the standards established since **\*\*624** Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, that as a matter of fact the statements were involuntarily made. The central issues here are therefore identical to those presented in Spevack v. Klein, supra: whether consequences may properly be permitted to result to a claimant after his invocation of the constitutional privilege, and if so, whether the consequence in question is permissible. For reasons which I have stated in Spevack v. Klein, in my view nothing in the logic or purposes of the privilege demands that all consequences which may result from a witness' silence be forbidden merely because that silence is privileged. The validity of a consequence depends both upon the hazards, if any, it presents to the integrity of the privilege and upon the urgency of the public interests it is designed to protect.

It can hardly be denied that New Jersey is permitted by the Constitution to establish reasonable qualifications and standards of conduct for its public employees. Nor can it be said that it is arbitrary or unreasonable for New Jersey to insist that its employees furnish the appropriate authorities with information pertinent to their employment. Cf. Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414; Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692. Finally, it is surely plain that New Jersey may in particular require its employees to assist in the prevention and detection of unlawful activities by officers of the state government. The urgency of these requirements is the more obvious here, where the conduct in question is that of officials directly entrusted with the administration of justice. The importance for our systems of justice **\*508** of the integrity of local police forces can scarcely be exaggerated. Thus, it need only be recalled that this Court itself has often intervened in state criminal prosecutions precisely on the ground that this might encourage high standards of police behavior. See, e.g., Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; Miranda

87 S.Ct. 616, 17 L.Ed.2d 562

v. State of Arizona, supra. It must be concluded, therefore, that the sanction at issue here is reasonably calculated to serve the most basic interests of the citizens of New Jersey.

The final question is the hazard, if any, which this sanction presents to the constitutional privilege. The purposes for which, and the circumstances in which, an officer's discharge might be ordered under New Jersey law plainly may vary. It is of course possible that discharge might in a given case be predicated on an imputation of guilt drawn from the use of the privilege, as was thought by this Court to have occurred in Slochower v. Board of Higher Education, supra. But from our vantage point, it would be quite improper to assume that New Jersey will employ these procedures for purposes other than to assess in good faith an employee's continued fitness for public employment. This Court, when a state procedure for investigating the loyalty and fitness of public employees might result either in the Slochower situation or in an assessment in good faith of an employee, has until today consistently paused to examine the actual circumstances of each case. Beilan v. Board of Public Education, supra; Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494. I am unable to see any justification for the majority's abandonment of that process; it is well calculated both to protect the essential purposes of the privilege and to guarantee the most generous opportunities for the pursuit of other public values. The majority's broad prohibition, on the other hand, extends the scope of the privilege beyond its essential purposes, and seriously hampers the protection of other important values. Despite the majority's **\*509** disclaimer, it is quite plain that the logic of its prohibiting rule would in this situation prevent the discharge of these policemen. It would therefore entirely forbid a sanction which presents, at least on its face, no hazard to the **\*\*625** purposes of the constitutional privilege, and which may reasonably be expected to serve important public interests. We are not entitled to assume that discharges will be used either to vindicate impermissible inferences of guilt or to penalize privileged silence, but must instead presume that this procedure is only intended and will only be used to establish and enforce standards of conduct for public employees. [2] As such, it does not minimize or endanger the petitioners' constitutional privilege against self-incrimination. [3]

**\*510** I would therefore conclude that the sanction provided by the State is constitutionally permissible. From this, it surely follows that the warning given of the possibility of discharge is constitutionally unobjectionable. Given the constitutionality both of the sanction and of the warning of its application, the petitioners would be constitutionally entitled to exclude the use of their statements as evidence in a criminal prosecution against them only if it is found that the statements were, when given, involuntary in fact. For the reasons stated above, I cannot agree that these statements were involuntary in fact.

I would affirm the judgments of the Supreme Court of New Jersey.

**All Citations**

385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562

---

## Footnotes

1    'Any person holding or who has held any elective or appointive public office, position or employment (whether State, county or municipal), who refuses to testify upon matters relating to the office, position or employment in any criminal proceeding wherein he is a defendant or is called as a witness on behalf of the prosecution, upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself or refuses to waive immunity when called by a grand jury to testify thereon or who willfully refuses or fails to appear before any court, commission or body of this state which has the right to inquire under oath upon matters relating to the office, position or employment of such person or who, having been sworn, refuses to testify or to answer any material question upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself, shall, if holding elective or public office, position or employment, be removed therefrom or shall thereby forfeit his office, position or employment and any vested or future right of tenure or pension granted to him by any law of this State provided the inquiry relates to a matter which occurred or arose within the preceding five years. Any person so forfeiting his office, position or employment

shall not thereafter be eligible for election or appointment to any public office, position or employment in this State.'

🚩 N.J.Rev.Stat. s 2A:81—17.1 (Supp.1965), N.J.S.A.

2    At the trial the court excused the jury and conducted a hearing to determine whether, inter alia, the statements were voluntary. The State offered witnesses who testified as to the manner in which the statements were taken; the appellants did not testify at that hearing. The court held the statements to be voluntary.

3    N. 1, supra.

4    🏳 Stevens v. Marks, 383 U.S. 234, 243, 86 S.Ct. 788, 793, 15 L.Ed.2d 724, quoting from 🏳 Frost Trucking Co. v. Railroad Comm'n, 271 U.S. 583, 593, 46 S.Ct. 605, 607, 70 L.Ed. 1101.

5    Cf. Lamm, The 5th Amendment and Its Equivalent in Jewish Law, 17 Decalogue Jour. 1 (Jan.—Feb.1967):

'It should be pointed out, at the very outset, that the Halakhah does not distinguish between voluntary and forced confessions, for reasons which will be discussed later. And it is here that one of the basic differences between Constitutional and Talmudic Law arises. According to the Constitution, a man cannot be compelled to testify against himself. The provision against self-incrimination is a privilege of which a citizen may or may not avail himself, as he wishes. The Halakhah, however, does not permit self-incriminating testimony. It is inadmissible, even if voluntarily offered. Confession, in other than a religious context, or financial cases completely free from any traces of criminality, is simply not an instrument of the Law. The issue, then, is not compulsion, but the whole idea of legal confession.

'The Halakhah, then, is obviously concerned with protecting the confessant from his own aberrations which manifest themselves, either as completely fabricated confessions, or as exaggerations of the real facts. * * * While certainly not all, or even most criminal confessions are directly attributable, in whole or part, to the Death Instinct, the Halakhah is sufficiently concerned with the minority of instances, where such is the case, to disqualify all criminal confessions and to discard confession as a legal instrument. Its function is to ensure the total victory of the Life Instinct over its omnipresent antagonist. Such are the conclusions to be drawn from Maimonides' interpretation of the Halakhah's equivalent of the Fifth Amendment.

'In summary, therefore, the Constitutional ruling on self-incrimination concerns only forced confessions, and its restricted character is a result of its historical evolution as a civilized protest against the use of torture in extorting confessions. The Halakhic ruling, however, is much broader and discards confessions in toto, and this because of its psychological insight and its concern for saving man from his own destructive inclinations.' Id., at 10, 12.

1    The warning given to Chief Garrity is typical. 'I want to advise you that anything you say must be said of your own free will and accord without any threats or promises or coercion, and anything you say may be, of course, used against you or any other person in any subsequent criminal proceedings in the courts of our state.

'You do have, under our law, as you probably know, a privilege to refuse to make any disclosure which may tend to incriminate you. If you make a disclosure with knowledge of this right or privilege, voluntarily, you thereby waive that right or privilege in relation to any other questions which I might put to you relevant to such disclosure in this investigation.

'This right or privilege which you have is somewhat limited to the extent that you as a police officer under the laws of our state, may be subjected to a proceeding to have you removed from office if you refuse to answer a question put to you under oath pertaining to your office or your function within that office. It doesn't mean, however, you can't exercise the right. You do have the right.'

A. 'No, I will cooperate.'

87 S.Ct. 616, 17 L.Ed.2d 562

Q. 'Understanding this, are you willing to proceed at this time and answer any questions?'

A. 'Yes.'

2    The legislative history of 🚩 N.J.Rev.Stat.2A:81—17.1, N.J.S.A. provides nothing which clearly indicates the purposes of the statute, beyond what is to be inferred from its face. In any event, the New Jersey Supreme Court noted below that the State would be entitled, even without the statutory authorization, to discharge state employees who declined to provide information relevant to their official responsibilities. There is therefore nothing to which this Court could properly now look to forecast the purposes for which or circumstances in which New Jersey might discharge those who have invoked the constitutional privilege.

3    The late Judge Jerome Frank thus once noted, in the course of a spirited defense of the privilege, that it would be entirely permissible to discharge police officers who decline, on grounds of the privilege, to disclose information pertinent to their public responsibilities. Judge Frank quoted the following with approval:

"Duty required them to answer. Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers. They claim that they had a constitutional right to refuse to answer under the circumstances, but * * * they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them.' 🚩 Christal v. Police Commission of San Francisco'. Citing 33 Cal.App.2d 564, 92 P.2d 416. (Emphasis added by Judge Frank.) United States v. Field, 2 Cir., 193 F.2d 92, 106 (separate opinion).

---

**End of Document**           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Travis v. Village of Dobbs Ferry,   S.D.N.Y.,   February 8, 2005

246 F.3d 194

United States Court of Appeals, Second Circuit.

Thomas C. CERRONE, Plaintiff–Appellee,

v.

Scott L. BROWN and Thomas M. Fresenius, individually and in their official
capacity as members of the New York State Police, Defendants–Appellants,
Michael F. Cahill, Francis A. Defrancesco, Salvatore S. Valvo, Richard G. Morse,
Deborah L. Komar, individually and in their official capacity as members of the
New York State Police, Jonathan Z. Friedman and Gerald W. Connolly, Defendants.

Docket No. 00–7177
|
Argued Sept. 20, 2000.
|
Decided April 10, 2001.

## Synopsis

State police trooper brought § 1983 action against fellow officers who had seized him as part of criminal investigation into suspected misconduct in the performance of his official duties. Defendants' motion for summary judgment on ground of qualified immunity was denied by the   United States District Court for the Northern District of New York, Thomas J. McAvoy, J., 84 F.Supp.2d 330, and defendants appealed. The Court of Appeals, John M. Walker, Jr., Chief Judge, held that: (1) the law in 1995 was clearly established that seizure of a police officer in the context of a criminal investigation required probable cause on the part of the seizing officers; (2) defendant officers may be still entitled to qualified immunity if they had arguable probable cause for the seizure, thus rendering their conduct objectively reasonable; and (3) officers would be entitled to qualified immunity on this basis if the only conclusion a reasonable jury could reach was that reasonable officers would disagree on the constitutionality of the seizure.

Vacated and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

## Attorneys and Law Firms

**\*196** Paul M. Collins, Hinman, Straub, Pigors & Manning, P.C., Albany, NY, (Deirdre Roney, Lawrence H. Schaefer, of counsel, on the brief), for Plaintiff–Appellee.

Alan S. Kaufman, Chamberlain & Kaufman, Albany, NY, (Jeffrey Chamberlain, on the brief), for Defendants–Appellants.

Before: WALKER, Chief Judge, MINER and POOLER, Circuit Judges.

## Opinion

JOHN M. WALKER, Jr., Chief Judge:

This appeal requires us to determine whether in 1995 the law was clearly established that a police officer must have probable cause to seize another police officer in the course of a criminal investigation. Plaintiff-appellee Thomas C. Cerrone, a New York State Police Trooper, was detained and questioned by fellow officers during a criminal investigation of a suspected cover-up of a hit-and-run accident. Cerrone sued the investigating officers, including defendants-appellants Lieutenant Scott L. Brown and Captain Thomas Fresenius of the Inspection Section of the New York State Police, and others, for damages pursuant to 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights to be free from an unreasonable seizure. On January 28, 2000, the United States District Court for the Northern District of New York (Thomas A. McAvoy, *Senior District Judge*) denied appellants' motion for summary judgment and found that issues of fact precluded finding them entitled to qualified immunity as a matter of law. This appeal followed.

In his complaint, Cerrone alleges that the defendants held him for questioning without probable cause. In support of their claim of qualified immunity, appellants argue that in 1995, the time of the seizure in this case, the law was not clearly established that probable cause was required to detain a police officer for questioning in the context of an investigation arising out of the performance of his official duties. In the alternative, appellants argue that if probable cause were required, the district court misapplied the standard for determining whether the defendants' conduct was nonetheless objectively reasonable—whether they had "arguable probable cause" to justify the seizure in this case.

We hold that in 1995 the law was clearly established that a seizure of a police officer in the context of a criminal investigation required probable cause. However, because we agree with the appellants that the district court applied the wrong standard to determine whether their conduct was objectively reasonable, and failed to examine whether reasonable police officers could disagree as to the existence of probable cause given the information the arresting officers had, we vacate and remand to the district court for further proceedings.

**\*197** BACKGROUND

The district court has described the facts of this case in considerable detail. *See Cerrone v. Cahill,* 84 F.Supp.2d 330 (N.D.N.Y.2000). We summarize only those facts most relevant to this appeal.

In September 1994, the New York State Police received a letter describing a hit-and-run accident that had occurred in April or May of 1993. The letter identified the driver as one Rory Knapp and alleged that Rory Knapp's brother Timothy Knapp, a New York State Police Trooper, had assisted him in covering up the accident. The letter stated that Rory Knapp had hidden his car in Trooper Knapp's garage to avoid detection, and suggested in cryptic terms that several state troopers in the Peekskill barracks were aware of the cover-up ("the truth lies within the four walls of that barracks"). Though the letter appeared to have been authored by a man named Ed Scott, the author's identity was never verified. The letter did not mention Cerrone by name; nor did it suggest that he was involved in a cover-up.

The letter sparked an investigation into the incident. Appellants Fresenius and Brown were assigned to the investigation under the supervision of defendant Inspector Michael Cahill, who is not a party to this appeal. Their investigation revealed that on April 3, 1993, a car accident had taken place as described in the letter: Rory Knapp, driving a car owned by his companion, Dawn Brissett, crossed into the wrong lane of traffic and struck Maureen Hunt's vehicle. Hunt suffered minor injuries. Brissett later told police investigators that Rory Knapp had told her about his involvement in the accident. She stated that the day after the accident, Rory Knapp hid the car beside his brother Trooper Knapp's house, leaving it there until he took it to be destroyed.

The investigators ultimately concluded that the trooper who responded to the scene and prepared an accident report, Robert Gregory, had failed to conduct a thorough investigation. Appellant Brown learned from witnesses that the victim had provided Gregory with a description of the car, a partial license plate number, and items of the perpetrator's clothing found at the accident scene. However, it was apparent from a review of Gregory's report that Gregory did not follow up on these leads; instead he

wrote in his report that "further investigation revealed no new clues, leads, suspects. Operator of Vehicle 1 could offer no new information." Cerrone signed Gregory's report as a supervisor.

Margaret Murphy, a bartender at an establishment near the accident scene, told an investigator that she was friends with both Rory Knapp and Sergeant Welsh, Cerrone's direct supervisor and the State Police Officer in charge of the zone in which the Peekskill State Police Station was located. She stated that Knapp and Welsh were friends with each other and that Rory Knapp had admitted to her that after the accident he had called Welsh, who told him "not to worry about it as [he] would take care of it."

Based upon the investigation, appellant Brown concluded that it was "reasonable to believe that Sergeant Cerrone was directly implicated in the cover-up as a result of at least the following facts, which reasonably appeared to be true to the investigation team": (1) Cerrone was Station Commander at the Peekskill Station, and thus would be expected to be aware of all of the activities at the station; (2) Cerrone was on duty when the accident occurred and went to the scene; (3) to the extent that Zone Sergeant Welsh, Cerrone's direct supervisor, had assisted in the cover-up, "he could not have done it without **\*198** including Cerrone"; (4) Cerrone failed to find the car involved in the accident, despite having been given a detailed description of the car and the fact that it was placed in two locations that were frequently passed by officers of the Peekskill barracks; (5) Cerrone signed the accident report prepared by Trooper Gregory, which the appellants had determined was incomplete. *See* 🚩*Cerrone, 84 F.Supp.2d at 331.*

On January 4, 1995, appellant Brown met with defendant Gerald Connolly of the Westchester County District Attorney's Office, who is not a party to this appeal, to discuss possible criminal charges arising out of the cover-up. According to Brown, Connolly indicated to him that they "would have a stronger case if [they] were able to get an oral admission from one of the targets."

On January 17, 1995, the investigative team discussed a possible criminal case based on the alleged cover-up. On that day, the district court found, "[d]efendants decided to stop Cerrone on his way home from work, question him in connection with the April 3 accident, and determine if he would cooperate with the investigation." *Id.* at 332. An agent of the New York State Bureau of Criminal Investigation, Lieutenant John Edward Grant, provided the investigators with a psychological profile of Cerrone in order to assist them in conducting the planned interview. *See id.*

On January 19, 1995, using an unmarked police car, the defendants stopped Cerrone. They asked whether he was carrying a weapon, allegedly "placed him in the felony position, placed him in the back of an unmarked police car (where he was guarded), transported him to a hotel room, read him his *Miranda* rights, [and] informed him that he was the target of a criminal investigation." *Id.* After approximately six hours of questioning, "Cerrone was told he could leave after he agreed to take a polygraph examination, which he took the next day." *Id.* Cerrone was never charged with a crime.

Cerrone sued the defendant police officers under 📁 42 U.S.C. § 1983 for damages based on the deprivation of his Fourth and Fourteenth Amendment rights. Appellants Brown and Fresenius moved for summary judgment on the ground that they were entitled to qualified immunity. Appellants appeal the district court's denial of that motion.


DISCUSSION

We review *de novo* a decision denying a government official's motion for summary judgment on the basis of qualified immunity. *See* 🚩*Tellier v. Fields,* 230 F.3d 502, 511 (2d Cir.2000).

The district court held that the defendants were not entitled to qualified immunity on summary judgment because (1) the law was "clearly established" at the time of the seizure that probable cause was required to seize a police officer for the purpose of

a criminal investigation; and (2) an issue of fact existed as to whether defendants' actions were "objectively reasonable" under the circumstances. *See* 🚩 *Cerrone,* 84 F.Supp.2d at 333–40.

Appellants concede for purposes of this appeal that their actions with respect to Cerrone on January 19, 1995 amounted to a "seizure" under the Fourth and Fourteenth Amendments. They argue, however, that the district court erred in two respects, asserting that: (1) the law was not clearly established in 1995 as to the level of individualized suspicion necessary to seize a police officer in order to investigate misconduct arising out of the performance of his official duties; and (2) even if the law were clearly established that probable cause was required, appellants' conduct was objectively reasonable because **\*199** they had "arguable probable cause" to seize Cerrone. In this regard, they argue that the district court applied the wrong legal standard and thus erroneously found material facts in dispute to deny their qualified immunity claim. We consider each argument in turn.

## I.

A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," 🚩 *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), or (2) it was " 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." 🚩 *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing 🚩 *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Focusing on the first element in a qualified immunity analysis, the existence of a "clearly established right," the Supreme Court has explained: "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." 🚩 *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (internal citation omitted). Thus,

> [i]n deciding whether a particular right was clearly established as of a particular time, we must determine (i) whether the right at issue was defined with reasonable clarity; (ii) whether the Supreme Court or the Second Circuit had affirmed the existence of the right; and (iii) whether reasonable police officers in the defendants' position would have understood from the existing law that their conduct was unlawful.

🚩 *Townes v. City of New York,* 176 F.3d 138, 144 (2d Cir.), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 311 (1999). There can be little doubt that at the time of Cerrone's seizure, it was clearly established law that the Fourth Amendment prohibited police seizures of persons for custodial interrogation—even brief detentions falling short of arrest—without probable cause. *See* 🚩 *Dunaway v. New York,* 442 U.S. 200, 206–16, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (holding that "detention for custodial interrogation ... intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest" and to require probable cause); 🚩 *Davis v. Mississippi,* 394 U.S. 721, 726–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (holding that the Fourth Amendment applies during the investigative, as well as accusatory, stage); 🚩 *Katz v. United States,* 389 U.S. 347, 358–59, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers. *See* 🚩 *Elkins v. United States,* 364 U.S. 206, 213, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

Appellants, however, maintain that the law was not clearly established in 1995 that the Fourth and Fourteenth Amendments prohibited police seizures of other police officers without probable cause. They assert that regardless of whether such a seizure is for the purpose of a criminal investigation, probable cause is not required when the suspected police misconduct occurs during the performance of an officer's official duties. Like the district court, we disagree.

The fact that the person seized was a police officer does not alter a Fourth Amendment analysis, for "policemen, like teachers and lawyers, are not relegated to **\*200** a watered-down version of constitutional rights." *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (holding that police officers enjoy the same rights as other citizens).

In support of their argument, appellants point to several cases in which this court has upheld searches or seizures of police officers or other government employees in the absence of probable cause, *see, e.g.,* *Biehunik v. Felicetta,* 441 F.2d 228 (2d Cir.1971), and maintain that the distinction between those cases requiring probable cause and those requiring something less should be whether "the investigation arises out [of] the performance of the employee's duties," regardless of its purpose. They assert that "police employment gives rise to 'special considerations' that must be taken into account in considering the reasonableness of work-related searches and seizures. Steps taken to assure 'employees' trustworthy performance of their assigned tasks [as policemen] are reasonable under the Fourth Amendment," quoting *Biehunik,* 441 F.2d at 231. Appellants also assert that this exception rests upon " 'the substantial public interest in ensuring the appearance and actuality of police integrity,' " again quoting *Biehunik,* 441 F.2d at 230.

We are not persuaded by appellants' argument, as it would erode the principle that a criminal suspect who is a policeman enjoys the same rights as other suspects. *See* *Garrity,* 385 U.S. at 500, 87 S.Ct. 616. The crucial question is not whether the investigation involves actions arising out of a police officer's duties, but whether the investigation's objective is to discipline the officer within the department or to seek criminal prosecution.

We have permitted police seizures of police officers based upon less than probable cause in connection with internal administrative or disciplinary proceedings. In *Biehunik,* for example, we upheld as reasonable, despite the absence of any individualized suspicion, a lineup of 62 police officers for identification in the context of an internal investigation of police misconduct. The *Biehunik* court found that investigations with different purposes require different degrees of individualized suspicion:

> In the familiar criminal arrest context, the reasonableness of a seizure of the person is indeed usually measured by the existence *vel non* of probable cause. But we cannot accept the contention that this principle, well established as it may be, must be applied inflexibly even in cases far removed from the criminal arrest arena.

*Biehunik,* 441 F.2d at 230. Distinguishing the facts there from the typical criminal investigation the court noted:

> The lineup was ordered by that official of the police department charged with running an efficient and law-abiding organization—the Police Commissioner—and was clearly and highly relevant to the legitimate end of assuring his employees' trustworthy performance of their assigned tasks. Commissioner Felicetta's reference in his order directing the lineup to a possible criminal prosecution did not dilute the potential

usefulness of the lineup in administering disciplinary measures. We therefore need not consider at this time the propriety of enjoining a similar lineup conducted exclusively with criminal prosecution in mind.

*Id.* at 231 (footnote omitted). Thus, *Biehunik* drew a distinction based upon whether the purpose of a seizure is exclusively to aid a criminal investigation, or simply to seek internal discipline:

> We do not believe that the public must tolerate failure by responsible officials to **\*201** seek out, identify, and appropriately discipline policemen responsible for brutal or unlawful behavior in the line of duty, merely because measures appropriate to those ends would be improper if they were directed solely toward the objective of criminal prosecution.

*Id.* at 230. *Biehunik* is also factually distinguishable from this case, as *Biehunik* did not involve custodial interrogation, which the Supreme Court expressly held, several years after *Biehunik* was decided, requires probable cause. *See* *Dunaway v. New York,* 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

It therefore is clear, as it was in 1995, that *Biehunik*'s exception to the probable cause requirement is limited to internal disciplinary investigations. Nothing in *Biehunik* disturbs the well-settled principle, established long before 1995, that probable cause is required for a seizure for custodial interrogation in the criminal context.

The Supreme Court's decision in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), further clarified that a lesser standard of individualized suspicion is permissible only in internal disciplinary investigations of government employees by their government employers. Indeed, as appellants correctly point out, the court in *O'Connor* specifically limited its holding to the facts before it:

> Because the parties in this case have alleged that the search was either a noninvestigatory work-related intrusion or an investigatory search for evidence of suspected work-related employee misfeasance, we undertake to determine the appropriate Fourth Amendment standard of reasonableness *only* for these two types of employer intrusions and leave for another day inquiry into other circumstances.

*O'Connor,* 480 U.S. at 723, 107 S.Ct. 1492 (emphasis in original). Like *Biehunik, O'Connor* did not disturb the well-settled rule that probable cause is required for criminal investigations.

Here, the district court found that Cerrone's seizure was for the purpose of a criminal, rather than a disciplinary or administrative, investigation. *See* *Cerrone,* 84 F.Supp.2d at 334. The court based this conclusion on (1) the nature of the seizure, its setting, and its preparation; (2) the fact that the defendants did not follow the applicable collective bargaining agreement's specific procedures for administrative investigations; and (3) multiple admissions by appellants in the record that Cerrone was the target of a criminal investigation. *See id.* These admissions included appellant Brown's testimony:

Q: And at that date and at that interview [on January 19, 1995] was Sgt. Cerrone the target of an administrative investigation of the Division of State Police?

A: No.

Q: What was he?

A: At that time Sgt. Cerrone was considered a witness and possible suspect in a criminal investigation.

Brown also stated that prosecutors from the Public Integrity Bureau of the Westchester County District Attorney's Office "began working with the State Police investigation with respect to possible criminal prosecutions." Defendant Cahill testified that Cerrone's interview was "a criminal interview not an administrative interview."

Appellants' reliance upon 🚩 *United States v. Collins,* 349 F.2d 863 (2d Cir.1965), is unavailing. While *Collins* involved a criminal investigation, it is not controlling here. In *Collins,* we approved as reasonable a supervisor's search for stolen mail in a customs official's work **\*202** jacket that was hanging in a public area. In that case, we placed special emphasis upon the broad authority of the supervising Customs Official to search public areas to find stolen mail or stolen property within a Customs facility. *See id.* at 868. *Collins* did not involve a seizure of a target of a criminal investigation for the purpose of custodial interrogation. Moreover, the *Collins* court expressly found that probable cause existed to search the defendant's person and apartment, and to arrest him. *See id.* at 868–69. Appellants' reliance upon the district court opinion in 🚩 *Sponito v. City of New York,* No. 84 Civ. 3937 1986 WL 6158, at \*5–6 (S.D.N.Y. May 28, 1986), *aff'd,* 805 F.2d 391 (2d Cir.1986) (table decision) is similarly unavailing. A district court opinion affirmed by an unpublished table decision does not determine whether a right was clearly established. *Cf.* 🚩 *Townes,* 176 F.3d at 144 (only Supreme Court and Second Circuit precedent are relevant to whether a right is clearly established).

We therefore agree with the district court's decision that Cerrone's seizure and custodial interrogation for the purpose of a criminal investigation required probable cause and that the law in that regard was clearly established at the time of the seizure.

## II.

The appellants next assert that even if probable cause were required, they are still entitled to qualified immunity because they had "arguable" probable cause to seize Cerrone, and thus their actions were objectively reasonable under the second element of qualified immunity analysis. Cerrone responds that we lack appellate jurisdiction to reach this issue, because the district court's denial of qualified immunity on summary judgment was based upon its finding that material facts were in dispute. We disagree with Cerrone. We have appellate jurisdiction to address appellant's second argument because we hold that the district court applied the wrong legal standard to this element of appellants' qualified immunity claim. *See* 🚩 *Martinez v. Simonetti,* 202 F.3d 625, 632 (2d Cir.2000) ("[A] district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law,* is an appealable 'final decision' within the meaning of 🚩 28 U.S.C. § 1291.") (internal quotation marks omitted).

Therefore, we turn to the merits of appellants' second claim. Even though the law was clearly established that probable cause was required to seize Cerrone, the second element of qualified immunity analysis permits a court to grant summary judgment if a reasonable officer could have believed his or her actions were lawful. A court must evaluate the objective reasonableness of the appellants' conduct "in light of clearly established law and the information the ... officers possessed." 🚩 *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. Because the test is an objective one, the officer's "subjective beliefs about the [seizure] are irrelevant." *Id.* A defendant is therefore entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." 🚩 *Lennon,* 66 F.3d at 420 (quoting 🚩 *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The appellants correctly point out that to be entitled to qualified immunity, they need only have possessed "arguable" probable cause to seize Cerrone, not actual probable cause. Arguable probable cause exists when "a reasonable police officer **\*203** in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (internal quotation marks omitted). "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. Even on summary judgment, where all facts must be viewed in the light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (noting that "a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference"). A "police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Simonetti,* 202 F.3d at 635 (internal quotation marks omitted). Nor is a police officer required to "sit as prosecutor, judge, or jury" in making a probable cause determination. *Id.* at 635–36 (internal quotation marks omitted).

In holding that there remained material issues in dispute with respect to whether appellants' conduct was objectively reasonable, the district court relied upon language specifically disavowed by the Supreme Court in *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The district court stated that " '[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment or a directed verdict in a § 1983 action based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach.' " *Cerrone,* 84 F.Supp.2d at 340 (quoting *Hunter,* 502 U.S. at 233, 112 S.Ct. 534 (Stevens, *J.,* dissenting)). *But see id.* at 228, 112 S.Ct. 534 (per curiam) (expressly rejecting the dissent's characterization). The district court ultimately found that because material facts were in dispute, a "reasonable finder of fact could reach more than one conclusion." *Cerrone,* 84 F.Supp.2d at 334.

As both this Circuit and the Supreme Court have repeatedly stated, the court must grant police officers qualified immunity when the court concludes that the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality of the seizure. *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Lennon,* 66 F.3d at 420–21. Because the district court failed to apply the correct legal standard to the objective reasonableness test and failed to consider whether appellants had arguable probable cause to seize Cerrone, we vacate and remand to the district court to consider whether appellants' conduct was objectively reasonable under the circumstances presented here.

## CONCLUSION

We hold that the law in 1995 was clearly established that seizure of a police officer in the context of a criminal investigation required probable cause on the part of the seizing officers. We also hold that the officers may be entitled to qualified immunity **\*204** if they had arguable probable cause for the seizure, thus rendering their conduct objectively reasonable.

Accordingly, the decision of the district court is vacated and remanded for further proceedings consistent with this opinion.

No costs to either party.

**All Citations**

246 F.3d 194

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

03 Cal. Daily Op. Serv. 9997, 2003 Daily Journal D.A.R. 12,539

⚑ KeyCite Yellow Flag - Negative Treatment

Distinguished by  Torres v. City of Madera,  9th Cir.(Cal.),  August 22, 2011

⚠ KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Pearson v. Callahan,  U.S.,  January 21, 2009

350 F.3d 949

United States Court of Appeals, Ninth Circuit.

Kely WILKINS, Individually and as the Successor in Interest to Decedent William Alberto Wilkins; William Alberto
Wilkins, Individually; The Estate of William Wilkins; William Randolph Wilkins, a minor, by and through his Guardian
Ad Litem, Kely Wilkins; Fernando Wilkins, Individually; Josefina Wilkins, Individually, Plaintiffs–Appellees,

v.

CITY OF OAKLAND, Defendant,

v.

Tim Scarrott, individually, and in his official capacity as a Police Officer for the City of Oakland; Andrew Koponen,
individually, and in his official capacity as a Police Officer for the City of Oakland, Defendants–Appellants.

No. 03–15086

|

Argued and Submitted Oct. 6, 2003.

|

Filed Nov. 20, 2003.

**Synopsis**

Estate and surviving family members of police officer who was allegedly shot by other officers while he was making arrest at
gunpoint while in plain clothes brought § 1983 action against the other officers and the city, alleging violation of the victim
officer's Fourth Amendment right to be free from excessive force and of his due process rights. The United States District Court
for the Northern District of California, Maxine M. Chesney, J., denied the officers' motion for summary judgment on basis of
qualified immunity, and officers appealed. The Court of Appeals, Betty B. Fletcher, Circuit Judge, held that: (1) the Court of
Appeals had jurisdiction over the interlocutory appeal; (2) the Court of Appeals lacked jurisdiction to consider whether the
defendant police officers violated the victim officer's Fourth Amendment right and whether the trial court identified facts which
would support such a finding; and (3) a genuine issue of material fact existed as to whether the defendant officers' mistaken
belief that the victim officer was a civilian was reasonable under the circumstances, precluding summary judgment on ground
of qualified immunity.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

*951  Todd Boley, Oakland, CA, for the Defendants–Appellants.

Michael J. Haddad, Oakland, CA, for the Plaintiffs–Appellees.

Appeal from the United States District Court for the Northern District of California; Maxine M. Chesney, District Judge,
Presiding. D.C. No. CV–01–01402–MMC.

Before HUG, B. FLETCHER, and TASHIMA, Circuit Judges.

03 Cal. Daily Op. Serv. 9997, 2003 Daily Journal D.A.R. 12,539

---

## OPINION

BETTY B. FLETCHER, Circuit Judge:

Defendants–Appellants Tim Scarrott and Andrew Koponen, Police Officers for the City of Oakland ("Scarrott and Koponen," or "the officers"), raise several issues on appeal. We conclude that we have jurisdiction to consider only the district court's denial of their motion for summary judgment on the ground of qualified immunity. We affirm.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1291 over an interlocutory appeal where the ground for the motion in question is qualified immunity. *Jeffers v. Gomez,* 267 F.3d 895, 903 (9th Cir.2001) (per curiam); *Schwenk v. Hartford,* 204 F.3d 1187, 1195 (9th Cir.2000). In such circumstances, however, appellate review is generally limited to issues of law, *see Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), and "does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact." *Jeffers,* 267 F.3d at 903; *see Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

The first question to be resolved, therefore, is whether this court has jurisdiction over all the issues raised on appeal. In *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court held that a district court's rejection of a claim of qualified immunity, "to the extent that it turns on an issue of law," is a final decision subject to immediate appeal under 28 U.S.C. § 1291. Nevertheless, we are not precluded from hearing this interlocutory appeal merely because there are issues of fact in dispute. *See Jeffers,* 267 F.3d at 903; *Schwenk,* 204 F.3d at 1195; *Knox v. Southwest Airlines,* 124 F.3d 1103, 1107 (9th Cir.1997). Where disputed facts exist, we will determine if the denial of qualified immunity was proper by assuming that the version of events offered by the non-moving party is correct.

It is well-established that "an appellate court lacks jurisdiction over an interlocutory appeal challenging the sufficiency of the evidence supporting the trial court's conclusion that an issue of fact exists." *Jeffers,* 267 F.3d at 903, citing **\*952** *Johnson,* 515 U.S. at 313, 115 S.Ct. 2151. The opinion in *Jeffers* explained that "any issue of law, including the *materiality* of the disputed issues of fact, is a permissible subject for appellate review." 267 F.3d at 905 (emphasis added). Thus this court has jurisdiction to consider whether, even accepting the Wilkinses'[1] version of the events on January 11, 2001, the alleged conduct of the officers violated a clearly established legal standard. *See Knox,* 124 F.3d at 1107 (distinguishing *Johnson,* where the defendant simply denied having committed the alleged acts, from the situation where the motion presents only the legal question of whether the alleged conduct violated a clearly established right).

The officers raise three issues in their appeal of the denial of qualified immunity, arguing that: (1) they did not violate the decedent Wilkins' Fourth Amendment right; (2) the trial court did not identify facts which would support such a finding; and (3) even if there were a triable issue of fact on the alleged Fourth Amendment violation, the officers are entitled to qualified immunity. We have no jurisdiction over the first two issues in this interlocutory appeal, because they focus on the merits of the Wilkinses' claim, not the materiality of disputed facts, nor the legal issues relevant to qualified immunity. On an interlocutory appeal of a denial of qualified immunity, this court does not have jurisdiction to rule on the merits of the Wilkinses' Fourth Amendment claim, nor may it conduct an inquiry into the sufficiency of evidence to support a finding that the officers did in fact violate Wilkins' constitutional right. Contrary to the arguments of the officers in their brief, the key issue in this case is

03 Cal. Daily Op. Serv. 9997, 2003 Daily Journal D.A.R. 12,539

not whether the "undisputed facts establish that the actions of the officers were objectively reasonable and not a violation of Wilkins' constitutional right." As we explain below, in this case it is the *disputed* facts that are crucial for both the qualified immunity analysis and the eventual disposition of the Wilkinses' claim on the merits. The issue for decision is thus whether the officers are eligible for qualified immunity under the Wilkinses' version of the disputed facts.

Resolving all factual disputes in the Wilkinses' favor, therefore, we may consider only whether Scarrott and Koponen are entitled to qualified immunity from the Wilkinses' 🚩 § 1983 claim.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties recount different versions of the events that took place on the night of January 11, 2001. Although some of the relevant facts are undisputed, others that are important to the merits of the Wilkinses' claim remain contested. In reviewing the district court's denial of summary judgment on the ground of qualified immunity, this court must "assume that the version of the facts asserted by the non-moving party is correct in determining whether the denial of qualified immunity was appropriate." 🚩⚠ *Bingham v. City of Manhattan Beach,* 341 F.3d 939, 942 (9th Cir.2003); *see also* 🚩 *Schwenk,* 204 F.3d at 1193, n. 3.

The following facts are not in dispute. On January 11, 2001, Officer William Wilkins was assigned to work in plain clothes in the narcotics unit of the Oakland Police Department. At approximately 11:00 p.m., Officer Wilkins and other police officers **\*953** were pursuing a stolen white Jeep near 90th Avenue and B Street in Oakland. During the pursuit, the suspect, later identified as Demetrius Phillips, left the vehicle and ran away. Police officers, including Officer Wilkins, continued the chase on foot. Several transmissions regarding the theft and subsequent chase were broadcast on the main police radio channel. Appellants Scarrott and Koponen heard these transmissions, and although they were already responding to another incident, they decided to assist in the search for the car theft suspect. The dispatcher directed them to 91st Avenue and B Street, where they were to help form a perimeter of police units, sealing off the area in which the suspect was believed to be located. Upon arriving at the intersection of 91st and B, Scarrott (who was driving the patrol car) saw two men near the sidewalk on B Street between 90th and 91st Avenues. He drove toward the men, and stopped the car at an angle pointing directly to the location of the two men on the sidewalk. When the car stopped, both defendants alighted to investigate. Scarrott and Koponen had each been on the street as a patrol officer for fewer than five months, and neither was acquainted with Officer Wilkins. These are the main undisputed facts.

Accepting the Wilkinses' version of the disputed facts, the following picture emerges. Although conflicting descriptions of the suspect were broadcast on the main channel, at least two of them included the detail that he was wearing a red shirt. Scarrott noticed that one of the two men on the sidewalk was wearing a red shirt; this man was in fact Demetrius Phillips, the suspect. The other man, Officer Wilkins, was wearing a gray sweatshirt. In a voice loud enough to be audible from the corner of 90th and B, Wilkins ordered Phillips to lie on the ground. After this order was repeated, Officer Wilkins punched and kicked Phillips, who then lay spreadeagled on the ground with his head turned to the right. Wilkins pointed his gun at Phillips, and approached him from the left side. Both Mr. Phillips' position and the manner of Wilkins' approach were described by other officers at the scene as consistent with police procedure for high risk arrests, and at least one of those officers—Officer Nash—immediately recognized that the scene he was viewing was a police arrest.

At this point, Koponen said "He's got a gun." Officer Nash, after noting that the suspect was not armed, said either "He's a cop," or "That's Will," speaking to the defendants and referring to Officer Wilkins. This statement was made from less than 30 feet away from Wilkins' position. Officer Wilkins pulled off the hood of his sweatshirt, turned toward the defendants, and said loudly "It's me, Willie." He then turned back to Phillips. Koponen was less than 15 feet away. In the Appellees' version of the incident, Koponen said only "he's got a gun"; Scarrott said nothing, and neither officer ordered Wilkins to drop the gun. The Wilkinses contend that no other warning was given.

03 Cal. Daily Op. Serv. 9997, 2003 Daily Journal D.A.R. 12,539

Soon after Wilkins' statement, Scarrott and Koponen opened fire. The gunshots began seconds after the officers approached Wilkins and Phillips on the sidewalk. Both officers fired several shots in the space of a few seconds: Scarrott fired six or seven times, while Koponen fired seven shots. Wilkins was hit nine times, and came to rest on the ground approximately 12 to 15 feet away from Phillips. Wilkins' gun was found on the ground next to Phillips, an indication that he had dropped his weapon at or close to his original position when Scarrott and Koponen opened fire.

**\*954** Appellees—Officer Wilkins' estate, his widow and son, and his parents—commenced this action, alleging violations of Wilkins' constitutional rights under the Fourth Amendment and the Due Process clauses of the Fifth and Fourteenth Amendments, as well as their own substantive due process rights. The complaint requests damages under 42 U.S.C. § 1983. After discovery had begun, all the named defendants brought a motion for summary judgment, arguing *inter alia* that they were entitled to summary judgment on the substantive due process claims, that the officers did not violate Wilkins' Fourth Amendment right to be free from excessive force, and that the officers were entitled to qualified immunity.

The district court granted the motion with regard to the substantive due process claims, but denied the motion in all other respects. The portion of the district court's order denying defendants' remaining claims held first that "triable issues of material fact existed which, if resolved in plaintiffs' favor, would support a finding that defendants used unreasonable force and thus violated the decedent's Fourth Amendment right to be free from unreasonable seizure;" second, it found that "such right was clearly established at the time of the incident and, viewing the disputed material facts in the light most favorable to the plaintiffs, it would have been clear to a reasonable officer that the conduct was unlawful in the situation confronted." Scarrott and Koponen filed a timely notice of appeal.

## DISCUSSION

We review de novo Scarrott and Koponen's appeal from a denial of summary judgment based on qualified immunity. *See Bingham,* 341 F.3d at 945. The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Billington v. Smith,* 292 F.3d 1177, 1183 (9th Cir.2002). This general evaluation of the constitutionality of the alleged conduct, however, is not sufficient; we must also determine whether the actions alleged violate a clearly established constitutional right, where 'clearly established' means that "it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 (emphasis added).

*Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), established that the use of force is contrary to the Fourth Amendment's prohibition against unreasonable seizures, if that force is excessive as measured by objective standards of reasonableness. In *Saucier,* the Supreme Court explained that this rule is applied in the first stage of the qualified immunity analysis by inquiring whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted. 533 U.S. at 205, 121 S.Ct. 2151(explaining that this rule would protect a reasonable belief that the force was required, even if that belief were mistaken). That is, the first step in the analysis is an inquiry into the objective reasonableness of the officer's belief in the *necessity* of his actions, and there is no Fourth Amendment violation if the officer can satisfy this standard. *See Liston v. County of Riverside,* 120 F.3d 965, 976 (9th Cir.1997) (explaining that "it is the need for force that is at the heart of the *Graham* factors").

The second step of the analysis, which the court reaches only if it determines that the alleged conduct violates a clearly-established **\*955** constitutional right, is to inquire whether the officer was reasonable in his belief that his conduct did not violate the Constitution. This step, in contrast to the first, is an inquiry into the reasonableness of the officer's belief in the

*legality* of his actions. *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151. Even if his actions did violate the Fourth Amendment, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity. Qualified immunity thus "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). For the reasons outlined below, we do not need to reach the second step of the qualified immunity analysis to decide this case.

At the time of the shooting, and unlike the other police officers at the scene, the officers were operating under the mistaken impression that Officer Wilkins was a civilian threatening another civilian with a gun. Thus this case does not present the usual questions, where a given set of facts is known to all parties, and the issue on appeal is whether the defendants' actions were prohibited by the Constitution, or whether their mistaken belief that the conduct was lawful was in fact reasonable.

It is undisputed—and the officers do not contest—that the Fourth Amendment bars the use of deadly force against a fellow police officer effecting an arrest, and that there could be no reasonable mistake about this prohibition. Indeed, in *Jensen v. City of Oxnard,* 145 F.3d 1078 (9th Cir.), *cert. denied,* 525 U.S. 1016, 119 S.Ct. 540, 142 L.Ed.2d 449 (1998), we held that "it was clearly established that police officers retain their Fourth Amendment rights," 145 F.3d at 1085, and obvious from common sense that the decedent police officer in that case "had the right to be free from an unreasonable seizure even from a fellow officer in the course of police work." *Id.* at 1086.

But it is equally uncontested that the officers did not believe that they were shooting a police officer. The crucial question, therefore, is whether their mistaken belief that Wilkins was a civilian was reasonable under the circumstances. Scarrott and Koponen could not have been reasonably mistaken as to the legality of their actions had they realized that Wilkins was a police officer. As a result, the officers' entitlement to summary judgment is determined solely by the application of the first stage of the qualified immunity analysis.

The objective reasonableness of the officers' conduct in this case turns on their mistake of fact with regard to Officer Wilkins' status and purpose at the scene that night. In turn, whether this mistake of fact was reasonable depends on which version of the facts is accepted by a jury. We emphasize that our decision here does not affirm a reflexive denial of summary judgment whenever a material issue of fact remains to be resolved, a practice which the Supreme Court rejected in *Saucier.* Even applying the step-by-step qualified immunity analysis outlined in *Saucier,* there is no question whether the officers' actions in this case violated clearly established law. They did. The only question for resolution is whether their belief in the necessity of their actions was objectively reasonable. That is, was it reasonable for them not to understand that the person they were shooting was another police officer? Because the answer to that question depends on disputed issues of material fact, it is not a legal inquiry, but rather a question of fact best resolved by a jury. *See Santos v. Gates,* 287 F.3d 846, 855 n. 12 (9th Cir.2002) (finding it premature to decide the qualified immunity issue "because whether the officers may be said to **\*956** have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom") (internal citation omitted). *See also Curley v. Klem,* 298 F.3d 271, 278 (3d Cir.2002) (acknowledging that "the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue," noting that the prohibition is consistent with the *Saucier* analytical framework, and citing cases from all other circuits to support the notion of a "general prohibition against deciding qualified immunity questions in the face of disputed historical facts").

This case presents a complicated factual situation, in which the issues that are likely to prove dispositive are hotly disputed. If resolved in favor of the Wilkinses, these issues of material fact would support a finding that Scarrott and Koponen violated Wilkins' clearly established Fourth Amendment right to be free from unreasonable seizure by excessive force. Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate. *See Saucier,* 533 U.S. at 216, 121 S.Ct. 2151 (Ginsburg, J., concurring) ("Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street,

03 Cal. Daily Op. Serv. 9997, 2003 Daily Journal D.A.R. 12,539

*Graham* will not permit summary judgment in favor of the defendant official."). We affirm the district court's denial of summary judgment.

AFFIRMED.

**All Citations**

350 F.3d 949, 03 Cal. Daily Op. Serv. 9997, 2003 Daily Journal D.A.R. 12,539

---

## Footnotes

1    Appellees are the decedent Wilkins' estate, his parents, his widow and child (hereinafter "the Wilkinses"). References to "the Wilkinses" are therefore to the parties who are the appellees in this case; references to "Wilkins" are to the decedent whose Fourth Amendment right was allegedly violated by the officers.

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Milstead v. Kibler,   4th Cir.(Va.),   March 15, 2001

946 F.2d 278

United States Court of Appeals, Fourth Circuit.

James H. RUCKER, Individually and as next friend of David W. Rucker, Minor, Plaintiff–Appellant,

v.

HARFORD COUNTY, MARYLAND; Gary Vernon; Richard F. Williams; Steven Bodway; Elmer H. Tippitt, Superintendent; James Gruver; David B. Alexander; Dominic J. Mele; John J. O'Neal, Defendants–Appellees,

and

Harford County Sheriff's Department; Gerard Morgan; Jerry David Mace; Vernon James Conoway; Carl Pearsall, Defendants.

No. 90–2453

|

Argued March 5, 1991.

|

Decided Oct. 3, 1991.

**Synopsis**

Father of bystander who was killed by police officers who were attempting to apprehend fleeing criminal brought § 1983 action against police officers and county alleging violations of Fourth and Fourteenth Amendments. The United States District Court for the District of Maryland, Marvin J. Garbis, J., dismissed all claims against all defendants by summary judgment and appeal was taken. The Court of Appeals, Phillips, Circuit Judge, held that: (1) Fourth Amendment provides no protection to innocent bystander against being unintentionally injured by police officers trying to apprehend fleeing criminal suspect, and (2) although due process clause provides substantive protection to such bystander against infliction of personal injury by police conduct sufficiently outrageous to constitute completely arbitrary state action, police conduct in this instance did not violate that substantive due process right.

Affirmed.

See also   316 Md. 275, 558 A.2d 399.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

 **\*279** Daniel M. Clements, Israelson, Salsbury, Clements & Bekman, Baltimore, Md., argued (Suzanne K. Farace, on the brief), for plaintiff-appellant.

Carmen Mercedes Shepard, Asst. Atty. Gen., Baltimore, Md., argued (J. Joseph Curran, Jr., Atty. Gen., Stuart M. Nathan, Asst. Atty. Gen., Baltimore, Md., Jefferson L. Blomquist, Harford County Solicitor's Office, Bel Air, Md., Diana G. Motz, Frank, Bernstein, Conaway & Goldman, Michael J. Travieso, Gallagher, Evelius & Jones, Philip M. Andrews, Kramon & Graham, P.A., Baltimore, Md., on the brief), for defendants-appellees.

Before PHILLIPS and NIEMEYER, Circuit Judges, and RESTANI, United States Court of International Trade, sitting by designation.

OPINION

PHILLIPS, Circuit Judge:

This appeal presents as its principal issue whether, and if so to what extent, the fourth amendment's prohibition of unreasonable seizures of the person or the fourteenth amendment's due process clause provide constitutional protection to an innocent bystander against being unintentionally injured by police officers trying to apprehend a fleeing criminal suspect. It also presents the issue whether one bearing an intimate familial relationship to a person so injured has any constitutional right based upon the relationship that is thereby violated.

We conclude that the fourth amendment provides no protection to such a bystander because under the circumstances he is not being "seized" by the police officers. We further conclude that though the due process clause provides substantive protection to such a bystander against the infliction of personal injury by police conduct sufficiently outrageous to constitute completely arbitrary state action, the police conduct indisputably established on this record did not violate that substantive due process right. Finally, we conclude that if there be any constitutional right in one other than a person so injured arising from their intimate familial relationship, the one alleged here could only be a derivative right which fails with failure of the primary claim.

We therefore affirm.

I

The tragic events giving rise to this action began on July 28, 1987, when Jerry Mace, under the influence of PCP, stole a friend's Ford Bronco. From Edgewood, Maryland, he drove southbound on Interstate 95. Responding to a report that Mace was driving recklessly and had failed to pay a highway toll, a Maryland State Trooper, Officer Pearsall, set out to find and apprehend him. Having located Mace on I–95, the officer, later joined by local police officers, attempted to overtake and detain him. Mace refused to stop, speeding away wildly, weaving in and out of traffic. After running through the Maryland House rest stop, Mace drove onto a median strip. There he drove in circles and was seen dancing in his car. Eventually, he stopped on the median strip, but when Pearsall again attempted to detain him, he again sped away, this time southbound in the northbound lanes of I–95. Finally, Mace left I–95 via the northbound entrance ramp onto Route 24.

The police lost sight of Mace for a brief period until he was seen stopped at the corner of Route 152 and Hanson Road. Trooper James Gruver pulled up to him at that location and stepped out of his car, whereupon Mace drove away, barely avoiding a head-on collision. Deputy Sheriff David Alexander positioned himself up the road a bit, near the corner of Trimble Road and Route 152, while Gruver made chase. At this point, Mace turned off the road into the Walls family's field. Gruver followed Mace onto the field, where Mace was again seen driving in circles. Mace then drove his Bronco at Gruver's car, forcing Gruver to swerve to avert a collision. Mace then drove back onto Trimble Road, where he continued for about a mile, veering, finally, **\*280** over an embankment and into a cornfield on the Heine farm. Once in the cornfield, the Bronco was hidden from view.

Having heard of this automobile chase on the police radio, Deputies Stephen Bodway, Charles Hellman, Gary Vernon, and Ricky Williams all responded to assist Alexander and Gruver. Vernon, Alexander, Hellman, and Gruver positioned themselves at the corners of the cornfield, hoping to block any attempts by Mace to leave the field.

Meanwhile, David Rucker, Michael and Valerie Baublitz, and the Baublitz's three children were driving down Trimble Road in the direction of the Heine driveway. Beyond the Heine driveway, on Trimble Road, an officer blocked the road. Rucker drove into the Heine driveway and approached Deputy Vernon to ask what was going on. Vernon told Rucker to leave the scene.

Rucker then drove the car with his passengers across Trimble Road, up an embankment, and into another field. Mrs. Baublitz and the children remained in the car. At some point Rucker and Michael Baublitz left the vehicle.

Deputies Bodway and Conoway went into the cornfield on foot, trying to see the Bronco. Bodway disappeared into the cornfield with no means of communication. He spotted Mace in the Bronco, drew his weapon, and told Mace to freeze and leave the Bronco. Instead, Mace accelerated—it is unclear whether he went towards Bodway—sending dirt into Bodway's face. Bodway shot at the Bronco's tires. Mace continued toward the Heine driveway where Vernon was standing. Vernon noticed Michael Baublitz in the distance, standing beyond the driveway and he shouted for Baublitz to get out of the way. Baublitz then disappeared from sight.

Meanwhile, Mace drove right into the embankment bordering the Heine driveway. Vernon yelled for Mace to stop, but he did not. As Mace drove the vehicle down the driveway towards Trimble Road, Vernon stepped down the driveway, crouched, and fired twelve shots of his semi-automatic weapon at the Bronco's tires. Though not established as fact, it appears, and we assume for purposes of this case, that one of these shots hit Rucker, who apparently was lying on top of the embankment on the other side of Trimble Road. Vernon maintains that he was unaware of Rucker's presence there. A witness who was sitting in Vernon's car in the driveway later testified, however, that she could see Rucker from her vantage point. Two other officers opened fire on the Bronco, finally hitting and collapsing its tires. When Mace then fled on foot, he was captured, and at this point passes from this account.

Rucker's father, individually and as next friend of Rucker, then brought this action alleging claims against the various county police officers involved in the incident and Harford County, seeking damages for Rucker's injury. The claims in Rucker's behalf alleged, under 🚩42 U.S.C. § 1983; violations of constitutional rights secured by the fourth amendment and the due process clauses, parallel state constitutional claims under the Maryland Declaration of Rights, and state tort claims. The claims in plaintiff's individual capacity alleged under 🚩42 U.S.C. § 1983, a violation of the constitutional right "to intimate association."

The district court dismissed all claims against all defendants by summary judgment. This appeal followed.

On the appeal, appellant only challenges the dismissal by summary judgment of his 🚩§ 1983 claims brought in his individual and representative capacities against the various police officers in their individual capacities, and the parallel state constitutional claims against those officers, conceding that the latter rise or fall with the former. No challenge is made to the dismissal of these claims against the County, nor to dismissal of the pendent state-law tort claims. We therefore address only the propriety of the district court's dismissal of the parallel federal and state constitutional claims, focussing on the 🚩§ 1983 claims as controlling.

## II

The primary claim, that made in behalf of Rucker minor, was that his shooting by one of the police officers involved in the chase (presumably Vernon) violated his **\*281** fourth amendment, via fourteenth amendment, right not to be "unreasonably seized," and his fourteenth amendment right to "substantive due process."

## A

The fourth amendment claim is directly foreclosed by 🚩*Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), which held that one is "seized" within the fourth amendment's meaning only when one is the *intended object* of a physical restraint by an agent of the state. This means that a fourth amendment seizure may occur notwithstanding that the person restrained was mistakenly thought to be another, because he nevertheless is the intended object of the specific act of

physical restraint. But it does not mean, as Rucker contends, that a seizure occurs just so long as the act of restraint itself is intended (here the act of shooting) though it restrains one not intended to be restrained. *See* ⚑ *Ansley v. Heinrich,* 925 F.2d 1339, 1344 (11th Cir.1991) (holding that "unintended consequences of government action [cannot] form the basis for a fourth amendment violation"); *see also* ⚑ *El Centro v. United States,* 922 F.2d 816, 822 (Fed.Cir.1990).

It being undisputed on the summary judgment record that Rucker was not the intended object of the shooting by which he was injured, he was not thereby "seized" within contemplation of the fourth amendment. The district court therefore did not err in dismissing that claim.

### B

Though the fourth amendment's specific protection against unreasonable seizures of the person does not, by definition, extend to unintentionally injured "bystanders" such as Rucker, the substantive protections of the due process clause may—in appropriate circumstances. We recently have so held in a case of first impression in this circuit, ⚑ *Temkin v. Frederick County Comm'rs,* 945 F.2d 716 (4th Cir.1991) (innocent "bystander" injured in high speed auto chase by police may have substantive due process claim; not established on facts of case).

*Temkin* held in effect that "substantive due process" guarantees embodied in the due process clause of the fourteenth amendment protect everyone subject to its general protections against being physically injured by agents of the states acting irrationally and arbitrarily, without regard to whether the injury was intended to be inflicted upon the victim. Hence, in appropriate circumstances, substantive due process protections might extend to an "innocent bystander" such as Rucker, even though the "restraint" imposed upon him by the infliction of physical injury did not constitute a fourth amendment "seizure."

But the residual protections of "substantive due process" in this (or any) context run only to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies. *See* ⚑ *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) ( "bar [s] certain government action regardless of ... procedures"); *cf.* ⚑ *id.* at 327, 106 S.Ct. at 662 (procedural due process not denied where state provides adequate post-deprivation remedy). Irrationality and arbitrariness imply a most stringent standard against which state action is to be measured in assessing a substantive due process claim. In this circuit, as generally, the test where physical injury is the basis of claim, is that the state actor's conduct must "amount to a brutal and inhumane abuse of official power literally shocking to the conscience." ⚑ *Temkin,* 945 F.2d at 720.

The undisputed facts of record here reveal police conduct that does not approach such an abuse of official power. The police, including Vernon, the presumed direct actor, were legitimately about the dangerous business of apprehending a madman run amok, threatening the lives of everyone in his way. Given his obvious willingness to injure them or anyone else in order to escape arrest, as evidenced by two near-misses when officers attempted to close with him, they were justified in resorting to the force used to stop his further flight. Rucker was an unfortunate intruder  **\*282**  into a scene of visible danger from which he was warned by the police to leave. So far as the record reveals, the police in the tense situation with which they were dealing were entitled to assume that he had left. So far as the record shows, he had time to do so before the tragic shooting occurred. For whatever reason, he did not. It is undisputed that his shooting was purely accidental. Whether it was negligent is not before us; on a claim of constitutional violation of substantive due process it would in any event not suffice even if proven. While it is possible to think of accidental shootings by police in situations of this general type that might be so reckless and irresponsible as to constitute "inhumane" conduct "literally shocking to the conscience" (shooting into a crowd at close range, or the like), this is no such situation. The only suggestion that Vernon even had the opportunity to see that Rucker might be somewhere in or near the line of fire, was the statement of a passenger who remained in Rucker's parked car after he had left it, that from that vantage point she could see Rucker at the time he was shot. The relative locations of Vernon and this witness, the relevant

topography of the area at the time, are not clear enough to refute Vernon's claim that he did not see Rucker. Even if he had, we still would conclude that given the exigencies of the situation, his accidental shooting of Rucker would not have constituted the kind of "oppressive" abuse of governmental power, *see* *Daniels,* 474 U.S. at 331, 106 S.Ct. at 664, against which substantive due process gives protection.

Obviously, if the conduct of the assumed direct actor, Vernon, does not constitute a substantive due process violation, that of none of the others involved in the chase could.

Accordingly, the district court did not err in granting summary judgment as to Rucker's "substantive due process" claim.

### III

Appellant's claim in his own behalf that the defendants' conduct in injuring his son violated appellant's separate constitutional liberty interest of "intimate association," is one of first impression in this court.

Some other courts have recognized such an independent constitutional right, variously locating it in the first amendment's guarantee of free association, *see* *Trujillo v. Board of County Comrs,* 768 F.2d 1186, 1189–90 (10th Cir.1985), and in the "substantive component" of the due process clause, *see* *Kelson v. Springfield,* 767 F.2d 651, 654 (9th Cir., 1985); *Bell v. Milwaukee,* 746 F.2d 1205, 1245 (7th Cir.1984).

Courts recognizing the existence of such a right also differ on its nature, hence on the way in which it can be violated. Some hold it is only violated by state action that directly injures the relationship itself, as by the taking of a child from its parents' custody or by interfering with matters of family choice. *See* *Ortiz v. Burgos,* 807 F.2d 6, 7–9 (1st Cir.1986). Others apparently hold it may be violated by any conduct which, though unrelated to the relationship, violates the constitutional right of any person in the relationship, on the theory that such conduct incidentally injures the relationship, hence the "liberty interest" in its preservation possessed by all parties to it. *See, e.g.,* *Smith v. Fontana,* 818 F.2d 1411, 1418 (9th Cir.1987) (close relative of person killed by unconstitutional conduct of police has viable § 1983 claim); *Bell v. Milwaukee,* 746 F.2d at 1245 (same).

The recognition of such a constitutional right—on either theory—presents issues of obvious importance and conceptual difficulty which we need not decide in this case, but can reserve for another day. We may do so because even if recognized, neither could be invoked successfully by Rucker's father on the undisputed facts of record in this case.

The police conduct here obviously was not directed at, nor did it directly impinge upon the familial relationship itself, and the claim made here could not indeed be interpreted as seeking to invoke a conduct-directly-related-to-relationship theory.

The other theory, of incidental injury to an associational interest by conduct unrelated to it that violates the constitutional right of another, also would be unavailing here. That theory essentially gives rise to a derivative claim that is dependent upon **\*283** predicate proof of the direct violation of another's constitutional right. Here that would require predicate proof of a violation of the son's constitutional right. That of course is not possible in view of our earlier rejection of that claim.

We therefore conclude that if there be any such constitutionally protectible relational interest as some courts have recognized —an issue we reserve—it could not be successfully invoked by claimant here.

AFFIRMED.

**All Citations**

946 F.2d 278

---

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta   Lemons v. City of Milwaukee,   E.D.Wis.,   July 8, 2016

109 S.Ct. 1865

Supreme Court of the United States

Dethorne GRAHAM, Petitioner

v.

M.S. CONNOR et al.

No. 87–6571

|

Argued Feb. 21, 1989.

|

Decided May 15, 1989.

**Synopsis**

Diabetic brought § 1983 action seeking to recover damages for injuries allegedly sustained when law enforcement officers used physical force against him during course of investigatory stop. The United States District Court for the Western District of North Carolina, 644 F.Supp. 246, directed verdict for defendants. On appeal, the Court of Appeals, 827 F.2d 945, affirmed, and certiorari was granted. The Supreme Court, Chief Justice Rehnquist, held that claim that law enforcement officials have used excessive force in course of arrest, investigatory stop or other "seizure" of a person are properly analyzed under Fourth Amendment's "objective reasonableness" standard.

Vacated and remanded.

Justice Blackmun concurred in part and concurred in the judgment and filed opinion in which Justices Brennan and Marshall joined.

**Procedural Posture(s):** Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict.

**\*\*1866** *Syllabus* [*]

 **\*386**  Petitioner Graham, a diabetic, asked his friend, Berry, to drive him to a convenience store to purchase orange juice to counteract the onset of an insulin reaction. Upon entering the store and seeing the number of people ahead of him, Graham hurried out and asked Berry to drive him to a friend's house instead. Respondent Connor, a city police officer, became suspicious after seeing Graham hastily enter and leave the store, followed Berry's car, and made an investigative stop, ordering the pair to wait while he found out what had happened in the store. Respondent back-up police officers arrived on the scene, handcuffed Graham, and ignored or rebuffed attempts to explain and treat Graham's condition. During the encounter, Graham sustained multiple injuries. He was released when Connor learned that nothing had happened in the store. Graham filed suit in the District Court under 42 U.S.C. § 1983 against respondents, alleging that they had used excessive force in making the stop, in violation of "rights secured to him under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983." The District Court granted respondents' motion for a directed verdict at the close of Graham's evidence, applying a four-factor test for determining when excessive use of force gives rise to a § 1983 cause of action, which inquires, *inter alia,* whether the force was applied in a good-faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm. *Johnson v. Glick,* 481 F.2d 1028. The Court of Appeals affirmed, endorsing this test as generally applicable

109 S.Ct. 1865, 104 L.Ed.2d 443, 57 USLW 4513

to all claims of constitutionally excessive force brought against government officials, rejecting Graham's argument that it was error to require him to prove that the allegedly excessive force was applied maliciously and sadistically to cause harm, and holding that a reasonable **\*\*1867** jury applying the *Johnson v. Glick* test to his evidence could not find that the force applied was constitutionally excessive.

*Held:* All claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard. Pp. 1869–1873.

**\*387**  a) The notion that all excessive force claims brought under 🚩 § 1983 are governed by a single generic standard is rejected. Instead, courts must identify the specific constitutional right allegedly infringed by the challenged application of force and then judge the claim by reference to the specific constitutional standard which governs that right. Pp. 1870–1871.

(b) Claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are most properly characterized as invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable seizures," and must be judged by reference to the Fourth Amendment's "reasonableness" standard. P. 1871.

(c) The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. Pp. 1871–1872.

(d) The *Johnson v. Glick* test applied by the courts below is incompatible with a proper Fourth Amendment analysis. The suggestion that the test's "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances is rejected. Also rejected is the conclusion that because individual officers' subjective motivations are of central importance in deciding whether force used against a convicted prisoner violates the Eighth Amendment, it cannot be reversible error to inquire into them in deciding whether force used against a suspect or arrestee violates the Fourth Amendment. The Eighth Amendment terms "cruel" and "punishments" clearly suggest some inquiry into subjective state of mind, whereas the Fourth Amendment term "unreasonable" does not. Moreover, the less protective Eighth Amendment standard applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. Pp. 1872–1873.

🚩⚠️ 827 F.2d 945, (CA4 1987), vacated and remanded.

REHNQUIST, C.J., delivered the opinion of the Court, in which WHITE, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. ___.

**Attorneys and Law Firms**

**\*388**  H. Gerald Beaver argued the cause for petitioner. On the briefs was Richard B. Glazier.

Mark I. Levy argued the cause for respondents. On the brief was Frank B. Aycock III.*

109 S.Ct. 1865, 104 L.Ed.2d 443, 57 USLW 4513

---

\* Briefs of amici curiae urging reversal were filed for the United States by Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Clegg, David L. Shapiro, Brian J. Martin, and David K. Flynn; and for the American Civil Liberties Union et al. by Steven R. Shapiro.

Lacy H. Thornburg, Attorney General of North Carolina, Isaac T. Avery III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, filed a brief for the State of North Carolina as amicus curiae urging affirmance.

**Opinion**

Chief Justice REHNQUIST delivered the opinion of the Court.

This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We hold that such claims are properly analyzed under the Fourth Amendment's "objective reasonableness" **\*\*1868** standard, rather than under a substantive due process standard.

In this action under 42 U.S.C. § 1983, petitioner Dethorne Graham seeks to recover damages for injuries allegedly sustained when law enforcement officers used physical force against him during the course of an investigatory stop. Because the case comes to us from a decision of the Court of Appeals affirming the entry of a directed verdict for respondents, we take the evidence hereafter noted in the light most favorable to petitioner. On November 12, 1984, Graham, a diabetic, felt the onset of an insulin reaction. He asked a friend, William Berry, to drive him to a nearby convenience store so he could purchase some orange juice to counteract the reaction. Berry agreed, but when Graham entered the store, he saw a number of people ahead of him in the check **\*389** outline. Concerned about the delay, he hurried out of the store and asked Berry to drive him to a friend's house instead.

Respondent Connor, an officer of the Charlotte, North Carolina, Police Department, saw Graham hastily enter and leave the store. The officer became suspicious that something was amiss and followed Berry's car. About one-half mile from the store, he made an investigative stop. Although Berry told Connor that Graham was simply suffering from a "sugar reaction," the officer ordered Berry and Graham to wait while he found out what, if anything, had happened at the convenience store. When Officer Connor returned to his patrol car to call for backup assistance, Graham got out of the car, ran around it twice, and finally sat down on the curb, where he passed out briefly.

In the ensuing confusion, a number of other Charlotte police officers arrived on the scene in response to Officer Connor's request for backup. One of the officers rolled Graham over on the sidewalk and cuffed his hands tightly behind his back, ignoring Berry's pleas to get him some sugar. Another officer said: "I've seen a lot of people with sugar diabetes that never acted like this. Ain't nothing wrong with the M.F. but drunk. Lock the S.B. up." App. 42. Several officers then lifted Graham up from behind, carried him over to Berry's car, and placed him face down on its hood. Regaining consciousness, Graham asked the officers to check in his wallet for a diabetic decal that he carried. In response, one of the officers told him to "shut up" and shoved his face down against the hood of the car. Four officers grabbed Graham and threw him headfirst into the police car. A friend of Graham's brought some orange juice to the car, but the officers refused to let him have it. Finally, Officer Connor received a report that Graham had done nothing wrong at the convenience store, and the officers drove him home and released him.

**\*390** At some point during his encounter with the police, Graham sustained a broken foot, cuts on his wrists, a bruised forehead, and an injured shoulder; he also claims to have developed a loud ringing in his right ear that continues to this day. He commenced this action under 42 U.S.C. § 1983 against the individual officers involved in the incident, all of whom are respondents here,[1] alleging that they had used excessive force in making the investigatory stop, in violation of "rights secured to him under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983." Complaint ¶ 10, App. 5.[2] The case was tried before a jury. At the close of petitioner's evidence, respondents moved for a directed verdict. In ruling

on that motion, the District Court considered the following **\*\*1869** four factors, which it identified as "[t]he factors to be considered in determining when the excessive use of force gives rise to a cause of action under 🚩 § 1983": (1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; (3) the extent of the injury inflicted; and (4) "[w]hether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." 🚩 644 F.Supp. 246, 248 (WDNC 1986). Finding that the amount of force used by the officers was "appropriate under the circumstances," that "[t]here was no discernable injury inflicted," and that the force used "was not applied maliciously or sadistically for the very purpose of causing harm," but in "a good faith effort to maintain or restore order in the face of a potentially explosive **\*391** situation," 🚩 *id., at 248–249,* the District Court granted respondents' motion for a directed verdict.

A divided panel of the Court of Appeals for the Fourth Circuit affirmed. 🚩⚠️ 827 F.2d 945 (1987). The majority ruled first that the District Court had applied the correct legal standard in assessing petitioner's excessive force claim. 🚩⚠️ *Id., at 948–949.* Without attempting to identify the specific constitutional provision under which that claim arose,[3] the majority endorsed the four-factor test applied by the District Court as generally applicable to all claims of "constitutionally excessive force" brought against governmental officials. 🚩⚠️ *Id., at 948.* The majority rejected petitioner's argument, based on Circuit precedent,[4] that it was error to require him to prove that the allegedly excessive force used against him was applied "maliciously and sadistically for the very purpose of causing harm."[5] *Ibid.* Finally, the majority held that a reasonable jury applying the four-part test it had just endorsed **\*392** to petitioner's evidence "could not find that the force applied was constitutionally excessive." ⚠️ *Id., at 949–950.* The dissenting judge argued that this Court's decisions in 🚩 *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and 🚩 *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), required that excessive force claims arising out of investigatory stops be analyzed under the Fourth Amendment's "objective reasonableness" standard. 🚩⚠️ 827 F.2d, at 950–952. We granted certiorari, 488 U.S. 816, 109 S.Ct. 54, 102 L.Ed.2d 32 (1988), and now reverse.

Fifteen years ago, in 🚩 *Johnson v. Glick,* 481 F.2d 1028, cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), the Court of Appeals for the Second Circuit addressed a 🚩 § 1983 damages claim filed by a pretrial detainee who claimed that a guard had assaulted him without justification. In evaluating the detainee's claim, Judge Friendly applied neither the Fourth **\*\*1870** Amendment nor the Eighth, the two most textually obvious sources of constitutional protection against physically abusive governmental conduct.[6] Instead, he looked to "substantive due process," holding that "quite apart from any 'specific' of the Bill of Rights, application of undue force by **\*393** law enforcement officers deprives a suspect of liberty without due process of law." 🚩 481 F.2d, at 1032. As support for this proposition, he relied upon our decision in 🚩 *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), which used the Due Process Clause to void a state criminal conviction based on evidence obtained by pumping the defendant's stomach. 🚩 481 F.2d, at 1032–1033. If a police officer's use of force which "shocks the conscience" could justify setting aside a criminal conviction, Judge Friendly reasoned, a correctional officer's use of similarly excessive force must give rise to a due process violation actionable under 🚩 § 1983. *Ibid.* Judge Friendly went on to set forth four factors to guide courts in determining "whether the constitutional line has been crossed" by a particular use of force—the same four factors relied upon by the courts below in this case. 🚩 *Id., at 1033.*

In the years following *Johnson v. Glick,* the vast majority of lower federal courts have applied its four-part "substantive due process" test indiscriminately to all excessive force claims lodged against law enforcement and prison officials under 🚩 § 1983, without considering whether the particular application of force might implicate a more specific constitutional right governed by a different standard.[7] Indeed, many courts have seemed to assume, as did the courts below in this case, that there is a generic

"right" to be free from excessive force, grounded not in any particular constitutional provision but rather in "basic principles of ⚑ § 1983 jurisprudence." [8]

We reject this notion that all excessive force claims brought under ⚑ § 1983 are governed by a single generic standard. As we have said many times, ⚑ § 1983 "is not itself a **\*394** source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3, 61 L.Ed.2d 433 (1979). In addressing an excessive force claim brought under ⚑ § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. See ⚑ *id.,* at 140, 99 S.Ct., at 2692 ("The first inquiry in any ⚑ § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged"). [9] In most instances, **\*\*1871** that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. The validity of the claim must be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard. See ⚑ *Tennessee v. Garner, supra,* 471 U.S., at 7–22, 105 S.Ct., at 1699–1707 (claim of excessive force to effect arrest analyzed under a Fourth Amendment standard); ⚑ *Whitley v. Albers,* 475 U.S. 312, 318–326, 106 S.Ct. 1078, 1083–1088, 89 L.Ed.2d 251 (1986) (claim of excessive force to subdue convicted prisoner analyzed under an Eighth Amendment standard).

Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person. This much is clear from our decision in *Tennessee v. Garner, supra.* In *Garner,* we addressed a claim that the use of deadly force to apprehend a fleeing suspect who did not appear to be armed or otherwise dangerous violated the suspect's constitutional rights, notwithstanding the existence of probable cause to arrest. **\*395** Though the complaint alleged violations of both the Fourth Amendment and the Due Process Clause, see 471 U.S., at 5, 105 S.Ct., at 1698, we analyzed the constitutionality of the challenged application of force solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person, holding that the "reasonableness" of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out. ⚑ *Id.,* at 7–8, 105 S.Ct., at 1699–1700. Today we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims. [10]

**\*396** Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. ⚑ *Id.,* at 8, 105 S.Ct., at 1699, quoting ⚑ *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Our Fourth Amendment jurisprudence **\*\*1872** has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See ⚑ *Terry v. Ohio,* 392 U.S., at 22–27, 88 S.Ct., at 1880–1883. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," ⚑ *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See

*Tennessee v. Garner,* 471 U.S., at 8–9, 105 S.Ct., at 1699–1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See *Terry v. Ohio, supra,* 392 U.S., at 20–22, 88 S.Ct., at 1879–1881. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, *Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick,* 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody **\*397** allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See *Scott v. United States,* 436 U.S. 128, 137–139, 98 S.Ct. 1717, 1723–1724, 56 L.Ed.2d 168 (1978); see also *Terry v. Ohio, supra,* 392 U.S., at 21, 88 S.Ct., at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See *Scott v. United States, supra,* 436 U.S., at 138, 98 S.Ct., at 1723, citing *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Because petitioner's excessive force claim is one arising under the Fourth Amendment, the Court of Appeals erred in analyzing it under the four-part *Johnson v. Glick* test. That test, which requires consideration of whether the individual officers acted in "good faith" or "maliciously and sadistically for the very purpose of causing harm," is incompatible with a proper Fourth Amendment analysis. We do not agree with the Court of Appeals' suggestion, see 827 F.2d, at 948, that the "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances. Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic" factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is "unreasonable" under the Fourth **\*\*1873** Amendment.

Nor do we agree with the **\*398** Court of Appeals' conclusion, see *id.,* at 948, n. 3, that because the subjective motivations of the individual officers are of central importance in deciding whether force used against a convicted prisoner violates the Eighth Amendment, see *Whitley v. Albers,* 475 U.S., at 320–321, 106 S.Ct., at 1084–1085, [11] it cannot be reversible error to inquire into them in deciding whether force used against a suspect or arrestee violates the Fourth Amendment. Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms "cruel" and "punishments" clearly suggest some inquiry into subjective state of mind, whereas the term "unreasonable" does not. Moreover, the less protective Eighth Amendment standard applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." **\*399** *Ingraham v. Wright,* 430 U.S. 651, 671, n. 40, 97 S.Ct. 1401, 1412, n. 40, 51 L.Ed.2d 711 (1977). The Fourth Amendment inquiry is one of "objective reasonableness" under the circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry. [12]

109 S.Ct. 1865, 104 L.Ed.2d 443, 57 USLW 4513

Because the Court of Appeals reviewed the District Court's ruling on the motion for directed verdict under an erroneous view of the governing substantive law, its judgment must be vacated and the case remanded to that court for reconsideration of that issue under the proper Fourth Amendment standard.

*It is so ordered.*

Justice BLACKMUN, with whom Justice BRENNAN and Justice MARSHALL join, concurring in part and concurring in the judgment.

I join the Court's opinion insofar as it rules that the Fourth Amendment is the primary tool for analyzing claims of excessive force in the prearrest context, and I concur in the judgment remanding the case to the Court of Appeals for reconsideration of the evidence under a reasonableness standard. In light of respondents' concession, **1874 however, that the pleadings in this case properly may be construed as raising a Fourth Amendment claim, see Brief for Respondents 3, I see no reason for the Court to find it necessary further to reach out to decide that prearrest excessive force claims are to be analyzed under the Fourth Amendment *rather than* under a *400 substantive due process standard. I also see no basis for the Court's suggestion, *ante,* at 1871, that our decision in ⚑ *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), implicitly so held. Nowhere in *Garner* is a substantive due process standard for evaluating the use of excessive force in a particular case discussed; there is no suggestion that such a standard was offered as an alternative and rejected.

In this case, petitioner apparently decided that it was in his best interest to disavow the continued applicability of substantive due process analysis as an alternative basis for recovery in prearrest excessive force cases. See Brief for Petitioner 20. His choice was certainly wise as a matter of litigation strategy in his own case, but does not (indeed, cannot be expected to) serve other potential plaintiffs equally well. It is for that reason that the Court would have done better to leave that question for another day. I expect that the use of force that is not demonstrably unreasonable under the Fourth Amendment only rarely will raise substantive due process concerns. But until I am faced with a case in which that question is squarely raised, and its merits are subjected to adversary presentation, I do not join in foreclosing the use of substantive due process analysis in prearrest cases.

**All Citations**

490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443, 57 USLW 4513

---

### Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See ⚑ *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Also named as a defendant was the city of Charlotte, which employed the individual respondents. The District Court granted a directed verdict for the city, and petitioner did not challenge that ruling before the Court of Appeals. Accordingly, the city is not a party to the proceedings before this Court.

2    Petitioner also asserted pendent state-law claims of assault, false imprisonment, and intentional infliction of emotional distress. Those claims have been dismissed from the case and are not before this Court.

3    The majority did note that because Graham was not an incarcerated prisoner, "his complaint of excessive force did not, therefore, arise under the eighth amendment." 🚩⚠️ 827 F.2d, at 948, n. 3. However, it made no further effort to identify the constitutional basis for his claim.

4    Petitioner's argument was based primarily on *Kidd v. O'Neil,* 774 F.2d 1252 (CA4 1985), which read this Court's decision in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), as mandating application of a Fourth Amendment "objective reasonableness" standard to claims of excessive force during arrest. See 774 F.2d, at 1254–1257. The reasoning of *Kidd* was subsequently rejected by the en banc Fourth Circuit in *Justice v. Dennis,* 834 F.2d 380, 383 (1987), cert. pending, No. 87–1422.

5    The majority noted that in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), we held that the question whether physical force used against convicted prisoners in the course of quelling a prison riot violates the Eighth Amendment "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " 🚩⚠️ 827 F.2d, at 948, n. 3, quoting *Whitley v. Albers, supra,* 475 U.S., at 320–321, 106 S.Ct., at 1085. Though the Court of Appeals acknowledged that petitioner was not a convicted prisoner, it thought it "unreasonable ... to suggest that a conceptual factor could be central to one type of excessive force claim but reversible error when merely considered by the court in another context." 🚩⚠️ 827 F.2d, at 948, n. 3.

6    Judge Friendly did not apply the Eighth Amendment's Cruel and Unusual Punishments Clause to the detainee's claim for two reasons. First, he thought that the Eighth Amendment's protections did not attach until after conviction and sentence. 481 F.2d, at 1032. This view was confirmed by *Ingraham v. Wright,* 430 U.S. 651, 671, n. 40, 97 S.Ct. 1401, 1412, n. 40, 51 L.Ed.2d 711 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions"). Second, he expressed doubt whether a "spontaneous attack" by a prison guard, done without the authorization of prison officials, fell within the traditional Eighth Amendment definition of "punishments." 481 F.2d, at 1032. Although Judge Friendly gave no reason for not analyzing the detainee's claim under the Fourth Amendment's prohibition against "unreasonable ... seizures" of the person, his refusal to do so was apparently based on a belief that the protections of the Fourth Amendment did not extend to pretrial detainees. See *id.,* at 1033 (noting that "most of the courts faced with challenges to the conditions of *pretrial* detention have primarily based their analysis directly on the due process clause"). See n. 10, *infra.*

7    See Freyermuth, Rethinking Excessive Force, 1987 Duke L.J. 692, 694–696, and nn. 16–23 (1987) (collecting cases).

8    See *Justice v. Dennis, supra,* at 382 ("There are ... certain basic principles in section 1983 jurisprudence as it relates to claims of excessive force that are beyond question[,] [w]hether the factual circumstances involve an arrestee, a pretrial detainee or a prisoner").

9    The same analysis applies to excessive force claims brought against federal law enforcement and correctional officials under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

10    A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force or show of authority, ... in some way restrained the liberty of a citizen," *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968); see *Brower v. County of Inyo,* 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989).

Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. See *Bell v. Wolfish,* 441 U.S. 520, 535–539, 99 S.Ct. 1861, 1871–1874, 60 L.Ed.2d 447 (1979). After conviction, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S., at 327, 106 S.Ct., at 1088. Any protection that "substantive due process" affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment. *Ibid.*

11    In *Whitley,* we addressed a § 1983 claim brought by a convicted prisoner, who claimed that prison officials had violated his Eighth Amendment rights by shooting him in the knee during a prison riot. We began our Eighth Amendment analysis by reiterating the long-established maxim that an Eighth Amendment violation requires proof of the " ' "unnecessary and wanton infliction of pain." ' " 475 U.S., at 319, 106 S.Ct., at 1084, quoting *Ingraham v. Wright,* 430 U.S., at 670, 97 S.Ct., at 1412, in turn quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). We went on to say that when prison officials use physical force against an inmate "to restore order in the face of a prison disturbance, ... the question whether the measure taken inflicted unnecessary and wanton pain ... *ultimately turns* on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " 475 U.S., at 320–321, 106 S.Ct., at 1084–1085 (emphasis added), quoting *Johnson v. Glick,* 481 F.2d, at 1033. We also suggested that the other prongs of the *Johnson v. Glick* test might be useful in analyzing excessive force claims brought under the Eighth Amendment. 475 U.S., at 321, 106 S.Ct., at 1085. But we made clear that this was so *not* because Judge Friendly's four-part test is some talismanic formula generally applicable to all excessive force claims, but because its four factors help to focus the central inquiry in the Eighth Amendment context, which is whether the particular use of force amounts to the "unnecessary and wanton infliction of pain." See *id.,* at 320–321, 106 S.Ct., at 1084–1085. Our endorsement of the *Johnson v. Glick* test in *Whitley* thus had no implications beyond the Eighth Amendment context.

12    Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen. See *Scott v. United States,* 436 U.S. 128, 139, n. 13, 98 S.Ct. 1717, 1724, n. 13, 56 L.Ed.2d 168 (1978). Similarly, the officer's *objective* "good faith"—that is, whether he could reasonably have believed that the force used did not violate the Fourth Amendment—may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Since no claim of qualified immunity has been raised in this case, however, we express no view on its proper application in excessive force cases that arise under the Fourth Amendment.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Caraway v. City of Pineville,   4th Cir.(N.C.),   August 6, 2024

80 F.4th 264
United States Court of Appeals, Fourth Circuit.

Azucena Zamorano ALEMAN, individually and as Administrator
of the Estate of Ruben Galindo Chavez, Plaintiff – Appellant,

v.

CITY OF CHARLOTTE; David Guerra, individually and officially, Defendants – Appellees,

and

Courtney Suggs, individually and officially, Defendant.

No. 21-2223
|
Argued: December 7, 2022
|
Decided: August 16, 2023

**Synopsis**

**Background:** Girlfriend of 911 emergency caller, individually and as administrator of caller's estate, brought § 1983 action in state court, asserting Fourth Amendment excessive force claim against police officer who fired lethal gunshots, state law claim against officer for assault and battery, state law claim against city for negligent police officer training, and state law claims against both officer and city for wrongful death caused by negligence and for negligent infliction of emotional distress. After removal, the United States District Court for the Western District of North Carolina, Robert J. Conrad, Jr., J., 2021 WL 4495907, granted summary judgment to officer and city. Girlfriend appealed.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

genuine disputes of material fact as to objective reasonableness of use of deadly force precluded summary judgment;

the Fourth Amendment right allegedly violated by officer was clearly established in September 2017, precluding qualified immunity; and

there was no evidence of negligent training of police.

Affirmed in part, vacated in part, and remanded.

Richardson, Circuit Judge, filed a dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*268** Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad Jr., District Judge. (3:19-cv-00491-RJC-DCK)

**Attorneys and Law Firms**

ARGUED: S. Luke Largess, TIN FULTON WALKER & OWEN, Charlotte, North Carolina, for Appellant. Lori R. Keeton, LAW OFFICERS OF LORI KEETON, Charlotte, North Carolina; Roger A. McCalman, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellees. ON BRIEF: Brian R. Hochman, Bradley W. Butler, BUTLER, QUINN & HOCHMAN, PLLC, Charlotte, North Carolina, for Appellant. Clarence E. Matherson, Jr., OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellee City of Charlotte.

Before KING and RICHARDSON, Circuit Judges, and KEENAN, Senior Circuit Judge.

**Opinion**

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the majority opinion, in which Senior Judge Keenan joined. Judge Richardson wrote a dissenting opinion.

KING, Circuit Judge:

**\*269** This civil action on appeal from the Western District of North Carolina arises from the September 2017 fatal police shooting of Ruben Galindo Chavez (who used the surname "Galindo") during an encounter with officers of the Charlotte-Mecklenburg Police Department. The action was initiated by plaintiff Azucena Zamorano Aleman — Galindo's girlfriend and the mother of his child — both as the administrator of Galindo's estate and in her individual capacity. The plaintiff's five causes of action include a 42 U.S.C. § 1983 claim against defendant David Guerra, the police officer who fired the lethal shots, for use of excessive force in violation of Galindo's Fourth Amendment rights, plus the following state law claims: a claim against Guerra for assault and battery; claims against both Guerra and the City of Charlotte for wrongful death caused by negligence and for negligent infliction of emotional distress; and a claim against the City alone for negligent police officer training.

After amassing an assortment of evidence during discovery, including video footage from body cameras worn by the officers present at the shooting scene, the parties filed cross-motions for summary judgment. For reasons outlined in its Order of September 2021, the district court awarded summary judgment to the defendants on each of the plaintiff's claims. *See Aleman v. City of Charlotte*, No. 3:19-cv-00491, 2021 WL 4495907 (W.D.N.C. Sept. 30, 2021), ECF No. 50 (the "Opinion"). The court therein determined that — because it was objectively reasonable for Officer Guerra to shoot Galindo, in that Galindo posed an immediate threat to Guerra and others — Guerra is entitled to qualified immunity on the Fourth Amendment claim. For the same reason, the court awarded summary judgment to Guerra and the City on the assault and battery, wrongful death, and negligent infliction of emotional distress claims. Citing a lack of sufficient evidence, the court also awarded summary judgment to the City on the negligent training claim.

The appeal now being pursued by the plaintiff presents several close questions on the facts and applicable law, against a backdrop of tragic and dangerous circumstances. As we recently acknowledged in another fatal police shooting case, "[i]t is not lost on us that we issue this decision from the calm of a courthouse" and that, "[u]nlike us, [the defendant officer] could not press pause or rewind before determining whether [the decedent] posed an imminent threat." *See Franklin v. City of Charlotte*, 64 F.4th 519, 539 (4th Cir. 2023). Upon careful consideration of the video footage and the other evidence in the record, we are satisfied to affirm the district court's summary judgment award to the City on the negligent training claim. On the other hand, we vacate the award of qualified immunity to Officer Guerra on the Fourth Amendment claim, as well as the related summary judgment awards to Guerra and the City on the balance of the state law claims. Rather than directing the entry of judgment in favor of the plaintiff on any of those claims, we remand for further proceedings as to all of them.

I.

A.

The plaintiff initiated this action in August 2019 in a state court in Mecklenburg County, North Carolina, and the defendants removed the matter in September 2019 to the Western District of North Carolina. Of the plaintiff's five causes of action, four were asserted on behalf of Galindo's estate: the Fourth Amendment and assault and battery claims against Officer **\*270** Guerra; the wrongful death claim against Guerra and the City of Charlotte; and the negligent training claim against the City. The plaintiff alleged the remaining cause of action — the negligent infliction of emotional distress claim against Guerra and the City — on her own behalf.

The parties engaged in extensive discovery proceedings, securing not only the video footage from the body cameras worn by Officer Guerra and the other police officers present at the shooting scene, but also copies of relevant 911 dispatch records, depositions of Guerra and his colleagues, and records of the officers' interviews during the Charlotte-Mecklenburg Police Department's internal investigation of the shooting. In addition, the parties presented expert witnesses on the reasonableness of Guerra's actions and the adequacy of the City's police officer training.

By their respective summary judgment motions, Officer Guerra and the City requested judgment as to all the plaintiff's claims. The plaintiff's cross-motion for summary judgment sought only a partial judgment, on the Fourth Amendment, assault and battery, and negligent infliction of emotional distress claims.

1.

As the plaintiff has highlighted in the summary judgment proceedings, the record reflects that at the time of the September 2017 shooting, Galindo was a 30-year-old Mexican man who worked in the Charlotte area and did not speak English. [1] He had recently been diagnosed with paranoia, without being deemed a danger to himself or others. Galindo was facing North Carolina charges of misdemeanor assault by pointing a firearm and simple assault, but he had no other known history of criminal activity.

a.

(1)

On September 6, 2017, at about 9:04 p.m., Galindo placed the first of two 911 calls seeking assistance from the Charlotte-Mecklenburg Police Department. To accommodate Galindo, that call was transferred to a Spanish-speaking dispatcher available through the Department's Spanish language phone line. During the call, which lasted approximately 18 minutes, Galindo said that he sought to turn himself in for impending court proceedings and that he wanted police officers to pick him up at his apartment, located at 1918 Prospect Drive, in Charlotte. Galindo also gave the following reason for requesting the officers: "Because I have a gun in my hand." *See* J.A. 243. [2]

When asked by the dispatcher what he was "going to do with the gun," Galindo responded with the query, "Are you going to help me or are you not going to help me?" *See* J.A. 243. Pressed about his intentions, Galindo said that the dispatcher should "tell me if [the officers] are coming or not so that I can put my firearm there **\*271** in the front or whatever," suggesting that he intended to surrender the firearm. *Id.* at 244.

Meanwhile, Galindo repeatedly failed to provide information expressly requested by the dispatcher, including whether he was suicidal or homicidal. Some of Galindo's remarks to the dispatcher evidenced his paranoia. For example, Galindo first claimed his name was "El Dios Estrella" (which translates to "the Star God"), before giving the name "Ruben Galindo." *See* J.A. 244-45. He complained of police officers and other people "following me," and he said that "I can't take it any longer." *Id.* at 245. Galindo also admitting to drinking alcohol that day but denied using drugs.

Throughout the first 911 call, Galindo asked whether he was going to receive any help, prompting the dispatcher to periodically assure him that police officers were on the way. At one point, having heard a woman's voice in the background, the dispatcher asked Galindo how many people were in his apartment. Galindo did not provide that information. Rather, he answered: "Look, I only need [the officers] to come for me[.] It's only for me [and] I will be outside of the apartment." *See* J.A. 245. Galindo elaborated, "I only need the police to come for me, for them to take me." *Id.* He also requested that a responding officer be "someone that speaks Spanish." *Id.*

Near the end of the first 911 call, the dispatcher elicited from Galindo that he was still inside the apartment but would go outside once the police officers were there. When specifically asked if he was "thinking of harming the officers" or "anyone in [his] house," Galindo responded, "No." *See* J.A. 246. He again expressed that "I want to turn myself in" and that "I prefer for [the officers] to lock me up." *Id.* The dispatcher's last statement to Galindo during the call was that "the officers are in route, they are on their way and they will be there as soon as possible, thank you." *Id.* Galindo responded before the call was disconnected, "Are they coming or not because [I] can't take it anymore." *Id.*

(2)

A few minutes later, Galindo placed his second 911 call, which lasted for nearly 12 minutes and remained connected until after the fatal shooting. During that call, Galindo and the Spanish-speaking dispatcher mainly discussed Galindo's firearm. At the outset, Galindo said that the firearm was "[i]n my bag" and that "if you want I will take it out." *See* J.A. 247. The dispatcher then repeatedly instructed Galindo to leave the firearm in a safe place and not to have it when the police officers arrived to meet him outside his apartment. Specifically, the dispatcher advised: "leave it in a safe place and when you see the officers, show your hands, I don't want you to have the [firearm]"; "[n]o please, no, no please [do not have the firearm with you]"; "please leave it" "for your safety and of everyone's"; "I need you to assure me that you will leave the gun please"; and "I need you to please put that gun somewhere please." *Id.* at 247-48.

Even as the dispatcher gave those instructions, Galindo continually indicated that he planned to have his firearm with him when he met the police officers. He also suggested, as he had during the first 911 call, that he intended to surrender the firearm. That is, Galindo asked the dispatcher, "How do you want me to show a firearm?" *See* J.A. 248. Soon thereafter, he stated that "as long as [the officers] don't shoot me I will throw them the gun." *Id.* While reportedly "giggling" during the second 911 call, Galindo asserted that the firearm "doesn't have bullets." *Id.* at 247. He then said approximately 11 more times that "I don't have bullets." *Id.* at 247-48. **\*272** Galindo's last words to the dispatcher before the shooting were, "Look I know that you are nervous, and all of that, I know, well me too," followed by, "Can you help me or not?" *Id.* at 248.

b.

At about 9:10 p.m., approximately six minutes into Galindo's first 911 call, a request had gone out for officers of the Charlotte-Mecklenburg Police Department to respond to a Spanish-speaking caller who "adv[ised] he's armed with a gun and wants officers to come help him." *See* J.A. 108. That request was promptly entered into the Department's computer system as an "event." The computer system identifies and records the officers who respond to such an event and allows the dispatcher to provide updates as relevant information becomes available. The responding officers receive the updated event information in real time on laptops in their patrol vehicles.

Information about the "Galindo event" was updated throughout his first 911 call, with the dispatcher relaying the following to the responding officers:

- "Refuses to give ... further information";

- "Unk[nown] what he wants to do with the gun";

- "Unk[nown] if the comp[lainant] is homicidal or suicidal";

- "Adv[ises] he wants to turn himself in, unk[nown] reason, unk[nown] warrant";

- "Comp[lainant] is not cooperating";

- "See El Dios Estrella (Rub[e]n Galindo)"; [3]

- "Comp[lainant] has been drinking, neg [denies] drugs";

- "Unk[nown] how many times the res[idence] is occupied. Heard a female in the b[ackground]"; and

- "***Use Caution. Comp[lainant] sounds delusional.***"

*See* J.A. 108-09.

The Galindo event information was not updated during his second 911 call. In radio communications, however, the responding officers were informed that Galindo had told the dispatcher that his "gun has no bullets." *See* J.A. 241. The officers were also advised that Galindo had "said that he would put down the gun when [the officers] arrived." *Id.* at 313.

c.

Officer Guerra and three of his colleagues — Officers Ryan Tran-Thompson, Courtney Suggs, and David Batson — responded to the Galindo event. As explained in their depositions in this civil action, none of the four responding officers was fluent in Spanish. The officers initially met in a parking lot near their police station to review the information they had about Galindo, to discuss concerns that he could be intending an ambush, and to make a plan for safely approaching him. During the meeting, Officer Batson searched law enforcement databases for Galindo's name and found that a "Ruben Galindo" had been charged in April 2017 with assault by pointing a firearm. Additionally, Officer Tran-Thompson asked his colleagues how to say "hands up" in Spanish and got the reply "manos arriba." *See* J.A. 628.

Consistent with the request made by Galindo during his first 911 call, a Spanish-speaking officer was summoned from a neighboring division to assist the responding officers. At about 9:21 p.m., the Spanish-speaking **\*273** officer announced that he was en route. By then, however, the responding officers had received the event update that included "[h]eard a female in the b[ackground]." *See* J.A. 109. That update, which came at about 9:18 p.m., alerted the responding officers that there was a woman or girl in the apartment with Galindo and caused them to fear that the situation could escalate to domestic violence. Consequently, the responding officers decided to proceed to Galindo's apartment without waiting for the Spanish-speaking officer.

Based on his police experience with Spanish speakers, Officer Guerra expected Galindo to understand simple English phrases such as "are you okay" and "what can I do for you." *See* J.A. 303. Guerra also thought he could speak enough Spanish to convey the message, "Hey, I don't speak Spanish, but someone who speaks Spanish is coming soon." *Id.* As for the dispatcher's warning that Galindo "sounds delusional," *see id.* at 109, Guerra "wasn't sure if it was a clinical diagnosis that [Galindo] was delusional or if it was figurative or what." *Id.* at 295. Guerra thought "to assess the situation accurately," he "would have to do it best in person" and "try to establish an open line of communication [with Galindo] and basically feel him out." *Id.* at 296.

d.

Between 9:28 and 9:29 p.m., after dark, the four responding officers arrived at the large apartment complex where Galindo resided and parked several buildings away from Galindo's Building 1918. His residence was in an apartment located at an end of the building and abutted by a small, wooded area. The patio entrance to Galindo's apartment faced a wall of Building 1920 containing the patio entrances to the apartments located therein. A bright streetlight illuminated the walkway right outside of Galindo's apartment, affording a clear view of where Galindo would stand when he exited through his screen patio door. No other person was present in the outside area between the apartment buildings.

The four responding officers approached Galindo's apartment at approximately 9:30 p.m. Officer Guerra took a position alongside the closest corner of Building 1920, approximately 10 yards from Galindo's patio entrance. Meanwhile, Officer Tran-Thompson took a position several yards farther away, in the wooded area behind and to the left of Guerra. Both Tran-Thompson and Guerra were armed with rifles. For their part, Officers Batson and Suggs carried handguns and took positions on the opposite corner of Building 1920, approximately 20 yards from Galindo's patio entrance. Each of the responding officers had a position that provided cover.

Each officer also wore a body camera, with the video footage from Officer Tran-Thompson's camera being the footage that most fully shows the scene as it unfolded. Because of the stance of his body during the encounter, Officer Guerra's camera was largely blocked by the corner of Building 1920, with just a partial view of Galindo. Moreover, the footage from Officer Batson's and Officer Suggs's cameras shows Galindo's left arm only. But Tran-Thompson's camera was unobstructed and filmed both Guerra and Galindo throughout the encounter, including the moments when the fatal shots were fired.

e.

As the plaintiff has described it, the video footage from the responding officers' body cameras reveals that, upon taking his position alongside the corner of Building 1920, Officer Guerra called out "Ruben" to a man standing behind the screen patio door of Galindo's apartment. That man — Ruben Galindo — responded in the affirmative **\*274** and opened the door, prompting Guerra to call out, in Spanish, "Ruben, policia, manos, manos" (which translates to "Ruben, police, hands, hands"). Guerra moved out from his cover to engage with Galindo, such that Galindo could view Guerra's entire body.

Immediately after opening the screen patio door, Galindo stood in the doorway, facing Officer Guerra. Galindo's left arm was down at his side, and his right arm was similarly at his side but just behind the door frame. Guerra pointed his rifle at Galindo's lower body and quickly said "manos" two more times. Concomitantly, Guerra raised his right arm off the barrel of his rifle, demonstrating to Galindo to raise his hand.

In response to Officer Guerra's Spanish commands of "manos," Galindo raised his left hand — in which he was holding a pistol — to about waist level. According to the plaintiff, it is unclear from the video footage whether the pistol had already been in Galindo's left hand or whether Galindo grasped the pistol just before raising the hand, but the video footage suggests that the pistol had already been in Galindo's left hand. After raising the hand to about waist level, Galindo paused, which the plaintiff asserts was a demonstration of Galindo's uncertainty as to whether he should throw the pistol or continue holding it in his raised hand.

The sight of the pistol caused Officer Guerra to yell, now in English, "put it down, drop the gun, put it down." Galindo reacted to those English commands by quickly raising his left arm above his shoulder and extending his left hand — still holding the pistol — past the end of the opened screen patio door. Galindo's left arm was then extended about 45 degrees from the center of his body and pointing toward the wall of Building 1920, leaving it about 45 degrees away from Guerra.

When Galindo raised his left arm, he also began to raise his right arm. From there, the four responding officers shouted over each other, still in English, to "drop the gun" and "put it down." As they shouted, Galindo swiftly raised his right arm and extended it out like his left, above shoulder height and about 45 degrees from the center of his body.

The plaintiff does not contend that any of the video footage from the responding officers' body cameras is clear enough to conclusively show how Galindo was holding the pistol in his left hand or where the pistol itself was pointing as he raised his left and then right arms. But the plaintiff maintains that the video footage firmly establishes that Galindo was ultimately standing still with both his arms frozen in place and both his hands in the air, in a universally recognized position of surrender. And Galindo's left arm remained pointing at the wall of Building 1920, not at Officer Guerra.

It was at that point that Officer Guerra fired at Galindo twice. Under the plaintiffs' interpretation of the video footage, the first shot caused Galindo to collapse and fall forward, and the second shot hit him in the top of the head as he fell. Approximately four seconds had elapsed between Guerra's first English commands to "put it down, drop the gun, put it down" and his first shot at Galindo, who died at the scene. [4]

**\*275**  f.

Two days later, on September 8, 2017, investigators with the Charlotte-Mecklenburg Police Department interviewed Officer Guerra about the fatal shooting. Notably, Guerra had not yet viewed the video footage from his and the other responding officers' body cameras.

In his interview with the shooting investigators, Officer Guerra asserted that when Galindo opened his screen patio door, Guerra called out "manos arriba" ("put your hands up"). *See* J.A. 446. Guerra described Galindo as facing Guerra, with the door open behind Galindo. Additionally, Guerra demonstrated that Galindo fully raised both his arms in response to Guerra's "manos arriba" command. Guerra then said that — after Galindo fully raised both his arms — Galindo kept his right arm raised but lowered his left arm, reached into his pocket, and pulled out his pistol. According to Guerra, Galindo had the pistol "gripped high in the palm of the hand" and "his fingers were wrapped around the pistol grip" such that he was "about to fire." *Id.* at 447. Guerra also recounted that, upon his subsequent instructions to "drop the gun," Galindo "pivot[ed] the firearm towards me" with "the muzzle raised in my direction." *Id.* at 448-49. In Guerra's words, "I had the conscious thought of I have to shoot this guy because I immediately felt a threat [of] death [or] serious bodily injury from him pointing a firearm at me." *Id.* at 449. Guerra explained that he fired the second shot at Galindo because Galindo remained standing after the first shot, making it unclear whether the first shot had hit him.

At Officer Guerra's subsequent deposition in this civil action, after viewing the video footage from the responding officers' body cameras, Guerra conceded that he had called out only "manos" to Galindo, not "manos arriba." *See* J.A. 315. Guerra confirmed that Galindo had been facing Guerra during the encounter. He also reiterated, based on his "memory" rather than the video footage, that Galindo initially raised both his arms and then kept his right arm raised while lowering his left arm and retrieving his pistol from his pocket. *Id.* at 318.

Upon rewatching the video footage during his deposition, Officer Guerra admitted that, when he shot Galindo, both of Galindo's arms were raised and extended about 45 degrees from the center of his body, with his left arm pointed at the wall of Building 1920, away from Guerra. Further, Guerra acknowledged that he would consider that to be a position of surrender "[f]or an unarmed subject." *See* J.A. 326.

In any event, Officer Guerra stood by his previous account that Galindo had pivoted his pistol toward Guerra, justifying Guerra's shooting of Galindo. Guerra sought to clarify that Galindo had pivoted his left elbow and thereby pointed his pistol at Guerra. Further, Guerra asserted that, although Galindo's left arm continued to point at the wall of Building 1920, "it is possible to hold

your arm up and still point [a pistol] in a separate direction." *See* J.A. 332. Guerra did not claim that any pivot of Galindo's left elbow, or the direction in which the pistol was pointed, can be seen in the video footage.

Regarding his prior statement that he fired the second shot at Galindo because Galindo remained standing after the first, Officer Guerra conceded that the second shot hit Galindo in the top of the head. But Guerra allowed only that it was "possible"  **\*276** that Galindo must have been falling from the first shot in order for the second shot to have hit where it did. *See* J.A. 340.

Finally, as for the issue of how Galindo had been holding his pistol, Officer Guerra continued to insist that Galindo held the pistol "high and firm with a pistol grip," which is "how you hold [a pistol] before you fire it." *See* J.A. 317. Prior to Guerra's deposition, however, Officer Batson had related in his interview with the shooting investigators that he saw Galindo holding the pistol upside down, with the grip pinched between his thumb and fingers — not in the shooter's position described by Guerra. Batson later, in his deposition testimony, reiterated that description of how Galindo had been holding his pistol. Confronted with Batson's account during his own deposition, Guerra acknowledged that the manner in which Batson saw Galindo holding the pistol was "pretty much the opposite" from the way in which Guerra saw it. *Id.* at 333. Guerra then suggested that he was in a better position than Batson to discern how the pistol was actually being held, as his "vantage point" had "better lighting" and was "much closer" than Batson's. *Id.* at 335. Indeed, Guerra confirmed that he "could see the gun and the details of the gun" throughout the encounter with Galindo. *Id.* at 338.

### 2.

For their parts, Officer Guerra and the City of Charlotte have highlighted much of the same foregoing evidence in the summary judgment proceedings, with an emphasis on inferences that can be drawn in their favor. The defendants have also raised some additional aspects of the record. Those include Officer Batson's deposition testimony that Galindo could have fired his pistol while holding it upside down by either using his pinky finger or changing his grip, along with deposition testimony of Batson, as well as Officer Suggs, that Galindo's pistol had been pointed toward Guerra.

In other deposition testimony invoked by the defendants, Officer Tran-Thompson recounted hearing Officer Guerra shout out "manos arriba" to Galindo and seeing a metallic object in Galindo's left hand. Tran-Thompson stated that, as he then joined Guerra in yelling "drop the gun" and "drop it," Galindo raised both his hands upward, turned his body toward Guerra, took a small step in Guerra's direction, and began to lower his left arm or elbow. According to Tran-Thompson, it appeared to him that "Galindo was getting ready to punch out and take a shooter's stance by punching his arm straight forward out towards Officer Guerra and possibly begin shooting at Officer Guerra." *See* J.A. 619. That is, Tran-Thompson said he "observed movements [indicating that Galindo] was going to take a shooter's stance and start firing at Guerra." *Id.* at 624. Once the deposition proceeded to a viewing of the video footage from the responding officers' body cameras, however, Tran-Thompson acknowledged that the footage does not show any of the threatening movements that he had described.

### 3.

Turning to the expert witnesses, the parties collectively presented three experts on the use of force and police officer training: Jon Blum for the defendants, and William Harmening and Melvin Tucker for the plaintiff. Upon reviewing the evidence in the summary judgment record, those witnesses opined — by written reports and, in the case of the plaintiff's experts, by deposition testimony — on both the reasonableness of Officer Guerra's actions and the adequacy of the training provided  **\*277**  by the City of Charlotte.[5]

a.

Regarding the issue of whether Officer Guerra's actions were reasonable, each expert witness considered the totality of the circumstances facing Guerra when he fired the fatal shots at Galindo. Those circumstances included that Galindo: had called 911 for unclear reasons and admitted to drinking and being armed with a "gun"; was described by the Spanish-speaking dispatcher as being uncooperative and seemingly "delusional"; was suspected of having committed a previous firearm-related offense; presently posed a threat of domestic violence to a "female" inside his apartment and of ambush to the responding police officers; brandished his pistol when he met the other officers outside the apartment, in contravention of the dispatcher's repeated Spanish instructions to leave the firearm behind; and failed to drop the pistol in response to Guerra's and the other officers' English commands to "drop the gun" and "put it down." *See* J.A. 108-09.

As part of the analysis in his report, the defendants' expert (Blum) also accepted as true — based on Officer Guerra's post-shooting statements, and not on the video footage from the body cameras worn by Guerra and the other responding officers — that Galindo had "pivoted his left elbow backwards" after raising his left arm and hand holding his pistol. *See* J.A. 203. According to Blum, that movement "led officers on the scene and in the moment to believe that [Galindo] was going to point the handgun at and shoot Officer Guerra." *Id.* at 206. Consequently, Blum concluded that Guerra's use of deadly force against Galindo was justified in the totality of the circumstances. In Blum's words, "it was reasonably necessary for Guerra ... to use deadly force and defend [himself] because Mr. Galindo posed an imminent threat of death or great bodily harm." *Id.* at 211 (emphasis omitted).

Of the plaintiff's experts, the first (Harmening) readily acknowledged in his deposition testimony that the circumstances created a "volatile and dangerous situation" — "especially with a gun involved." *See* J.A. 731. Harmening also recognized that, even if Galindo had been holding his pistol upside down as Officer Batson described, the pistol could have been fired. *Id.* at 734 (explaining that "a gun can always be fired no matter how they're holding it"). Nonetheless, based on Batson's description of Galindo pinching the pistol's grip between his thumb and fingers — as well as what Harmening could see on the video footage from the responding officers' body cameras — Harmening concluded that Galindo was not holding the pistol in "a firing stance" or in such a way "to indicate that he's going to use it." *Id.* at 733-34.

The video footage further led Harmening to reject Officer Guerra's account that Galindo had pivoted his left elbow and thereby pointed the pistol toward Guerra. As Harmening interpreted the video footage and Galindo's demeanor therein, Galindo "never pointed a gun at [Guerra] and **\*278** never demonstrated anything to indicate that he was going to point a gun at [Guerra]." *See* J.A. 733. Harmening elaborated:

> [M]y perception of the video and what I see is a man who's trying to comply with everything he's being told. I get it, [Galindo] didn't leave the gun inside, he didn't drop the gun yet, but I think there's also a communication barrier and some confusion here, but I think for the most part he was trying to comply.

*Id.* at 734. Similarly, Harmening interpreted Galindo's 911 calls and discussion with the dispatcher to indicate that he did not intend to harm any of the responding officers. Harmening specifically mentioned Galindo's assurances that his pistol had no bullets, explaining that although Guerra could not assume the pistol was unloaded, "it's part of the totality of the consideration here that [Galindo] says it's not loaded." *Id.* at 733. Additionally, Harmening suggested that Guerra should have considered that he and the other officers had "good cover" available. *Id.*

All told, Harmening opined "that a gun is always a threat," but that "there has to be an active threat before [police officers] shoot somebody." *See* J.A. 733, 735. In Harmening's view, there was no active threat justifying Officer Guerra's shooting of Galindo, because Galindo was "complying with [Guerra and his colleagues]," albeit "not perfectly," and "because at the moment

[Galindo] got shot, both [his] arms [were] in the air, [and] he [was] clearly showing [the officers] the gun that I believe [was] not pointed at anyone, nor [was] it even being held in a manner that could be fired accurately at anyone." *Id.* at 736.

Much like Harmening, the plaintiff's second expert (Tucker) opined that Officer Guerra "did not have any justification on September 6, 2017 to use deadly force against Ruben Galindo" because Galindo had not been "posing an immediate threat of serious body harm or death to anyone," i.e., "a threat that is going to occur at that moment in time absent intervention." *See* J.A. 650, 652. As Tucker explained in his report, he based that opinion on the video footage from the responding officers' body cameras, which Tucker interpreted to show that Galindo "never pointed [his pistol] at anyone before he was shot and killed" and that "the officers had cover available, nobody else was in danger[,] and [the] firearm in [Galindo's] left hand was up in the air." *Id.* Tucker "reaffirm[ed]" his opinion by his subsequent deposition testimony, saying that — in reviewing the contrary opinion of defendants' expert Blum that deadly force was reasonable and necessary in the totality of the circumstances — "I kept thinking necessity, necessity, where in the heck is necessity here?" *Id.* at 785-86.

b.

With further respect to the reasonableness of Officer Guerra's actions, as well as to the adequacy of the police officer training provided by the City of Charlotte, the plaintiff's experts Harmening and Tucker acknowledged that the City had relevant policies in place concerning the use of force and interacting with non-English speakers and persons suffering from mental illness. Those experts also acknowledged that the City had trained Guerra and his colleagues on those policies. Rather than questioning the sufficiency of the policies or the attendant training, Harmening and Tucker criticized Guerra and the other responding officers for disregarding their training and violating the City's policies. Indeed, Tucker testified in his deposition that he "thought the officers were either plainly incompetent or intentionally violated the laws and protocols." *See* J.A. 785.

**\*279**  Specifically addressing the responding officers' decision not to await the arrival of a Spanish-speaking officer before confronting Galindo, Harmening opined in his report that the officers should have recognized from their training "that a Spanish-speaking officer was going to be critical," in that the Galindo event "should have been viewed as a crisis intervention, and as such, effective communication (i.e., de-escalation) was going to be needed, especially with the presence of a gun." *See* J.A. 693. Harmening further asserted that Officer Guerra should have yet followed his training by, inter alia, "ask[ing] [Galindo] in a calm voice if he spoke English"; "reassur[ing] him that [the officers] were there to help"; "ask[ing] him in a non-threatening voice to lay the gun down on the ground"; and, "[i]f he indicated in some manner that he did not speak English, ... motion[ing] to him with hand gestures to lay the gun down." *Id.* at 695. Instead, Harmening underscored, Guerra simply said "manos" ("hands") in Spanish and then he and the other officers "commanded Galindo to drop the gun in English," thereby increasing "[t]he possibility of confusion." *Id.* at 693.

The defendants' expert Blum countered that the responding officers' conduct was consistent with both the City's policies and the training provided by the City to the officers. Blum focused on Officer Guerra's use of deadly force against Galindo, opining that Guerra followed his training and the applicable policies on the use of such force when he fatally shot Galindo after "Mr. Galindo refused to follow repeated officer instructions to 'Manos' and 'Drop the gun!' " and then "began to point [his pistol] at Officer Guerra (as perceived by officers in the moment and on the scene)." *See* J.A. 210-11.

4.

By his summary judgment motion, Officer Guerra sought qualified immunity on the Fourth Amendment claim, arguing that his fatal shooting of Galindo was objectively reasonable (such that he did not contravene Galindo's Fourth Amendment rights by using excessive force) and that there was no controlling legal precedent at the time of the shooting that indicated otherwise (such that any constitutional right violated was not, in any event, clearly established). *See, e.g.,* 🚩 *Mays v. Sprinkle,* 992 F.3d

295, 301 (4th Cir. 2021) (explaining that, to defeat a claim of qualified immunity, a plaintiff must "plead[ ] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct" (internal quotation marks omitted)). Based on the alleged objective reasonableness of the shooting, Guerra and the City of Charlotte also sought summary judgment on the assault and battery, wrongful death, and negligent infliction of emotional distress claims.

The defendants have insisted that the shooting was objectively reasonable in that Officer Guerra shot Galindo only after perceiving that Galindo was poised to fire his pistol at Guerra or others — a perception that the defendants admit may have been mistaken, but that they contend was nonetheless reasonable. In so arguing, the defendants have relied on supportive deposition testimony of Guerra and his colleagues, along with the report of the defendants' expert Blum. To the extent that the video footage from the responding officers' body cameras conflicts with or fails to corroborate Guerra's account of the shooting, the defendants maintain that the video footage does not reflect what Guerra could reasonably perceive because it was largely taken from the body cameras of other officers whose positions were different from his. The defendants also emphasize **\*280** that the video footage is not clear in all details and did not capture everything that occurred at the shooting scene.

The plaintiff generally has not disputed that the video footage is neither entirely clear nor complete. But in opposing the defendants' summary judgment motions, and in advancing her own request for partial summary judgment, the plaintiff has argued that the video footage is decisive in that it "quite clearly establish[es] that Galindo was not a threat to anyone at the moment Guerra killed him." *See* Br. of Appellant 22 (internal quotation marks omitted) (echoing arguments made in district court). As the plaintiff's experts Harmening and Tucker opined after studying the video footage, the plaintiff contends that the video footage shows that Guerra and the other responding officers had cover available; that Galindo was apparently confused by but attempted to comply with the officers' mix of Spanish and English commands; that Galindo quickly assumed a position of surrender; that Galindo did not seem to be pointing his pistol at Guerra; and that Galindo did not make any movement suggesting that he intended to fire his pistol, whether at Guerra or anyone else.

Additionally, the plaintiff has argued that the video footage "blatantly contradicts" Officer Guerra's account of the shooting. *See* Br. of Appellant 22; *see also* *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (recognizing that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Specifically, under the plaintiff's interpretation of the video footage, it establishes the following:

- In response to Officer Guerra's initial Spanish commands of "manos," Galindo kept his right hand down while raising his left hand, in which he held his pistol (and apparently had already been holding the pistol), to about waist level;

- Next, after Guerra commanded in English to "put it down, drop the gun, put it down," Galindo continued to hold the pistol in his left hand while raising his left arm above his shoulder and extending it about 45 degrees from the center of his body, and then similarly raising and extending his right arm;

- Thereafter, Galindo was standing still with both his arms frozen in place, leaving his left arm pointing at the wall of Building 1920, not at Guerra; and

- Galindo remained in that position until he was hit by Guerra's first shot, which caused Galindo to collapse and fall forward, such that Guerra's second shot hit Galindo in the top of the head as he fell.

According to the plaintiff, the video footage thereby contradicts these aspects of Guerra's account of the shooting:

- Guerra's assertion that Galindo initially raised both his arms and then kept his right arm raised while lowering his left arm and retrieving his pistol from his pocket;

- Guerra's assertion that — although Galindo subsequently had both his arms raised and extended about 45 degrees from the center of his body, with his left arm pointed at the wall of Building 1920, away from Guerra — Galindo then pivoted his left elbow and thereby pointed his pistol at Guerra;

- Officer Tran-Thompson's assertion that, just before being shot, Galindo **\*281** took a small step in Guerra's direction and began to lower his left arm or elbow, making it appear that Galindo was preparing to "punch out," i.e., to take a shooter's stance and fire his pistol at Guerra; and

- Guerra's assertion that Galindo remained standing after the first shot, explaining why Guerra fired the second shot. [6]

The plaintiff has further highlighted the discrepancies between Guerra's assertion that Galindo had been holding his pistol "high and firm with a pistol grip" — as if he was about to fire it — and Officer Batson's statements that Galindo was holding the pistol upside down, with the grip pinched between his thumb and fingers.

Even if the video footage is not so unambiguous as to merit an award of partial summary judgment against Officer Guerra and the City, the plaintiff argues that she is at least entitled to a trial on the Fourth Amendment, assault and battery, wrongful death, and negligent infliction of emotional distress claims. In that regard, the plaintiff contends that a jury could rely on the video footage and other evidence not only to find that Galindo posed no immediate threat to Guerra or anyone else at the time of the shooting, but also to find that Guerra knew that the shooting was unjustified and that he concocted "a remarkably false story" to evade liability. *See* Br. of Appellant 23.

As for the negligent training claim against the City, the City sought summary judgment as to that claim on the ground, inter alia, of inadequate evidentiary support, as the plaintiff's own experts Harmening and Tucker criticized not the City's training of its police officers, but the failure of Officer Guerra and his colleagues to act in accordance with that training. That is, the plaintiff's experts acknowledged that the City had trained the officers on relevant policies concerning the use of force and interacting with non-English speakers and persons suffering from mental illness, and those experts identified no deficiencies in either the policies or the attendant training. In her summary judgment briefing, however, the plaintiff has suggested that negligent training can be inferred from the conduct of Guerra and his colleagues, particularly their decision to approach Galindo without the assistance of a Spanish-speaking officer.

### B.

Based on the analysis in its Opinion of September 2021, the district court granted the defendants' summary judgment motions and denied the plaintiff's cross-motion for partial summary judgment. The Opinion began with the Fourth Amendment claim against Officer Guerra, recognizing that Guerra would be entitled to qualified immunity if he did not "use[ ] unreasonable and excessive force in violation of Rub[e]n Galindo's Fourth Amendment rights." *See* Opinion 8. The court thus assessed the Fourth Amendment claim on the first prong of the qualified immunity analysis (whether Guerra had "violated a statutory or constitutional right"), and not on the second prong (whether "the right was clearly established at the time of the challenged conduct"). *Id.* (quoting *Mays*, 992 F.3d at 301).

From there, the district court explained that "[w]hether excessive force was used is an objective inquiry assessing what a 'reasonable **\*282** officer on the scene' would have done, taking into account [factors that include] whether the suspect posed an immediate threat to the safety of the officers or others." *See* Opinion 8 (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The Opinion elaborated that, "if at the moment Galindo was shot, he posed an immediate threat to officers and others, then Officer Guerra's actions were objectively reasonable. Conversely, if Galindo did not pose an immediate threat, [the plaintiff] would be entitled to partial summary judgment or at least the right to a jury trial." *Id.* at 9.

In the course of analyzing the Fourth Amendment claim, the district court rendered its own interpretation of the video footage from the body cameras worn by Officer Guerra and his colleagues. As the court saw it, the video footage shows the following:

> Guerra can be heard yelling out "manos, manos" (hands, hands) as Galindo came out [his screen patio] door with his right arm initially hidden from view behind the door frame and his left hand empty. Galindo then reached his left hand down to his left pocket and pulled out a gun .... As officers yelled "put it down" and "drop the gun, drop the gun," Galindo raised the gun half-way up to shoulder height and lowered it again. As officers continued to yell "put it down" and "drop the gun," Galindo raised his left arm then his right arm above shoulder height. At this point it can be seen from the [vantage points of Officers Batson and Suggs] that Galindo is holding the firearm upside down, but from the [video footage from Officer Tran-Thompson's body camera], the same cannot be said. Galindo's left hand began to drop just before shots were fired.

*See* Opinion 5. The court thereby interpreted the video footage in ways different from both the plaintiff and the defendants. For example, no party has asserted that the video footage establishes that Galindo's left hand was initially empty or that he reached into his pocket and then pulled out his pistol. Nor has any party contended that the video footage shows that Galindo's left hand began to drop just before he was fatally shot by Officer Guerra.

Additionally, the district court rejected the plaintiff's contention that video footage "blatantly contradict[s]" Officer Guerra's account of the shooting and criticized the plaintiff for "sometimes hyperbolic characterizations of what is contained in the video footage." *See* Opinion 5 n.2. The Opinion also emphasized that the video footage "include[s] angles of observation unavailable to Officer Guerra" — particularly the Batson and Suggs video footage — and that "Guerra's view was split-second and of course not subject to slow-motion or replay." *Id.* Indeed, the court went so far as to declare that the Batson and Suggs video footage is from "a view that cannot be the view of a reasonable officer in Guerra's position." *Id.* at 10.

In any event, the district court's ruling on the Fourth Amendment claim was ultimately premised on what it deemed to be "the core uncontested and most probative fact of this case": "that Galindo ignored the [Spanish-speaking dispatcher's] directive to leave the gun in the house and in response to the officer's command 'manos,' ... drew [the] gun." *See* Opinion 12. As the Opinion characterized it, Galindo's conduct "could hardly be more provocative," even if it "was done in an ill-conceived attempt at surrender." *Id.* That is, once Galindo brandished his pistol, "[a] reasonable officer in Guerra's position did not have to wait; did not have to trust a man believed to be delusional, and possibly homicidal or suicidal; a man who had refused every law enforcement directive  **\*283**  aimed at keeping him and others safe." *Id.* at 11. Accordingly, the court concluded that Galindo posed an "imminent threat to officers and others" by being "a non-compliant, armed subject," such that it was objectively reasonable for Guerra to shoot him. *Id.* at 13.

The district court relied for its conclusion that Officer Guerra acted reasonably on this Court's decisions in 🚩 *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), 🚩 *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998), and 🚩 *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991). Those decisions, the Opinion observed, stand for the legal principle "that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *See* Opinion 11 (quoting 🚩 *Anderson*, 247 F.3d at 131).

Turning to the state law claims against Officer Guerra and the City of Charlotte for assault and battery, wrongful death, and negligent infliction of emotional distress, the district court incorporated the Opinion's analysis concerning the reasonableness of Guerra's actions, as conducted for purposes of the Fourth Amendment claim. *See* Opinion 18. The court then concluded that — because "Guerra's conduct was justified and reasonable" — each of the state law claims fails as a matter of law. *Id.*

Finally, in assessing the state law claim against the City for negligent training, the district court ruled that the plaintiff had failed to produce evidence sufficient to establish any alleged training failure. *See* Opinion 18-20. The Opinion observed, inter alia, that the plaintiff's own expert witnesses had acknowledged that the City both had relevant policies in place and had trained Officer Guerra and his colleagues on those policies. *Id.* at 19. The court then emphasized that — without criticizing the policies

or the training — the plaintiff's experts simply opined that Guerra and the other responding officers disregarded their training and violated the City's policies in their encounter with Galindo. *Id.* at 19-20.

Consistent with its Opinion, the district court awarded summary judgment to the defendants on each of the claims against them — to Officer Guerra on the Fourth Amendment, assault and battery, wrongful death, and negligent infliction of emotional distress claims, and to the City on the wrongful death, negligent infliction of emotional distress, and negligent training claims. Having done so, the court denied the plaintiff's cross-motion for partial summary judgment. The plaintiff has timely noted this appeal, and we possess jurisdiction pursuant to 🚩 28 U.S.C. § 1291.

## II.

We review de novo district court decisions on motions for summary judgment and qualified immunity. *See* 🚩 *Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See* 🚩 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When cross-motions for summary judgment are before us, we "examine[ ] each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (internal quotation marks omitted). Applying that standard, the facts and all **\*284** reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *See* 🚩 *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). That means "we may not credit [the movant's contrary] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor," even if "a jury could well believe the evidence forecast by the [movant]." *See* 🚩 *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017).

## III.

On appeal, the plaintiff contests the district court's awards of summary judgment to Officer Guerra and the City of Charlotte on all her claims, and she renews her own request for partial summary judgment. As previously stated, we are satisfied to affirm the summary judgment award to the City on the negligent training claim. We vacate, however, the award of qualified immunity to Guerra on the Fourth Amendment claim, as well as the summary judgment awards to Guerra and the City on the assault and battery, wrongful death caused by negligence, and negligent infliction of emotional distress claims. Because there are genuine disputes of material fact as to the objective reasonableness of Guerra's actions, we remand for further proceedings on each of those claims, without directing the entry of a judgment in the plaintiff's favor.

## A.

We first address the plaintiff's Fourth Amendment claim against Officer Guerra, brought under 🚩 42 U.S.C. § 1983 for the alleged use of excessive force. 🚩 Section 1983 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *See* 🚩 *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Law enforcement officers sued in their individual capacities under 🚩 § 1983 may invoke the doctrine

of qualified immunity, which shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See* 🚩 *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). Qualified immunity is designed to "protect[ ] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *See* 🚩 *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (internal quotation marks omitted).

As the district court recognized, the qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation. *See* 🚩 *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (citing 🚩 *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). If the answer to either question is "no," the officer being sued is entitled to qualified immunity. *See* 🚩 *Pearson*, 555 U.S. at 232, 129 S.Ct. 808. Courts possess discretion concerning which prong to address first. *See* 🚩 *Id.* at 236, 129 S.Ct. 808. In reviewing an award of qualified immunity to a defendant officer at the summary judgment stage, our job is to "consider whether there are any material disputes of fact ... that, when resolved, would amount to the violation of a clearly established constitutional right." *See* 🚩 *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). "If there are, summary judgment is inappropriate." 🚩 *Id.*

### 1.

We begin, as did the district court, with the first prong of the qualified immunity **\*285** analysis: here, whether — viewing the facts in the light most favorable to the plaintiff — Officer Guerra may have contravened the Fourth Amendment by employing excessive force when he fatally shot Ruben Galindo. On the premise that Guerra's use of deadly force was objectively reasonable, the district court concluded that there was no constitutional violation and thus that Guerra is entitled to qualified immunity.

### a.

### (1)

Pursuant to the Supreme Court's precedent in 🚩 *Graham v. Connor*, any claim "that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *See* 🚩 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In conducting that analysis, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 🚩 *Id.* at 396, 109 S.Ct. 1865. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." 🚩 *Id.* at 396-97, 109 S.Ct. 1865. Moreover, the analysis "requires careful attention to the facts and circumstances of each particular case," including "whether the suspect poses an immediate threat to the safety of the officers or others," as well as "the severity of the crime at issue" and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." 🚩 *Id.* at 396, 109 S.Ct. 1865.

Where deadly force has been used, the 🚩 *Graham* factor of whether the suspect posed an immediate threat "is particularly important." *See* 🚩 *Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023). In such cases, this Court considers whether a reasonable officer on the scene would have had "probable cause to believe that the suspect pose[d] a threat of serious physical

harm, either to the officer or to others." *See* *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). We assess the objective reasonableness of an officer's use of deadly force "based on the totality of the circumstances," *see Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 582 (4th Cir. 2017) (citing *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016)), "and based on the information available to the [officer] 'immediately prior to and at the very moment [he] fired the fatal shots,' " *id.* (quoting *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)).

It has long been "established in this circuit that the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." *See* *Waterman*, 393 F.3d at 481 (citing *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)); *see also* *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) ("We assess the reasonableness of the officer's conduct based on the circumstances confronting the officer immediately prior to and at the very moment he fired his weapon." (internal quotation marks omitted)). As such, we have recognized "that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *See* *Waterman*, 393 F.3d at 481. That is, our reasonableness "determination must focus on the moment that deadly force was used, **\*286** not the whole episode," and we must be mindful that "the justification for deadly force can fall away in seconds." *See* *Stanton*, 25 F.4th at 233.

(2)

In our 2013 decision in *Cooper v. Sheehan*, we clarified when a reasonable officer is — and is not — entitled to use deadly force against an armed suspect. *See* 735 F.3d at 159. Specifically, we explained that "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Id.* "Thus, an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Id.* "Instead," as we illuminated, "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Id.*

We recognized in *Cooper* that "there are many circumstances under which a police officer could reasonably feel threatened," such that the use of deadly force would be permissible. *See* 735 F.3d at 159 n.9. Those circumstances include, of course, when a firearm-brandishing suspect "point[s], aim[s], or fir[es] his weapon." *Id.*; *accord* *Elliott*, 99 F.3d at 642-44 (concluding that a fatal police shooting was justified where the handcuffed suspect had grasped a handgun, pointed it at officers with his finger on the trigger, and ignored an officer's directive to drop the firearm). To be sure, "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." *See* *Cooper*, 735 F.3d at 159 (quoting *Elliott*, 99 F.3d at 644).

The circumstances under which a police officer could reasonably feel threatened also include when a suspect who is armed, or mistakenly believed to be armed, makes some other threatening movement. As examples of those circumstances, *Cooper* identified three of our earlier cases: *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), wherein "the officers ordered a detainee to his hands and knees, and then shot him when he reached for a bulge in his waistband that turned out to be a radio"; *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994), wherein "a bystander was shot as he ran toward a police officer moments after the officer learned that an armed arrestee was on the loose in the area"; and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir.

1991), wherein "an officer shot a suspect who ignored commands to show his hands before turning quickly toward the officer with what turned out to be only a beer bottle in a clinched fist." *See* 🚩 *Cooper*, 735 F.3d at 159; *see also* 🚩 *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (recognizing that police officers reasonably felt threatened by a suspect who — after wielding a knife and issuing threats against the officers and others — walked toward the officers, appeared to still be armed, and disobeyed commands to stop).

As we explained in 🚩 *Cooper*, deadly force has been deemed constitutionally permissible where "the objective basis for the threat was real, but the [suspect's weapon] was not." *See* 🚩 735 F.3d at 159. Crucially, however, deadly force has proven to violate the Fourth Amendment where the suspect's weapon "was real," but "the threat was not." 🚩 *Id.*

Moreover, although 🚩 *Cooper* and the decisions that preceded it reflect that deadly force may be allowable where a suspect has ignored or defied a police officer's commands, those precedents establish that noncompliance alone is an insufficient justification. Under those precedents,

> the failure to obey commands by a person in possession of, or suspected to be **\*287** in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

*See* 🚩 *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022) (summarizing 🚩 *Cooper,* 🚩 *Anderson,* 🚩 *Sigman,* 🚩 *Elliott,* 🚩 *McLenagan,* and 🚩 *Slattery*, plus this Court's post-🚩 *Cooper* decision in 🚩 *Hensley*). Our precedents further reflect that, in order for deadly force to be justified, the commands defied by the suspect must have been "*clear* commands." *See* 🚩 *Franklin,* 64 F.4th at 533 (citing 🚩 *Elliott,* 🚩 *Slattery,* and 🚩 *Hensley*).

(3)

Applying the foregoing principles in 🚩 *Cooper*, we concluded that it was not objectively reasonable for law enforcement officers to fire on a suspect holding a shotgun, in that the evidence showed, inter alia, that the muzzle of the shotgun was "pointed at the ground" and the suspect "made no sudden moves" or "threats" and "ignored no commands." *See* 🚩 735 F.3d at 159. As we put it, "the facts fail[ed] to support the proposition that a reasonable officer would have had probable cause to feel threatened by [the suspect's] actions." 🚩 *Id.* Since 🚩 *Cooper*, we have similarly and repeatedly ruled that it was not objectively reasonable for officers to fire on suspects who, though armed, were not threatening the officers or others with their weapons at the moment they were shot. *See* 🚩 *Hensley,* 876 F.3d at 583 (suspect kept a "handgun pointed toward the ground at all times," "never raised the gun to the officers," and "never otherwise threatened them"); 🚩 *Betton,* 942 F.3d at 192 (suspect "was holding a firearm 'down' " by his hip and had no opportunity to raise it); 🚩 *Knibbs,* 30 F.4th at 217 (suspect was "holding a loaded shotgun that was not aimed at [the officer]" and had not "made any furtive movement towards [the officer] that would indicate his intent to cause physical harm"); 🚩 *Franklin,* 64 F.4th at 533-34 (suspect "pointed [his handgun] at no one" and "held it with just one hand from the top of the barrel," such that he "would have had to reposition his grip to become a threat").

In those cases, we were reviewing the grant or denial of qualified immunity to the defendant officers at the summary judgment stage, and we thus viewed the facts in the light most favorable to the plaintiffs. [7] Consequently, we disregarded contrary evidence proffered by the defendants, including sworn statements that certain suspects had actually pointed their firearms at the officers just before the officers shot those suspects. *See, e.g.,* *Hensley,* 876 F.3d at 579 (explaining that "we may not take as true the [officers'] assertion that [the suspect] had the muzzle of the gun pointed toward them in a 'shoot-from-the-hip' position").

Moreover, we highlighted additional circumstances that — if found by a jury — would undermine the officers' claims that they reasonably felt threatened by the suspects and their weapons. For example, in *Cooper*, it was apparent that the suspect had a "perfectly reasonable rationale" for being armed: The officers had gone onto **\*288** the suspect's property at night without announcing their presence or identifying themselves. *See* 735 F.3d at 160 (internal quotation marks omitted). Nevertheless, without giving any commands or having any "information suggesting that [the suspect] might harm them," the officers "fired on [the suspect while] he stood at the threshold of his home." *Id.* at 159. Similarly, in *Betton*, the officers made a violent, unannounced entry into the suspect's residence and then "fired 29 shots without warning or issuing any commands." *See* 942 F.3d at 192. And in *Knibbs*, the officer knocked on the suspect's door and announced himself, but he was not "readily recognizable as a law enforcement officer in the middle of the night on [the] unlit porch." *See* 30 F.4th at 217. The suspect thus "racked his shotgun in order to load it while investigating who was on his porch" and understandably ignored two commands to drop the firearm, without aiming his shotgun at the officer or making any furtive movements before the officer shot him through a window. *Id.* at 220-21.

In *Hensley,* although the officers had witnessed the suspect striking his daughter with his handgun on the front porch of his home, that "brief altercation" had ended with the suspect walking away from his daughter into his yard and thereafter making "no threatening statements or actions toward anyone." *See* 876 F.3d at 583-84. Meanwhile, the officers never spoke to the suspect and "never ordered [him] to drop the gun or warned that they would shoot." *Id.* at 585. Rather, the officers "opened fire on [the suspect] and killed him," apparently for the simple reason that "he had possession of a firearm." *Id.* at 583.

Most recently, in *Franklin*, the officers "receiv[ed] 911 accounts of a man terrorizing people [with a handgun] at a fast-food restaurant." *See* 64 F.4th at 532. But "the officers arrived at a very different scene than the one described in those reports," in that the suspect "was no longer inside the restaurant" and no longer being "aggressive or outwardly threatening." *Id.* Instead, the suspect was "crouched down next to the [open] passenger side of a Honda sedan parked in the restaurant parking lot," about a foot away from and facing a restaurant employee who was sitting in the passenger seat. *Id.* at 525-26. As the officers had been advised as they were en route to the scene, the restaurant employee had been "calming [the suspect] down" and "pray[ing] with him." *Id.* at 526 n.1.

Notably, video footage from the officers' body cameras showed how their ensuing encounter with the suspect unfolded. *See* *Franklin,* 64 F.4th at 526. Upon arrival, while approaching the suspect and before they could see him, the officers shouted four commands for the suspect to show his hands, without being able to visually ascertain whether the suspect was complying. *Id.* Once the suspect came into one officer's view, the suspect's handgun was out of sight and his "hands appeared to be clasped together between his legs." *Id.* The officers then yelled 22 commands for the suspect to drop his firearm. *Id.* at 526-27, 532. In the midst of those commands, another "restaurant employee felt comfortable enough to walk up to [the suspect]," only to be ordered by the officers "to get back." *Id.* at 526, 532. The commands were so loud and frequent that

the officers could not hear whether the suspect said anything back to them. 🚩*Id.* The suspect did not immediately comply with the commands and retained what appeared to be a "passive" demeanor. 🚩*Id.*

As it turned out, the suspect had not — as the officers "apparently assumed" — been holding his firearm in his hands when commanded to drop the weapon. *See* 🚩*Franklin,* 64 F.4th at 532. Rather, the **\*289** suspect's "gun was concealed under his jacket, not in his hands." 🚩*Id.* Thus, "the only way for him to obey the officers' commands to drop the gun was to reach into his jacket to retrieve it." 🚩*Id.* "When he did just that," however, the one officer who could see the suspect "interpreted his movement as a threatening maneuver." 🚩*Id.* Although the suspect then held his handgun "in a non-firing grip, pointed away from everyone," the officer promptly shot the suspect twice and killed him. 🚩*Id.*

In those circumstances, we concluded that a reasonable jury could find that the fatal shooting "rested on [the suspect's] 'mere possession of a firearm.' " *See* 🚩*Franklin,* 64 F.4th at 532 (quoting 🚩*Cooper,* 735 F.3d at 159). That was due, in part, to the "non-threatening way [the suspect] handled the weapon once he retrieved it." 🚩*Id.* at 534. It was also because — "observing the facts in the light most favorable to [the plaintiff] — there was nothing furtive or menacing about [the suspect's] response to the officers' commands." 🚩*Id.* at 532. Indeed, the officers' "commands simply were too ambiguous to transform [the suspect's] hesitation into recalcitrance." 🚩*Id.* at 533 (recapping that, "after demanding to see [the suspect's] hands, the officers then pivoted to an inconsistent instruction, ordering him to drop his gun"). As we explained, when the suspect "hesitated through twenty-some-odd commands as if contemplating something," he may have been "deciding how to drop a gun he was not holding" or he may have been "just frightened by the torrent of shouting and gun-pointing." 🚩*Id.* (internal quotation marks omitted). We also noted the officers' failure to act in accordance with their training, including their training "to give various commands to achieve specific results precisely because one misjudgment could endanger the officers or the public." 🚩*Id.*

Lastly, we related in 🚩*Franklin* that — although the district court had ruled in favor of the defendant officer who fatally shot the suspect — the district court recognized that, "in hindsight," the officer likely made a mistake in perceiving the suspect to pose an immediate threat. *See* 🚩64 F.4th at 531-32 (internal quotation marks omitted). In refusing to affirm the district court, we emphasized that "the question [was] whether [the officer's] mistake was *reasonable.*" 🚩*Id.* at 532. Given the evidence, particularly "the body camera footage depicting the encounter," we concluded that a reasonable jury could find that any mistake by the officer was not a reasonable one. 🚩*Id.*

b.

Here, viewing the facts in the light most favorable to the plaintiff, [8] Ruben Galindo sought help from police officers because — in the throes of paranoia — he wanted to surrender his pistol and turn himself in for impending court proceedings. Although he was firmly instructed by the Spanish-speaking 911 dispatcher to leave the firearm inside his apartment when he met the responding officers outside, Galindo insisted that he would have the firearm with him. He also denied any plan to harm the officers or anyone else, and he repeatedly asserted that he had no bullets for his pistol. Before they reached Galindo's apartment, the responding officers were advised by the dispatcher of both Galindo's assurances that he had no bullets and his **\*290** intention to "put down the gun" only after the officers arrived. *See* J.A. 313.

Unquestionably, the responding officers had good reason to be skeptical of Galindo and to treat him as a potential threat to the safety of the officers and others. Galindo's purported reason for summoning the officers was dubious, he was refusing to disarm

himself, and he was otherwise being uncooperative with the dispatcher and "sound[ing] delusional." *See* J.A. 109. Moreover, he had admitted to consuming alcohol, was suspected of a previous firearm-related offense, and posed a threat not only of ambush to the officers, but also of domestic violence to a "female" inside his apartment. *Id.*

Before proceeding to Galindo's apartment, Officer Guerra recognized that, "to assess the situation accurately," he "would have to do it best in person" and "try to establish an open line of communication [with Galindo] and basically feel him out." *See* J.A. 296. Furthermore, Guerra and the other responding officers had been trained to regard an event like the Galindo event "as a crisis intervention" necessitating "effective communication" and "de-escalation." *Id.* at 693. Notwithstanding that training — and despite that they were not fluent in Spanish, could speak only a few Spanish words, and could only presume that Galindo would be able to understand simple English phrases — the officers decided to proceed to Galindo's apartment without awaiting the assistance of a Spanish-speaking colleague. Even then, the officers' training would have had them calmly asking Galindo if he spoke English, conveying their intent to help him, non-threateningly asking him to lay his pistol on the ground, and using recognizable physical gestures in lieu of English words and phrases that Galindo may not have understood.

Instead, Officer Guerra greeted Galindo with a Spanish command of "manos" ("hands"), rather than the more precise "manos arriba" ("put your hands up"), albeit with a physical gesture demonstrating to Galindo what he should do. When Galindo then raised his left hand and showed himself to be holding the pistol that he had advised he would have with him, Guerra and the other responding officers immediately shouted English commands — neither calmly nor non-threateningly — to "drop the gun" and "put it down." Those commands, unlike the "manos" command, were not accompanied by any physical gestures that would illustrate what the officers meant.

In the midst of the Spanish and then English commands, Galindo demonstrated uncertainty as to whether he should throw his pistol or continue holding it in his raised left hand. He also demonstrated that he was trying to understand and comply with the officers' instructions. Quickly, Galindo assumed a position of surrender, with both his arms raised above shoulder height and about 45 degrees from the center of his body. Galindo's left arm was pointing toward the wall of the apartment building across from his own, away from Officer Guerra and his colleagues. Galindo was holding the pistol upside down, with the grip pinched between his thumb and fingers. Although he could have fired the pistol while holding it in that position, he could not have done so accurately. Moreover, Galindo never pointed his pistol toward Guerra or another officer, and no other person was present. Galindo also did not make any movement suggesting that he was about to fire the pistol. Rather, Galindo remained frozen in his position of surrender until he fell as a result of the first of the two shots fired at him by Guerra. Throughout the encounter, Guerra's rifle had been aimed at Galindo, Guerra had backup from his colleagues, and **\*291** cover had been available to all the officers, with only Guerra choosing to step away from his.

Two days later, during his interview with police department investigators, Officer Guerra gave an account of the fatal shooting in which he asserted the following: that he had greeted Galindo with the Spanish command "manos arriba"; that, in response, Galindo raised both his arms and only then lowered his left arm, reached into his pocket, and pulled out his pistol; that Galindo pivoted the pistol and pointed it toward Guerra just before Guerra fired his rifle at Galindo; and that Galindo remained standing after Guerra's first shot, such that Guerra was compelled to fire the second. Following the interview, however, the video footage from the responding officers' body cameras was shown to either flatly refute or at least fail to corroborate each of those assertions.

Somewhat undeterred, Officer Guerra continued to claim during his deposition that Galindo raised then lowered his left arm to reach into his pocket to retrieve his pistol, and that he pivoted the pistol toward Guerra after subsequently taking his position of surrender. Guerra has also endorsed the deposition testimony of Officer Tran-Thompson that, just before being shot, Galindo took a small step toward Guerra and began to lower his left arm or elbow in such a way that he appeared to be "getting ready to punch out and take a shooter's stance." *See* J.A. 619. Tran-Thompson's account, however, varies from Guerra's account and also lacks corroboration in the video footage. Additionally, although Guerra asserted in his police department interview and subsequent deposition that Galindo was holding his pistol in a shooter's position — i.e., "high and firm with a pistol grip," *id.* at 317 — that assertion has been contradicted by Officer Batson's statements that Galindo was less-threateningly holding the pistol upside down, with the grip pinched between his thumb and fingers.

In his statements, Officer Guerra has confirmed that he had a clear view of Galindo and his pistol throughout the encounter. Guerra has also proposed that differences between his account of the fatal shooting and those of other officers on the scene — as well as differences between his account and the video footage from the other officers' body cameras — are the result of the officers' varying vantage points. *See, e.g.*, J.A. 335 (suggesting that, because his vantage point was better lit and closer than Officer Batson's, he was in superior position to discern how Galindo's pistol was actually being held). Furthermore, it is generally undisputed in these proceedings that the video footage is not clear in all details and did not capture everything that occurred at the shooting scene.

### c.

Under the foregoing view of the facts — which, again, is necessarily in the light most favorable to the plaintiff — Galindo posed a threat to the safety of the responding officers at the moment he was shot, but a reasonable officer on the scene would not have had probable cause to believe that he posed an "immediate threat" such that deadly force could constitutionally be used against him. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865; *Waterman*, 393 F.3d at 477. Simply put, Officer Guerra fired at Galindo while Galindo was standing still in a position of surrender. Although Galindo was armed with a pistol, he did not threaten anyone with the pistol by "pointing, aiming, or firing his weapon." *See Cooper*, 735 F.3d at 159 n.9. And although Galindo failed to obey the officers' English commands to "drop the gun" and "put it down," he made no "furtive or other **\*292** threatening movement with the weapon" that would have signaled an "inten[t] to use it in a way that imminently threaten[ed] the safety of [Guerra] or another person." *See Knibbs*, 30 F.4th at 225. [9]

Indeed, the Spanish-speaking Galindo may not have even understood the English commands to "drop the gun" and "put it down." He seemed to want to comply with the officers' instructions, while being confused by what they were commanding. As we have explained, a suspect's failure to obey commands may not justify deadly force if the commands were unclear. *See Franklin*, 64 F.4th at 533 (observing that "our cases support [the] position that if [the suspect] defied *clear* commands, then his actions may have provoked deadly force").

Moreover, although it may not have been "perfectly reasonable," Galindo had a "rationale" for being armed: In a state of paranoia, he wanted to surrender his pistol and turn himself in for impending court proceedings. *Cf. Cooper*, 735 F.3d at 160 (recognizing suspect's "perfectly reasonable rationale" for being armed, i.e., officers' unannounced nighttime incursion on his property (internal quotation marks omitted)). Galindo so advised the Spanish-speaking 911 dispatcher, who in turn informed the responding officers that Galindo planned to "put down the gun" only after the officers arrived outside his apartment. *See* J.A. 313. The dispatcher also relayed to the officers that Galindo had given assurances that he had no bullets. That is not to say that the officers were obliged to believe Galindo or trust that he was not dangerous. But the fact that Galindo disclosed that he would be carrying the pistol so that he could surrender it, as well as the fact that Galindo affirmatively indicated that he intended the officers no harm, can be seen as further weakening the case for probable cause to believe that Galindo posed an immediate threat. *Cf. Sigman*, 161 F.3d at 787 (including in probable cause analysis that suspect had recently wielded knife while issuing verbal threats against officers and others).

It also may be deemed significant that Officer Guerra and his colleagues went into the Galindo event knowing that it should be treated "as a crisis intervention" with a person who "sound[ed] delusional," and knowing that they therefore needed "to establish an open line of communication" with someone who spoke Spanish and may have understood no English. *See* J.A. 109, 296, 693. Yet they proceeded to confront Galindo without the assistance of a Spanish-speaking officer, and they otherwise disregarded their training on how to properly interact with non-English speakers and persons suffering from mental illness. *See Franklin*, 64 F.4th at 533 (noting officers' failure to follow their training to issue clear commands).

Viewing the video footage and the other evidence in the light most favorable to the plaintiff, it may further be concluded that Officer Guerra's account of the fatal shooting was either contrived or unreasonably mistaken. *See Franklin, 64 F.4th at 532* (recognizing that deadly force will be justified where officer erroneously perceived immediate threat only if "mistake was *reasonable*").  **\*293**  That is, at this stage of the proceedings, Guerra's account cannot be credited, nor can inaccuracies in his account be excused as innocent misperceptions. *See id. at 529-30* (underscoring that, in considering a request for qualified immunity made by summary judgment motion, "[w]e may not credit [the movant's] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor" (quoting Hensley, 876 F.3d at 579)).

At bottom, a reasonable jury could review and interpret the video footage, consider the other evidence, and decide that Galindo did not pose an immediate threat to Officer Guerra or anyone else at the moment Guerra shot him. A reasonable jury could also find that Guerra fabricated his account of the fatal shooting because he knew that the real facts showed that the shooting was not justified. Or a reasonable jury could find that Guerra mistakenly perceived that Galindo posed an immediate threat, but that Guerra's mistake was not reasonable. As such, it very well may be concluded that Guerra used excessive force in contravention of the Fourth Amendment, meaning that he is not presently entitled to qualified immunity under the first prong of the qualified immunity analysis.

### d.

In ruling to the contrary, the district court erred. As an initial matter, the court rendered its own interpretation of the video footage from the responding officers' body cameras and failed in several instances to view the facts in the light most favorable to the plaintiff. For example, the court declared that the video footage shows that "Galindo's left hand began to drop just before shots were fired" — something not even Officer Guerra has claimed — and it dismissed the video footage from the body cameras of Officers Batson and Suggs as being from "a view that cannot be the view of a reasonable officer in Guerra's position." *See* Opinion 5, 10.

Because one of the few important things that is undisputed about the video footage is that it is not clear in all details and did not capture everything that occurred at the shooting scene — and because our own review of the video footage has confirmed that it is subject to different interpretations — neither the district court nor this Court is permitted to decide at the summary judgment stage of these proceedings what the video footage shows or what it did not capture. Like ours, the role of the district court is limited to viewing the facts in the light most favorable to the plaintiff and leaving material factual disputes to be resolved by a jury. *See Hensley, 876 F.3d at 579* (explaining that, under the summary judgment standard, we may not "weigh the evidence" or "resolve factual disputes").

Its error in improperly viewing the facts aside, the district court ultimately ruled in favor of Officer Guerra based on the uncontested evidence "that Galindo ignored the [Spanish-speaking dispatcher's] directive to leave the gun in the house and in response to the officer's command 'manos,' ... drew [the] gun." *See* Opinion 12. According to the court, once Galindo brandished his pistol, Guerra was immediately entitled to use deadly force against him because he posed an immediate threat to the responding officers by being "a non-compliant, armed subject." *See id.* at 11, 13. In other words, the court concluded that the fatal shooting was justified because of Galindo's conduct before he assumed a position of surrender and then allegedly pivoted his pistol toward Guerra and indicated he was about to fire.

The district court's theory is at odds, however, with the well-established principle  **\*294**  "that the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed," so that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been

eliminated." *See* *Waterman, 393 F.3d at 481*. Even accepting that deadly force was justified at the moment Galindo brandished his pistol, that justification would have vanished once Galindo assumed his position of surrender.

Additionally, the district court's theory disregards our precedents that deadly force cannot be used simply because a suspect is armed and has ignored commands. To be sure, the decisions invoked by the district court — *Anderson,* *Sigman*, and *Slattery* — stand for the legal principle "that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *See* Opinion 11 (quoting *Anderson, 247 F.3d at 131*). But those and other decisions make clear that there must be some basis, other than a suspect's mere possession of a weapon and failure to obey commands, for the officer to reasonably feel threatened. That is, the suspect must "make[ ] some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person." *See* *Knibbs, 30 F.4th at 225* (summarizing *Anderson,* *Sigman*, and *Slattery*, as well as *Cooper,* *Elliott,* *McLenagan*, and *Hensley*). Here, the allegation is that Galindo made such a furtive or threatening movement with his pistol only after taking the position of surrender.

In these circumstances, the district court erred in concluding at the summary judgment stage that Officer Guerra's use of deadly force was objectively reasonable, such that no Fourth Amendment violation occurred. Consequently, the court erred in awarding qualified immunity to Guerra under the first prong of the relevant analysis.

e.

Although we conclude that Officer Guerra is not presently entitled to qualified immunity under the first prong of the qualified immunity analysis, we also rule that the plaintiff is not entitled to summary judgment on her Fourth Amendment claim. In seeking such relief, the plaintiff has largely relied on the video footage from the responding officers' body cameras, arguing that the video footage is sufficiently unambiguous both to "quite clearly establish that Galindo was not a threat to anyone at the moment Guerra killed him" and to "blatantly contradict[ ]" Guerra's account of the shooting. *See* Br. of Appellant 22 (internal quotation marks omitted); *see also* *Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)* (recognizing that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

We cannot agree with the plaintiff that the video footage is unambiguous enough either to prove the lack of an immediate threat or to wholly discredit Officer Guerra's version of events. As the plaintiff has not disputed, the video footage is inconclusive as to key issues such as how Galindo was holding his pistol and where the pistol was pointing. Moreover, it is generally agreed that the video footage did not capture everything that occurred at the shooting scene, rendering it possible that, just before Guerra shot him, Galindo made threatening movements that the video footage does not show. Thus, the video **\*295** footage provides only "*some* support" to the plaintiff, and it does not compel an award of summary judgment in her favor. *See* *Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011)* (observing that "*Scott* does not hold that courts should reject [the nonmoving party's] account on summary judgment whenever documentary evidence, such as a video, offers *some* support for [the movant's] version of events").

It bears emphasis that — although a reasonable jury could rule in favor of the plaintiff after reviewing the video footage and other evidence — a reasonable jury could instead find that Galindo did pose an immediate threat at the moment Officer Guerra fatally shot him or that Guerra was reasonably mistaken in perceiving an immediate threat. We therefore decline to direct the entry of a judgment in the plaintiff's favor on her Fourth Amendment claim.

2.

That brings us to the second prong of the qualified immunity analysis with regard to the Fourth Amendment claim: whether the constitutional right allegedly violated was clearly established in September 2017 when Officer Guerra fatally shot Galindo. In light of its ruling in Guerra's favor under the first prong, the district court did not reach this issue. We address it, however, because if the right was not clearly established, Guerra would yet be entitled to qualified immunity and we would have an alternative ground for affirming the district court.

In assessing whether a right was clearly established, we look to decisions of the Supreme Court and this Court to "consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights." *See* Betton, 942 F.3d at 193-94. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See* City of Tahlequah v. Bond, ––– U.S. –––, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021) (internal quotation marks omitted). Nevertheless, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *See* Wilson v. Prince George's Cnty., 893 F.3d 213, 221 (4th Cir. 2018).

Here, the question is whether it was clearly established in September 2017 that an officer would contravene the Fourth Amendment by using deadly force against a suspect who is holding a firearm in his hand and ignoring commands to drop the weapon, but who is standing still in a position of surrender, is not firing the weapon or aiming it at any person, and is not otherwise making a furtive or threatening movement that would suggest he had an intent to use the weapon to harm the officer or anyone else. The answer is plainly "yes" under our 2013 decision in Cooper, as well as our earlier decisions in Anderson (2001), Sigman (1998), Elliott (1996), McLenagan (1994), and Slattery (1991).

Precisely on point, we have held that those six decisions — along with our November 2017 decision in Hensley — "together *clearly establish*" the following:

> [T]he failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, **\*296** thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

*See* Knibbs, 30 F.4th at 225 (emphasis added); *see also* Franklin, 64 F.4th at 534-35 (explaining that we had "little trouble concluding that [the suspect's] Fourth Amendment right was clearly established by our precedents," including Cooper and Hensley). That is, we not only have decisions that clearly establish the very right at issue in these proceedings, but we also have decisions that already recognize the right was clearly established under the earlier precedents.

Notably, Officer Guerra — who bears the burden of proof under the second prong of the qualified immunity analysis, *see* Stanton, 25 F.4th at 233 — does not argue that the aforementioned right did not become clearly established until we decided Hensley, two months after he fatally shot Galindo. And there is good reason for that, as it is not Hensley that

clearly established the right. At best, 🚩*Hensley* simply made even clearer the right that was clearly established by 🚩*Cooper,* 🚩*Anderson,* 🚩*Sigman,* 🚩*Elliott,* 🚩*McLenagan,* and 🚩*Slattery.*

Officer Guerra is thus left to assert that a different right is at issue in these proceedings — a right that has never been clearly established. Specifically, Guerra maintains that there is no precedent of this Court or the Supreme Court ruling that where an officer is "interacting with a subject who has a gun in his hand which the officer reasonably believes the subject is preparing to fire," and where "the officer has announced his presence and the subject has been commanded repeatedly to disarm," that officer "is not allowed to defend himself, his fellow officers and others with deadly force." *See* Br. of Appellees 41. The critical problem for Guerra is that his argument assumes that he shot Galindo based on a reasonable belief that Galindo was about to fire his own pistol, but that is not what the plaintiff contends.

Considering, as we must, the Fourth Amendment right that the plaintiff alleges was violated, we are readily satisfied that the right was clearly established at the time of the September 2017 fatal shooting. We therefore vacate the district court's award of qualified immunity to Officer Guerra and reinstate the plaintiff's Fourth Amendment claim for further proceedings.

B.

We next address the plaintiff's state law claims against Officer Guerra for assault and battery, and against both Guerra and the City of Charlotte for wrongful death caused by negligence and negligent infliction of emotional distress. The district court awarded summary judgment to the defendants on those claims, based on its conclusion with respect to the Fourth Amendment claim that Guerra's use of deadly force was objectively reasonable. As we have explained, however, there are genuine disputes of material fact as to the objective reasonableness of Guerra's actions. Thus, as with the Fourth Amendment claim, we reinstate the assault and battery, wrongful death, and negligent infliction of emotional distress claims for further proceedings, without directing the entry of judgment in the plaintiff's favor as to any of the claims.

C.

Finally, we address the plaintiff's state law claim against the City of Charlotte for negligent training police officer training. The district court awarded summary judgment to the City on the negligent training claim because of the plaintiff's failure to produce evidence sufficient **\*297** to establish any alleged training failure. In so doing, the court observed that the plaintiff's own expert witnesses acknowledged that Officer Guerra and his colleagues received appropriate training from the City, as the plaintiff's experts blamed the officers for disregarding their training and did not criticize the training itself. Despite that evidence, the plaintiff suggests that negligent training can somehow be inferred from the officers' conduct, particularly their decision to approach Galindo without the assistance of a Spanish-speaking officer. We agree with the district court, however, that there is an insufficient evidentiary basis for the negligent training claim, and we therefore affirm the summary judgment award to the City as to that claim.

IV.

Pursuant to the foregoing, we affirm the district court's summary judgment award to the City of Charlotte on the plaintiff's negligent training claim. We vacate the court's award of qualified immunity to Officer Guerra on the Fourth Amendment claim, as well as the related summary judgment awards to Guerra and the City on the assault and battery, wrongful death caused by negligence, and negligent infliction of emotional distress claims. We remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

RICHARDSON, Circuit Judge, dissenting:

In its fifty-seven-page opinion, the majority devotes a mere three pages to whether Officer Guerra violated clearly established law. Its brevity is telling. While the law may be established now, we must consider the law as it stood when Galindo was shot in September 2017. And the law at that time did not clearly establish that Officer Guerra violated the Fourth Amendment.

Determining whether an official violates clearly established law is a two-step process. We first must specifically define the right. *City of Tahlequah v. Bond*, ––– U.S. ––––, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021). Then, based on that right, we look to see if caselaw at the time of the conduct places the constitutional question "beyond debate." *Kisela v. Hughes*, ––– U.S. ––––, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017)). "It is not enough that the rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bond*, 142 S. Ct. at 11 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018)) (internal quotation marks omitted). This does not require an existing case directly on point. But it does demand that officers are entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015)). This clarity requires an *existing* "body of relevant case law" that actually *finds* "a Fourth Amendment violation 'under similar circumstances.' " [1] *Wesby*, 138 S. Ct. at 590–91 (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), and then quoting *White*, 580 U.S. at 79, 137 S.Ct. 548).

**\*298** It is here that the majority goes astray. Even were one to accept its definition of the right, [2] the majority does not identify a single case published before this September 2017 shooting—let alone a "body of relevant case law"—"finding a Fourth Amendment violation under similar circumstances." *Wesby*, 138 S. Ct. at 590–91. Its conclusory analysis instead relies on cases after the shooting and cases finding *no* violation.

The majority rests on our decisions in *Knibbs v. Momphard*, 30 F.4th 200 (2022), and *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023). But both were decided well after the shooting here, so they could not be part of the law that was clearly established by September 2017. *Wesby*, 138 S. Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in *then-existing* precedent." (emphasis added)); *Kisela*, 138 S. Ct. at 1154 (finding a case decided after the shooting at issue was of no use in the clearly established inquiry). To get around this problem, the majority reads *Knibbs* to say that our pre-shooting caselaw clearly established the right. The majority says that the right at issue in *Knibbs* is the same as the one at issue here. And—according to the majority—*Knibbs* said that right was clearly established "under ... earlier precedents." Majority Op. at 295–96.

But *Knibbs* doesn't say that. *Knibbs* lists seven cases that it says "together" clearly establish the right *as of April 2018. Knibbs*, 30 F.4th at 224–25. One of those cases, *Hensley*, was decided after Galindo's shooting. Nor can the majority reasonably rely on *Hensley* as holding that the right was, prior to that decision, clearly established, because *Hensley* expressly refused to consider whether any right was clearly established. [3] 876 F.3d at 580. So *Knibbs* doesn't say that

our pre-shooting cases clearly establish the right; it says our pre-shooting cases *plus one post-shooting case* do. And if it takes all seven cases "together" to clearly establish the right, and the majority can't rely on all seven, then the majority can't rely on *Knibbs*. This is especially true in relation to *Hensley*, which the *Knibbs* majority said "applied [the] right more directly to the particular situation presented in this appeal" than did any of the other cases discussed. *Id.* at 224; *see also Franklin*, 64 F.4th at 531, 535 (including *Hensley* as an important part of the analysis). In fact, *Knibbs* is a better case for Officer Guerra since it implies that the majority with its six cases comes up one short.

The majority speeds right past this hole in its logic, pausing only to half-heartedly assert that "*Hensley* simply made even clearer the right that was clearly established" by the other six cases. Majority Op. at 296. But now the majority is adding its gloss to *Knibbs's* gloss. And if our precedent needs that many coats to paint a right as clearly established, it's obvious that right was never clearly established at all.

**\*299** Plus, the majority's gloss isn't even correct. Without *Knibbs*, *Franklin*, or *Hensley*, and looking only to the caselaw that existed in September 2017, *see Wesby*, 138 S. Ct. at 589, Officer Guerra is entitled to qualified immunity. The majority cites six pre-shooting cases: (1) *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013); (2) *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); (3) *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998); (4) *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir. 1996); (5) *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994); and (6) *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991). But together or separately, none of these make it clear to "every reasonable official" that the use of deadly force in *this* case was *clearly* unlawful. *Wesby*, 138 S. Ct. at 589.

Start with *Cooper*. There, we denied qualified immunity when officers shot a man who stepped onto his front porch carrying a shotgun. *Cooper*, 735 F.3d at 154–56. Key to that holding was the officers' failure to present themselves as law enforcement officials. *Id.* at 159 ("*Importantly*, the Officers never identified themselves." (emphasis added)). This failure made their assumption that the man was threatening less reasonable. *Id.* But Officer Guerra identified himself. So *Cooper* is "simply too factually distinct to speak clearly to the specific circumstances here." *Mullenix*, 577 U.S. at 18, 136 S.Ct. 305; *cf. Knibbs*, 30 F.4th at 224 (noting that *Cooper* only defined the right "at a higher level of generality").

And, to the extent it does speak to these circumstances, *Cooper* actually suggests that Officer Guerra acted reasonably. We explained in *Cooper* that, if the officers had identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Cooper*, 735 F.3d at 159. We also said that "an armed suspect need not engage in some specific action—such as pointing, aiming, or firing his weapon—to pose a threat." *Id.* at 159 n.9. So, after *Cooper*, Officer Guerra might have reasonably assumed he could respond with deadly force to a man approaching him with a drawn weapon. Doubly so since Galindo was in fact drunk, delusional, and had repeatedly ignored commands to leave the firearm in his home. *Cooper* therefore did not put the constitutionality of Officer Guerra's actions "beyond debate." *See Kisela*, 138 S. Ct. at 1152.

The majority's other cases—*Anderson, Sigman, Elliott, McLenagan*, and *Slattery*— are even less helpful. The district court used all but one of them to hold that Officer Guerra did not violate the Fourth Amendment. *Aleman v. City of Charlotte*, No. 3:19-cv-00491, 2021 WL 4495907, at \*6–7 (W.D.N.C. Sept. 30, 2021). Officer Guerra argued the same. And

Aleman argued that they have "no application here." [4] Appellant's Br. at 32–35. None of them help show that Officer Guerra violated clearly established law.

In *Anderson,* *Sigman,* and *Elliott,* we held the officer's use of deadly force was reasonable. *Anderson,* 247 F.3d at 127; *Sigman,* 161 F.3d at 784; *Elliott,* 99 F.3d at 641. Officer Guerra and the district court could thus be forgiven for thinking they are evidence of what a police officer can legally do. Instead, the majority uses them as evidence of what a police officer **\*300** *cannot* legally do—presumably on the theory that if Galindo posed less of a threat than the plaintiffs in those cases, then his shooting was unreasonable. But the Supreme Court has rejected this reasoning: "[t]he mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here." *Mullenix,* 577 U.S. at 18, 136 S.Ct. 305. So these cases cannot demonstrate that Officer Guerra violated clearly established law.

What's more, those cases could reasonably be read—like *Cooper*—to support Officer Guerra's position. In *Anderson* we noted that "[t]his Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." 247 F.3d at 131. Similarly, in *Elliott* we explained that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." 99 F.3d at 644. We also said that "[o]fficers need not be absolutely ... sure of the nature of the threat or the suspect's intent to cause them harm" before using deadly force. *Id.* Given their holdings and dicta, a reasonable officer could look at these cases—where we condoned the use of deadly force against drunk, armed individuals—and infer that Officer Guerra's use of deadly force was reasonable. So these cases—where there was no constitutional violation at all—do nothing to place the unlawfulness of Officer Guerra's conduct "beyond debate."

*McLenagan* and *Slattery* are no better. In *McLenagan,* we granted qualified immunity to an officer who shot a handcuffed detainee that was running towards him because another officer was shouting "[t]he [detainee] has got a gun." 27 F.3d at 1005–06. The officer did not check to see if the detainee was armed or command him to stop. *Id.* at 1007. Nor did the detainee move his hands. *Id.* Yet we still condoned the officer's use of deadly force: "We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer or others." *Id.* at 1007–08. I—along with the district court and the parties—fail to see how a reasonable officer would know from *McLenagan* that Officer Guerra's use of deadly force was clearly unlawful.

Lastly, in *Slattery,* we granted qualified immunity to an officer who shot a man who ignored the officer's commands and began reaching for what the officer thought was a weapon. 939 F.2d at 215. We noted that "[a] police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Id.* at 216. Outside of that statement, there is scant analysis of the qualified immunity issue. *Id.* at 216–17. So *Slattery* does not clearly establish that Officer Guerra's conduct was unlawful; it hardly bears on the issue at all.

The point is not that the dicta in these cases is binding, or that officers are entitled to qualified immunity unless we've held otherwise on identical facts. It's simply that using cases in which there was no constitutional violation at all to show that an officer violated clearly established Fourth Amendment principles is a fraught endeavor. Such cases might show a constitutional violation, but they are unlikely to put the question "beyond debate."

All told, the majority has "failed to identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White*, 580 U.S. at 79, 137 S.Ct. 548. It has not shown that—based on our caselaw in September 2017—a reasonable officer would **\*301** have known that using deadly force in these circumstances was clearly unlawful, beyond debate. Officer Guerra's conduct *at least* falls in the "hazy border" between the unreasonable use of force in *Cooper* and the reasonable uses of force in *Anderson,* *Sigman,* *Elliott,* *McLenagan,* and *Slattery*. *See Mullenix*, 577 U.S. at 18, 136 S.Ct. 305 (quoting *Brosseau*, 543 U.S. at 201, 125 S.Ct. 596). That means he is entitled to qualified immunity. *Wilson v. Prince George's County*, 893 F.3d 213, 223 (4th Cir. 2018).

\* \* \*

"Qualified immunity is controversial, contested, and binding." *Stanton v. Elliott*, 25 F.4th 227, 237 (4th Cir. 2022) (cleaned up). While many criticize the doctrine, lower court judges are duty-bound to faithfully apply it so long as it exists. The majority does not. It instead joins the lengthy list of courts of appeals to improperly deny qualified immunity in a Fourth Amendment case. [5] I refuse to join that list and respectfully dissent.

**All Citations**

80 F.4th 264

---

## Footnotes

1    Of course, pursuant to the applicable summary judgment standard, we must view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). That means we must view the facts in the plaintiff's favor when considering the summary judgment motions of Officer Guerra and the City, and in those defendants' favor when considering the plaintiff's cross-motion for partial summary judgment.

2    The English language transcripts of the two 911 calls quoted herein are unverified translations that the defendants provided in discovery and that the plaintiff has invoked in the summary judgment proceedings. *See* J.A. 243-48. (Citations herein to "J.A. ——" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

3    The Galindo event information thus reported the two names that he gave the dispatcher — "El Dios Estrella" and "Ruben Galindo" — without explaining that "El Dios Estrella" translates to "the Star God." *See* J.A. 113.

4    Plaintiff Azucena Zamorano Aleman was inside the apartment at the time of the fatal shooting and was heard screaming in the background of Galindo's still-connected second 911 call, which had been made on a cell phone that Galindo was carrying during the encounter with Officer Guerra and his colleagues. The plaintiff has described the video footage from the officers' body cameras as showing her rushing outside, shouting "Ruben," and becoming hysterical when she saw Galindo's body on the ground. The plaintiff asserts that she has since been diagnosed with severe chronic depression and post-traumatic stress disorder related to the shooting.

5    We note that, in summary judgment proceedings, a court may consider an expert report that would itself be inadmissible at trial where "the party submitting the evidence shows that it will be possible to put the information into an admissible form." *See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015)

(alterations and internal quotation marks omitted). That showing must be made where there has been an objection to the court's consideration of the expert report on grounds of inadmissibility. 🔖 *Id.* at 538-39 (citing Fed. R. Civ. P. 56(c)(2)). Here, however, no such objection was lodged.

6    The plaintiff has also pointed out that the video footage contradicts the assertions of both Guerra and Tran-Thompson that Guerra's Spanish command to Galindo was "manos arriba" ("put your hands up"), rather than simply "manos" ("hands"). After viewing the video footage, Guerra conceded during his deposition that he said only "manos."

7    In the cases wherein qualified immunity had been denied, we were also required to accept the facts as viewed by the district court. *See, e.g.,* 🔖 *Cooper,* 735 F.3d at 157 (recognizing that our jurisdiction under the collateral order doctrine was limited to the "claim that there was no violation of clearly established law accepting the facts as the district court viewed them" (quoting 🔖 *Winfield v. Bass,* 106 F.3d 525, 530 (4th Cir. 1997) (en banc))).

8    Our recitation of the facts in the light most favorable to the plaintiff is drawn from the record before us, including the 911 dispatch records, the video footage from the responding officers' body cameras, the officers' deposition testimony and records of their interviews with police department investigators, and the reports and deposition testimony of the parties' expert witnesses.

9    We focus herein on the 🔖 *Graham* factor of whether the suspect posed an immediate threat because, where deadly force has been used, it "is particularly important." *See* 🔖 *Franklin,* 64 F.4th at 531. In any event, due to the facts of this case, the other factors specified in 🔖 *Graham* — "the severity of the crime at issue" and whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," *see* 🔖 490 U.S. at 396, 109 S.Ct. 1865 — are "not particularly germane to our analysis." *See* 🔖 *Knibbs,* 30 F.4th at 215-16 (concluding same where the defendant officer "was only trying to investigate a dispute between neighbors that may have involved an attempted misdemeanor property crime").

1    There is an exception—which the majority doesn't purport to rely on—for when the constitutional violation is "obvious ... even though existing precedent does not address similar circumstances." 🔖 *Wesby,* 138 S. Ct. at 590.

2    The majority defines the question as "whether it was clearly established in September 2017 that an officer would contravene the Fourth Amendment by using deadly force against a suspect who is holding a firearm in his hand and ignoring commands to drop the weapon, but who is standing still in a position of surrender, is not firing the weapon or aiming it at any person, and is not otherwise making a furtive or threatening movement that would suggest he had an intent to use the weapon to harm the officer or anyone else." Majority Op. at 295.

3    We specifically noted in 🔖 *Hensley* that the officers "failed to raise—and, therefore, have waived—any argument that the right at issue was not clearly established." 🔖 *Id.* at 580. So the only question was whether a constitutional violation occurred. 🔖 *Id.* at 580–81.

4    You might think the majority would be concerned that every actor involved in this litigation disagrees with it. Ordinarily this wouldn't be much of a problem. That others might think us wrong should not stop us from doing what we think is right. But when the question is whether something is beyond debate, it should give us pause when both parties and the district court judge go the other way.

5    *See, e.g.,* 🔖 *Bond,* 142 S. Ct. 9; 🔖 *Rivas-Villegas v. Cortesluna,* —— U.S. ——, 142 S. Ct. 4, 211 L.Ed.2d 164 (2021); 🔖 *City of Escondido v. Emmons,* —— U.S. ——, 139 S. Ct. 500, 202 L.Ed.2d 455 (2019); 🔖 *Kisela,* 138 S. Ct. 1148;

*Wesby*, 138 S. Ct. 577; *White*, 580 U.S. 73, 137 S.Ct. 548; *Mullenix*, 577 U.S. 7, 136 S.Ct. 305; *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014); *Carroll v. Carman*, 574 U.S. 13, 135 S.Ct. 348, 190 L.Ed.2d 311 (2014); *Stanton v. Sims*, 571 U.S. 3, 134 S.Ct. 3, 187 L.Ed.2d 341 (2013); *Ryburn v. Huff*, 565 U.S. 469, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Brosseau*, 543 U.S. 194, 125 S.Ct. 596.

---

**End of Document**        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

48 F.4th 1193

United States Court of Appeals, Tenth Circuit.

Vicki Jo LEWIS and Troy Levet Lewis, individually and as co-personal

representatives of the Estate of Isaiah Mark Lewis, deceased, Plaintiffs - Appellees,

v.

CITY OF EDMOND, an Oklahoma municipal corporation; Police Sergeant Milo Box, Defendants,

and

Police Officer Denton Scherman, Defendant - Appellant.

No. 21-6081

|

FILED September 16, 2022

**Synopsis**

**Background:** Suspect's estate brought § 1983 action against police officer, alleging excessive force in violation of Fourth Amendment after officer fatally shot suspect. The United States District Court for the Western District of Oklahoma, David L. Russell, J., 🚩 2021 WL 2815851, denied officer's motion for summary judgment based on qualified immunity. Officer appealed.

The Court of Appeals, Baldock, Circuit Judge, held that law was not clearly established that officer's conduct constituted excessive force.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**\*1194 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA (D.C. No. 5:19-CV-00489-R)**

**Attorneys and Law Firms**

Kathryn D. Terry (Catherine L. Campbell and Cody J. Cooper, with her on the briefs), Phillips Murrah, P.C., Oklahoma City, Oklahoma, for Defendant-Appellant.

Devi M. Rao, Roderick & Solange MacArthur Justice Center (Daniel M. Greenfield, Roderick & Solange MacArthur Justice Center, Northwestern Pritzker School of Law, Chicago, Illinois, Easha Anand, Roderick & Solange MacArthur Justice Center, San Francisco, California, and Christina N. Davis, Roderick & Solange MacArthur Justice Center, Washington, D.C. on the brief), Washington, D.C., for Plaintiffs-Appellees.

Before HARTZ, BALDOCK, and McHUGH, Circuit Judges.

**Opinion**

BALDOCK, Circuit Judge.

Officer Denton Scherman of the Edmond, Oklahoma Police Department shot an unarmed assailant, Isaiah Mark Lewis, four times (a fifth shot missed). Lewis died as a result of his wounds. Plaintiffs, the representatives of Lewis's estate, brought this

civil rights action under 42 U.S.C. § 1983 alleging Defendant Scherman used **\*1195** excessive force against the decedent in violation of the Fourth Amendment. Scherman now appeals the district court's decision denying his motion for summary judgment based on qualified immunity. *Lewis v. City of Edmond*, No. CIV-19-489-R, 2021 WL 2815851 (W.D. Okla. July 6, 2021). We reverse.

Our jurisdiction to review this denial, though limited, arises under 28 U.S.C. § 1291 via the collateral order doctrine. *See Duda v. Elder*, 7 F.4th 899, 909–10 (10th Cir. 2021). Our jurisdiction is limited because at this intermediate stage of the litigation, controlling precedent generally precludes us from reviewing a district court's factual findings if those findings have (as they do here) at least minimal support in the record. *See Lynch v. Barrett*, 703 F.3d 1153, 1158–60, 1160 n.2 (10th Cir. 2013). In such case, "[t]hose facts explicitly found by the district court, combined with those that it likely assumed, ... form the universe of facts upon which we base our legal review of whether [a] defendant[ ] [is] entitled to qualified immunity." *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008). Our legal review, which is de novo, is confined to "(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, and (2) whether th[e] [applicable] law was clearly established at the time of the alleged violation." *Dalton v. Reynolds*, 2 F.4th 1300, 1307–08 (10th Cir. 2021) (cleaned up) (quoting *Roosevelt-Hennix v. Drickett*, 717 F.3d 751, 753 (10th Cir. 2013)).

Defendant Scherman does not dispute the facts recited by the district court, when viewed in a light most favorable to Plaintiffs, suffice to show a violation of the decedent's Fourth Amendment right to be free from excessive force. *See City & Cty. of S.F. v. Sheehan*, 575 U.S. 600, 603, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015) ("Because this case arises in a summary judgment posture, we view the facts in the light most favorable to ... the nonmoving party."). Accordingly, we assume without deciding that those facts are sufficient to establish a constitutional violation. What Scherman does dispute is the district court's holding that the law was clearly established at the time of the incident such "that *every* reasonable [officer] would have understood" Scherman's actions, given the facts knowable to him, violated decedent's constitutional right. *Rivas-Villegas v. Cortesluna*, —— U.S. ——, 142 S. Ct. 4, 7, 211 L.Ed.2d 164 (2021) (per curiam) (emphasis added) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (per curiam)); *see also White v. Pauly (Pauly I)*, 580 U.S. 73, 76–77, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (per curiam) ("Because this case concerns the defense of qualified immunity, ... the Court considers only the facts that were knowable to the defendant officers.").

## I.

The facts recited by the district court are as follows. Lewis was at his girlfriend's house around 10:30 a.m. on April 29, 2019, when she noticed he was acting strangely. An altercation arose after Lewis asked to look at his girlfriend's cell phone. An individual outside the house heard the altercation. Around 1:00 p.m., a neighbor called 911 and stated a young man was "beating up" a girl. *Lewis*, 2021 WL 2815851, at \*1. In response to the call, police officers arrived on the scene around 1:04 p.m. Upon their arrival, Lewis's girlfriend told the officers that reports of a physical altercation between the two were overblown.

While officers were en route, Lewis removed his clothing and fled his girlfriend's house on foot. For the next hour or so, Lewis eluded police by running naked around the neighborhood and hiding. Although not part of the initial response team, Sergeant Milo Box and Defendant Scherman were assisting in the search for **\*1196** Lewis when they spotted him in a yard in a nearby neighborhood. Box and Scherman both knew a call referencing a domestic disturbance triggered the original dispatch. As Scherman slowly drove past Lewis, Box exited the patrol car, identified himself as a police officer, pointed his taser at Lewis, and commanded him to stop and get on the ground. Rather than comply, Lewis turned toward the nearest residence and forced his way inside by busting through the front door's oval glass window.

After watching Lewis physically break through the front door, Sergeant Box believed the residence was not Lewis's home. Whether anyone was in the home was unknown. Box followed Lewis inside. Box observed Lewis attempting to exit the back door and again commanded him to stop and get on the ground. Lewis then turned on Box and charged at him. Box deployed his taser on Lewis without effect. While Box and Lewis "fought" in the living room, Box deployed his taser a second time, again without effect. 🚩 *Id.* By this time, Defendant Scherman had entered the residence.

Scherman moved from the front entry hallway, a "small space," into the living room where he observed "Lewis pummeling Box," a felony under Oklahoma law. 🚩 *Id* at *1, *7; see* Okla. Stat. tit. 21, § 649(B) (proscribing assault and battery upon a police officer). According to the district court, while Scherman watched, "Lewis 'continued to strike Box in the head, face, and neck,' and Box attempted to use his taser [a third time] to 'drive stun' Lewis." 🚩 *Lewis,* 2021 WL 2851851, at *1. The taser failed to subdue Lewis, and Box disappeared from Scherman's line of sight. Lewis then turned toward Scherman, whom the district court described as an "undersized officer." 🚩 *Id.* at *7. Scherman drew his firearm. As Lewis advanced toward him, Scherman shot Lewis four times in the front of his body. Lewis sustained gunshot wounds to his face, groin, and both thighs.

At the point Defendant Scherman began shooting, the parties' respective versions of events diverge, so an understanding of what the district court actually found is critical. In the district court's words:

> [T]he Plaintiffs do not dispute that after his fight with Box in the living room, Lewis turned toward Scherman and advanced in his direction as Scherman backed down the entry hallway toward the front door. Four gunshot wounds in the front of Lewis's body and the bullet casings recorded in the Edmond police department's crime scene sketch confirm this account.

🚩 *Id.* at *2 (record citations omitted). Notably, however, the district court rejected as contrary to Plaintiffs' evidence Defendant Scherman's claim (1) that Lewis barreled toward or charged him in a tackling position, (2) that Lewis was close enough to land a punch on his face, and (3) that he shot Lewis from close range. Instead, Plaintiffs say Lewis "moved his arms in a windmill motion" while he advanced towards Scherman and he was "more than one and a half to two feet away from Scherman when Scherman discharged his firearm." 🚩 *Id.* (internal brackets omitted).

## II.

On the question of whether Defendant Scherman violated Lewis's right to be free from excessive force, the district court found that "after Scherman first shot Lewis, Lewis no longer 'continued to barrel toward him ....' A reasonable jury could conclude that, *after* Scherman discharged his firearm once, Lewis no longer presented a threat of serious physical harm" to Scherman or others. [1] 🚩 *Id.* at *7 (cleaned up) **\*1197** (emphasis added); *see* 🚩 *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (holding that where a suspect poses no immediate threat to the officer or others, the use of deadly force is excessive). As noted, Scherman does not challenge the district court's finding that when he shot Lewis multiple times, his use of force was objectively unreasonable and violated the Fourth Amendment. *See* 🚩 *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding an objective reasonableness standard governs Fourth Amendment excessive force claims). The only question for our resolution then is whether the law at the time of the incident was "clearly established," or, in other words, provided "fair warning" to a reasonable officer that his conduct was unconstitutional. 🚩 *Hope v. Pelzer,* 536 U.S. 730, 739–41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Because Defendant Scherman raised the defense of qualified immunity,

Plaintiffs have the burden of demonstrating the constitutional violation was clearly established on the date of the incident, April 29, 2019. [2] *See* *Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1168–69 (10th Cir. 2020).

So what constitutes the fair warning necessary for us to conclude the law was clearly established? According to Plaintiffs, "it has been clearly established for over a decade that the use of deadly force is unreasonable when a reasonable officer would have perceived that the threat has passed." Appellee's Br. at 27 (internal quotes omitted). Plaintiffs posit that because the district court found any serious threat to Scherman had passed after the first shot, at the very least "clearly established law forbade Scherman's second, third, and fourth shots." *Id.* at 27–28. Contrary to Plaintiffs' approach, however, the Supreme Court has told us *ad nauseam*, most recently in *City of Tahlequah v. Bond*, "not to define clearly established law at too high a level of generality." —— U.S. ——, 142 S. Ct. 9, 11, 211 L.Ed.2d 170 (2021) (per curiam); *see also* *Pauly I*, 580 U.S. at 79, 137 S.Ct. 548 ("Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011))). Statements derived from *Tennessee v. Garner* and its progeny that lay out excessive force principles or rules "at only a general level" "do not by themselves create clearly established **\*1198** law." [3] *Id.* at 79–80, 137 S.Ct. 548 (internal quotes and cites omitted).

Consistent with the Supreme Court's instructions, our inquiry "must be undertaken in light of the specific context of the case, not ... [the] broad general proposition" Plaintiffs endorse. *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)). While we do not require a prior case directly on point for the law to be clearly established, the Supreme Court tells us the law must be "settled." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018). This means "controlling authority" at the time of the incident, *i.e.*, a Supreme Court or Tenth Circuit published decision, or a "robust consensus of cases of persuasive authority," made clear the unconstitutionality of Defendant Scherman's use of deadly force against Lewis. *Id.* at 589–90 (cleaned up).

That then-existing precedent may have "suggested" the unconstitutionality of Scherman's conduct is insufficient. *Id.* at 590. The precedent "must be clear enough that *every* reasonable official would interpret it to establish" the unconstitutionality of Scherman's conduct. *Id.* (emphasis added). In other words, Scherman "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any* reasonable official in [Scherman's] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) (emphasis added). Existing precedent "must have placed the [un]constitutionality of [Defendant Scherman's] conduct 'beyond debate,'" a demanding standard the Supreme Court says "requires a high 'degree of specificity.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *Mullenix*, 577 U.S. at 13, 136 S.Ct. 305). The clearly established standard requires that the legal principle Plaintiffs seek to apply "clearly prohibit [Scherman's] conduct *in the particular circumstances before him.* The rule's contours must be so well defined that it is clear to a reasonable officer that [Scherman's] conduct was unlawful *in the situation he confronted."* *Id.* at 590 (emphasis added) (internal quotes omitted).

Even more to the point, the Supreme Court has also repeatedly stressed the importance of specificity in the context of excessive force claims arising under the Fourth Amendment. *See, e.g.*, *City of Escondido v. Emmons*, —— U.S. ——, 139 S. Ct. 500, 503, 202 L.Ed.2d 455 (2019) (per curiam). Specificity in such context is important because circumstances that are "tense, uncertain, and rapidly evolving" often force police officers to make "split-second judgments ... about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. However tempting, we must avoid the "20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. Rather, we must recognize that an officer may have difficulty determining

"how the relevant legal doctrine ... will apply to the factual situation the officer confronts." [4] **\*1199** *Kisela v. Hughes,* —— U.S. ——, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) (quoting *Mullenix,* 577 U.S. at 12, 136 S.Ct. 305). Claims of excessive force turn "very much on the facts of each case," and a police officer is entitled to qualified immunity unless existing prior precedent "squarely governs" the specific facts at issue. *Id.* at 1153 (quoting *Mullenix,* 577 U.S. at 13, 136 S.Ct. 305).

### III.

In this case, the district court contravened the settled principles the Supreme Court has instructed us time and time again to apply when a police officer raises the defense of qualified immunity in response to a Fourth Amendment excessive force claim. Simply put, none of the cases cited by the district court or Plaintiffs decided before April 29, 2019 "squarely governs," *Brosseau,* 543 U.S. at 201, 125 S.Ct. 596, the case at bar or places the unconstitutionality of Defendant Scherman's use of force "beyond debate," *al-Kidd,* 563 U.S. at 741, 131 S.Ct. 2074. Nor has our independent research uncovered such a case. Moreover, we remain mindful that cases decided after Lewis's death are of "*no use* in the clearly established inquiry." *City of Tahlequah,* 142 S. Ct. at 12 (emphasis added) (citing *Brosseau,* 543 U.S. at 200 n.4, 125 S.Ct. 596); *see also Kisela,* 138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious.").

Let us begin our comparison with prior precedent as it existed on April 29, 2019, by observing that this is not a case where an officer's alleged reckless conduct created the need to use deadly force against Lewis. *See Pauly v. White* (*Pauly II*), 874 F.3d 1197, 1219–21 (10th Cir. 2017) (on remand). So a case such as *Allen v. Muskogee,* 119 F.3d 837 (10th Cir. 1997), cited by both Plaintiffs and the district court, has no bearing on the outcome here. "The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect [who was threatening no one], and attempting to physically wrest a gun from his hands." *City of Tahlequah,* 142 S. Ct. at 12; *see Allen,* 119 F.3d at 839. As a result, the suspect ended up pointing his gun at one of the officers and was, in turn, fired upon twelve times and shot four times. *Id.* In contrast, the district court in our case found "it was objectively reasonable for [Sergeant] Box to exit [the] vehicle [Defendant Scherman was driving], announce his presence, and point a taser at Lewis." *Lewis,* 2021 WL 2815851, at \*5. The court further found Box acted reasonably when he pursued Lewis after Lewis refused to comply with Box's commands to "get down" and instead physically broke into a nearby residence. *Id.*

At this point, Scherman undoubtedly was aware that Lewis, in his efforts to evade arrest, had broken into a residence that probably was not his own and was fleeing from Box, who was in hot pursuit. Unlike the facts of any decision we have encountered, Defendant Scherman entered the residence's front entrance shortly thereafter and observed Lewis actively battering Sergeant Box in the living room, a violent felony under Oklahoma law. Lewis **\*1200** was "pummeling Box," which means he was striking Box repeatedly with his fists. *Id.* at \*1. In fact, Scherman witnessed Lewis "continue[ ] to strike Box in the head, face, and neck." *Id.* He also witnessed Box unsuccessfully "attempt[ ] to use his taser to 'drive stun' Lewis." *Id.* When Box disappeared from sight and Lewis turned his focus to Scherman, Scherman could reasonably presume Box *at the very least* had been rendered immobile if not seriously injured as a result of his encounter with Lewis. And Scherman knew Lewis had ignored Box's commands and was unaffected by Box's taser. Lewis backed up within a confined space while Scherman moved forward, swinging his arms in a windmill fashion. When Scherman fired his first shot, Lewis was "more than one and half to two feet away from Scherman" *Id.* at \*2. How much "more" the district court does not say. But this finding in itself does not

suggest a significant distance. Indeed, the court found as to Scherman's first shot that "a reasonable, undersized officer without the benefit of hindsight could have believed he faced danger of serious bodily harm." *Id.* at *7.

The totality of these facts readily distinguish our case from cases on which Plaintiffs rely in an effort to meet their burden. *See Arnold v. City of Olathe,* 35 F.4th 778, 789 (10th Cir. 2022) ("[O]ur reasonableness inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." (internal quotes omitted)). For instance, in *Perea v. Baca,* 817 F.3d 1198 (10th Cir. 2016), officers performing a welfare check chased the decedent, a suspected unarmed misdemeanant, off his bicycle and repeatedly tased him (up to ten times) within a span of two minutes after he had been subdued. *Id.* at 1200–04. In *Fancher v. Barrientos,* 723 F.3d 1191 (10th Cir. 2013), the officer, responding to a report of stolen beer, fired his weapon into the suspect's chest after the suspect took control of the officer's still-running patrol vehicle that the officer had left to pursue the suspect on foot. After the first shot, the officer saw the suspect slump. The officer testified that after the first shot, he stepped away from the vehicle and felt safer before firing at the suspect six more times. We explained the officer fired six shots into a suspect that was no longer able to control the patrol vehicle, escape, or fire the long guns located inside the vehicle. Prior to his additional shots, the officer stepped back, felt safer, and noticed the decedent had slumped. This provided the officer enough time to recognize and react to the changed circumstances and cease firing. *Id.* at 1194–98, 1201. Finally, in *Carr v. Castle,* 337 F.3d 1221 (10th Cir. 2003), a fleeing suspect, otherwise unarmed, threw a four-inch piece of concrete at two officers. After the suspect had thrown the concrete, the officers fired eleven shots at him. All the shots that hit the decedent entered his back side, with the fatal shot entering his buttocks and coming to rest in his heart. According to plaintiff's expert, this could have occurred only if the decedent had his head near the ground with his buttocks slightly elevated, hardly a position from which to threaten the officers. *Id.* at 1225, 1227.

Understandably, the district court relied on none of these cases to conclude the law was clearly established at the time Defendant Scherman fatally shot Lewis. This is because in all of these decisions the suspect had *clearly* been subdued in an outdoors setting, making the continued use of deadly force plainly unjustifiable. In contrast, the present case presents a situation where Defendant Scherman had good reason to believe Lewis in his attempts to evade arrest had battered Sergeant Box into submission before turning his attention to Scherman, all within a confined **\*1201** area. And Scherman knew all too well that verbal commands and force less lethal than a gun shot had been unsuccessful in stopping Lewis's rampage. When, after the first shot, Lewis continued to advance toward Scherman in this confined area, no prior decision placed "beyond debate," *Mullenix,* 577 U.S. at 14, 136 S.Ct. 305, the proposition that Scherman's subsequent shots in a "tense, uncertain, and rapidly evolving" situation requiring a "split-second" judgment constituted excessive force in violation of the Fourth Amendment. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. These prior cases on which Plaintiff relies do not "squarely govern[ ]" the outcome here because none of them held an officer violated the Fourth Amendment while acting under circumstances similar to those Defendant Scherman faced. *Brosseau,* 543 U.S. at 201, 125 S.Ct. 596.

Rather, the district court relied on our decision in *Estate of Ceballos v. Husk,* 919 F.3d 1204 (10th Cir. 2019), decided in March 2019, to conclude that "even though Lewis was approaching Scherman," an objective officer would have been on notice that continuing to employ deadly force violated the Fourth Amendment. *Lewis,* 2021 WL 2815851, at *8. In *Ceballos,* however, the suspect was "in his own driveway, with no one else around, and he was fully contained at the time he was shot and killed." 919 F.3d at 1220. Unlike our case, *Ceballos* was not only about whether an officer was in danger at the precise moment he used deadly force, but also, like *Allen,* whether an officer's own conduct in carelessly approaching a suspect unreasonably created the need to use such force.

In *Ceballos,* the suspect's wife summoned police because her husband was in the driveway of their home, swinging a baseball bat, and acting crazy. No one was in the immediate vicinity of Ceballos (everyone had retreated down the street) when two

officers began approaching him from around 100 yards and shouting commands to drop the bat. Ceballos retreated into his garage and one officer drew his firearm. Ceballos emerged from his garage with the bat still in his hand and began walking toward the officers. When Ceballos did not comply with commands to stop and drop the bat, the officer who drew his firearm shot and killed Ceballos. All this occurred within a minute of officers arriving on the scene. 🚩 *Id.* at 1209–11, 1216, 1218. The two officers testified they did not retreat from Ceballos because "they wanted to contain him and prevent him from running away and endangering the public." 🚩 *Id.* at 1210–11. A third officer on the scene stated "he did not think that either his own life or the lives of the other officers were in danger given their respective distances from Ceballos and that he was armed with a baseball bat." 🚩 *Id.* at 1210. Under the plaintiff's version of the facts, which the defendant officer accepted for purposes of appeal, the officers "approached Ceballos quickly, screaming at [him] to drop the bat and refusing to give ground as Ceballos approached [them]." 🚩 *Id.* at 1216. We explained that, based on 🚩 *Allen*, the law was clearly established that an officer violates the Fourth Amendment when his reckless conduct results in the need for lethal force. We further explained that 🚩 *Allen* clearly established that an officer acts unconstitutionally when he relies on lethal force as a first resort in confronting an irrational suspect armed with a weapon of short-range lethality who is on his own property. 🚩 *Id.* at 1219.

The first important difference between our case and 🚩 *Ceballos* is the district court found Sergeant Box acted reasonably when he initially approached Lewis. Unlike in 🚩 *Allen* or 🚩 *Ceballos,* the fact that Box and Scherman pursued Lewis into a house they saw Lewis physically break into did not unreasonably escalate the situation. A second difference is Defendant Scherman **\*1202** knew before drawing his firearm that Lewis (1) had not responded to non-lethal force, (2) had, by whatever means, rendered Box immobile, and (3) was committing a violent felony upon Box's person. A third difference is Scherman and Lewis were in a confined area making it difficult if not impossible for Scherman to retreat as Lewis advanced toward him while swinging his arms.

We need not belabor the point. Neither the district court nor Plaintiffs have identified a precedent finding a Fourth Amendment violation under the circumstances Defendant Scherman faced in this case. None of the cases they identify provided *fair notice* to Defendant Scherman that his repeated use of lethal force was unconstitutional when Lewis approached Scherman in a "small" hallway, "mov[ing] his arms in a windmill motion" after Scherman has just observed Lewis "pummeling Box until Box disappeared from Scherman's line of sight." 🚩 *Lewis,* 2021 WL 2815851, at \*7 (internal quotes omitted). Accordingly, Plaintiffs have failed to meet their burden of showing the law was clearly established such "that *every* reasonable [officer] would have understood" that the force Scherman used against Lewis was excessive under the circumstances presented. 🚩 *Rivas-Villegas,* 142 S. Ct. at 7 (emphasis added) (quoting 🚩 *Mullenix,* 577 U.S. at 11, 136 S.Ct. 305).

The judgment of the district court denying Defendant Scherman qualified immunity is reversed and this case is remanded for entry of judgment in his favor.

REVERSED and REMANDED.

**All Citations**

48 F.4th 1193

---

**Footnotes**

1    Throughout their brief, Plaintiffs presume the district court's rejection of Scherman's claim that after the first shot, Lewis "continued to barrel toward him" constitutes a finding that "Scherman's first shot stopped [Lewis] in his tracks" so that Lewis "ceased moving toward Scherman after the first shot." Appellees' Br. at 30, 35 n.18; *see also id.* at 2, 12, 28, 43. But the district court made no such finding and the wounds in the front of Lewis's body certainly suggest otherwise. One may advance toward another without barreling toward him. *See* Webster's Third New International Dictionary 179 (Philip Babcock Gove ed., 1981) (defining "barrel" as "to travel fast"). Our point is well illustrated by the district court's later observation and conclusion that "even though Lewis was approaching Scherman," his use of force violated clearly established law. 🚩 *Lewis*, 2021 WL 2815851, at \*8. In light of the court's prior statement that Scherman no longer faced a serious risk of harm *"after* [he] discharged his firearm once," *i.e.*, the first shot did not constitute excessive force, this latter statement, made in the context of the court's clearly established analysis, can only be read to mean Lewis continued to advance toward Scherman after the first shot. 🚩 *Id.* at \*7 (emphasis added).

2    "This clearly established standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." 🏳 *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (cleaned up).

3    Plaintiffs do not argue the present controversy is "the rare 'obvious case,' where the unlawfulness of the office's conduct is sufficiently clear even though existing precedent does not address similar circumstances." 🏳 *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 590, 199 L.Ed.2d 453 (2018). And most assuredly this case does not present the sort of facts "where a body of relevant case law is not needed" to overcome a qualified immunity defense. 🏳 *Id.* at 591 (internal quotes omitted); *cf.* 🏳 *Hope*, 536 U.S. at 741, 122 S.Ct. 2508 (use of a hitching post to unnecessarily and wantonly inflict punishment on an inmate constitutes an obvious and therefore clearly established Eighth Amendment violation).

4    Plaintiffs provide us with numerous examples of 20/20 hindsight in their brief. For instance, Plaintiffs argue that while Lewis fought with Box, "Scherman did not attempt to restrain [Lewis] or deploy his own taser at that time notwithstanding his 'clear tactical advantage' while [Lewis] was turned away and struggling with Box." Appellee' Br. at 11. Without any citation to a prior case with similar facts, we fail to see how such an argument bears on the question of whether the unlawfulness of Defendant Scherman's conduct was clearly established under the rapidly evolving circumstances he confronted. While such argument may bear upon the (un)reasonableness of Scherman's conduct, that question is not before us.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.